No. 25-1452

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

CALVARY CHAPEL BELFAST,
*Plaintiff-Appellant,*

v.

UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE
UNIVERSITY OF MAINE SYSTEM; RYAN LOW, individually and in their
official capacity as Vice Chancellor for Finance and Administration, University of
Maine; RACHEL PIPER, in their official capacity as Executive Director of
Strategic Procurement and Services, University of Maine System; ROBIN CYR, in
their official capacity as Senior Director of Strategic Procurement, University of
Maine System; DEREK HOUTMAN, in their official capacity as Associate
Strategic Sourcing Director, University of Maine System,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maine, Bangor Division
Case No. 1:24-cv-00392-SDN (Hon. Stacey D. Neumann)

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

Stephen C. Whiting
WHITING LAW FIRM
75 Pearl St., Ste. 207
Portland, ME 04101
(207) 780-0681
steve@whitinglawfirm.com

Mathew D. Staver,
  *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Plaintiff Calvary Chapel Belfast is a nonprofit local independent church formed pursuant to Me. Rev. Stat. tit. 13, § 3021. The Church is part of the global Calvary Chapel association but has no parent corporation, issues no stock, is not incorporated, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT......................................................................ii

TABLE OF AUTHORITIES.......................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT..........................viii

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT.......................................................... 6

STATEMENT OF THE ISSUE.................................................................. 7

STATEMENT OF THE CASE .................................................................. 8

    A.   Background ...................................................................................... 8

        1.   The System's Sale of the Hutchinson Center. ...................... 8

        2.   The Church's Winning Bid to Purchase the Hutchinson
Center. ................................................................................10

        3.   "Appalled and Horrified": The Unprecedented Backlash
against the Church's Winning Bid. ....................................11

        4.   The System's Experts Deny the Disappointed Bidders'
Discriminatory Protest Appeals. ........................................15

        5.   The System's Vice Chancellor Revokes the Church's
Winning Bid. ......................................................................17

    B.   Procedural History...................................................................26

STANDARD OF REVIEW....................................................................29

SUMMARY OF THE ARGUMENT .......................................................29

ARGUMENT .........................................................................................32

I.   The Church has established a strong likelihood that it will prevail
on the merits of its Equal Protection Clause claim. ........................32

    A.   Circumstantial evidence is sufficient to prove that a
government decisionmaker was motivated at least in part by
discriminatory intent...............................................................32

    B.   The district court erred as a matter of law by requiring a
provable connection between the religiously hostile community
animus and the System's alleged procedural irregularities.....35

C. The district court erred by discounting the cumulative weight of probative evidence showing that the System's revocation of the Church's award was motivated at least in part by discriminatory intent...............................................................45

    1. The specific sequence of events shows that the System bowed to unprecedented pressure from donors, alumni, and vocal community members, all of which was steeped in religious animus...............................................................46

    2. The System revoked the Church's award after overruling the findings of its strategic-procurement experts. ..............51

    3. The System bypassed its procurement policies and the terms of the RFP to revoke the Church's award. ................54

    4. The discriminatory impact of the System's decision was clearly foreseeable...............................................................61

    5. The System ignored less discriminatory avenues. ..............63

II. For the same reasons set forth in its Equal Protection claim, the Church is likely to prevail on its Free Exercise claim. ....................64

III. The System's revocation of the Church's winning bid cannot withstand strict scrutiny...............................................................66

IV. The Church meets the remaining factors for injunctive relief........66

CONCLUSION ........................................................................................67

# TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty.,*
515 F.3d 356 (4th Cir. 2008) ................................................................36

*A.F.A.P.S. v. A.R.P.E.,*
740 F. Supp. 95 (D.P.R. 1990) .......................................................37, 38

*Alexander v. S.C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ...............................................................................55

*Anderson v. Bessemer City,*
470 U.S. 564 (1985) .............................................................................55

*Avenue 6E Invs., LLC v. City of Yuma,*
818 F.3d 493 (9th Cir. 2016) ....................................................... passim

*Calvary Chapel Belfast v. Univ. of Maine Sys.,*
2025 WL 71701 (D. Me. Jan. 10, 2025) ............................................26

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist.
Comm'n,*
768 F.3d 183 (2d Cir. 2014) ....................................................33, 35, 45

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ........................................................................65, 66

*Church of Scientology of Georgia, Inc. v. City of Sandy Springs,*
843 F. Supp. 2d 1328 (N.D. Ga. 2012) ..............................................62

*Cumpiano v. Banco Santander,*
902 F.2d 148 (1st Cir. 1990) ..............................................................55

*Dailey v. City of Lawton,*
425 F.2d 1037 (10th Cir. 1970) ...............................................36, 44, 45

*Doe v. Trump,*
766 F. Supp. 3d 266 (D. Mass. 2025) .................................................67

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) .............................................................................65

*Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter,*
456 F.3d 978 (9th Cir. 2006) ...............................................................64

*Hallmark Devs., Inc. v. Fulton Cnty.,*
466 F.3d 1276 (11th Cir. 2006) ...................................................36

*Innovative Health Sys., Inc. v. City of White Plains,*
117 F.3d 37 (2d Cir. 1997) .......................................................passim

*Innovative Health Sys., Inc. v. City of White Plains,*
931 F. Supp. 222 (S.D.N.Y. 1996) ...........................................42

*Jean v. Nelson,*
711 F.2d 1455 (11th Cir. 1983) ...........................................50, 63

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.,*
915 F.3d 256 (4th Cir. 2019) ......................................35, 39, 40, 51

*LeBlanc–Sternberg v. Fletcher,*
67 F.3d 412 (2d Cir. 1995) .........................................................43

*Lowe v. Mills,*
68 F.4th 706 (1st Cir. 2023) .......................................................66

*Macone v. Town of Wakefield,*
277 F.3d 1 (1st Cir. 2002) ...........................................................32

*Mem'l Hosp. v. Maricopa Cnty.,*
415 U.S. 250 (1974) ....................................................................66

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
819 F.3d 581 (2d Cir. 2016) .............................................42, 49, 54, 61

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................................67

*Palmore v. Sidoti,*
466 U.S. 429 (1984) ....................................................................50

*Pers. Adm'r of Massachusetts v. Feeney,*
442 U.S. 256 (1979) ...........................................................33, 34, 49

*Riordan v. Kempiners,*
831 F.2d 690 (7th Cir. 1987) ......................................................34

*Rubinovitz v. Rogato,*
60 F.3d 906 (1st Cir. 1995) .........................................................33

*Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale,*
46 F.4th 1268 (11th Cir. 2022) ...................................................35

*Scott-Harris v. City of Fall River,*
134 F.3d 427 (1st Cir. 1997) ................................................................36

*SECSYS, LLC v. Vigil,*
666 F.3d 678 (10th Cir. 2012) ............................................................34

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
699 F.3d 1 (1st Cir. 2012) ...................................................................29

*Smith v. Town of Clarkton,*
682 F.2d 1055 (4th Cir. 1982) ...............................................38, 39, 43

*United States v. Bd. of Sch. Comm'rs of City of Indianapolis,*
573 F.2d 400 (7th Cir. 1978) ..........................................................62, 63

*United States v. Yonkers Bd. of Educ.,*
837 F.2d 1181 (2d Cir. 1987) ..............................................................37

*Waldron v. George Weston Bakeries Inc.,*
570 F.3d 5 (1st Cir. 2009) ...................................................................29

*Washington v. Davis,*
426 U.S. 229 (1976) ............................................................................49

*Wine & Spirits Retailers, Inc. v. Rhode Island,*
418 F.3d 36 (1st Cir. 2005) .................................................................29

**Treatises**

Ivan E. Bodensteiner & Rosalie Berger Levinson, 3 *State and Local Government Civil Rights Liability* § 5:20............................................34

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1.................................................................31

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Local Rule 34.0(a), Appellant respectfully requests oral argument. This case presents an important and unresolved legal question in this Circuit about the probative value of racially or religiously hostile constituent pressure as direct and circumstantial evidence of discriminatory intent. Oral argument will help the Court resolve this unsettled question of law.

# INTRODUCTION

Imagine this scenario. A state agency decides to sell an underused building, so it issues a public request for proposals. After carefully evaluating three proposals, it selects a local charity as the winning bidder. The charity is run by minorities, and it plans to use the building as a rehabilitation center for inner-city youth and minority programs.

Immediately after state officials announce the winning bidder, outraged citizens flood the agency with complaints. Some express racially coded concerns about "changing the character of the area." Others are more blunt, accusing the agency of selling the building to "criminals from the ghetto" and saying it is "completely inappropriate" to sell it to an organization with a minority-focused mission. State lawmakers amplify the outrage, threatening to cut funding to the agency if the sale proceeds.

The two disappointed bidders join the fray. Lobbing racially charged rhetoric, they file appeals challenging the award, claiming the winning bidder's mission for minority programs is inconsistent with the purpose of the building and the racist desires of the community. But the agency's procurement specialists see these arguments for what they are—unfounded and discriminatory—so they reject the appeals outright.

Undeterred, the disappointed bidders escalate their appeals to a high-ranking agency official who rarely adjudicates procurement disputes. Amid the rising tide of racial animus and financial pressure, the official ignores the agency's own rules regarding adjudication of procurement appeals and summarily rescinds the charity's winning bid, invoking a logistical issue that agency policy expressly allowed the parties to negotiate.

That decision would not withstand scrutiny under the Equal Protection Clause. The agency rescinded the charity's winning bid against the findings of its procurement experts and in flagrant violation of the rules applicable to the bidding process, and while it was drowning in a maelstrom of racially charged community outrage, funding-cut threats, and political pressure.

Substitute religion in place of race, and the above example is *this case*. The University of Maine System[1] selected Calvary Chapel Belfast ("the Church") as the winning bidder to buy the Hutchinson Center, a System-owned building in Belfast, Maine. Vocal community members immediately expressed outrage that the System would sell the property

---

[1] This brief collectively refers to the Appellees as "the System."

to a church with traditional Christian beliefs and specifically noted their objection was to the Church's religious beliefs. Angry donors threatened to cut off millions of dollars in financial support, similarly denouncing the Church's biblical principles. Alumni, faculty, and local politicians likewise inundated the System with religiously bigoted threats and complaints. And the disappointed bidders protested that the Church's religious views were incompatible with the System's values and mission.

After the System's procurement experts rejected the disappointed bidders' discriminatory appeals, the matter reached the desk of the System's Vice Chancellor of Finance, Ryan Low. Surrounded by a deluge of community animus and threats from state legislators, donors, employees, and alumni, Low reacted as our hypothetical high-ranking official did: He blatantly ignored the rules governing appeals, overruled the procurement experts' rejection of those appeals, and nullified the Church's winning bid. His excuse? The terms, conditions, and specifications of the original RFP contained a cost-avoidance deficiency.

Decisions from at least four sister circuits make clear that when an adverse government action follows on the heels of bigoted community opposition, that sequence of events is valid direct and circumstantial

3

evidence of discriminatory intent. What is more, proffering a seemingly legitimate justification does not cleanse the decision of its discriminatory taint. It serves as only an unconstitutional pretext.

The district court nevertheless found that no link existed between extraordinary constituent backlash and the System's revocation of the Church's winning bid. In the district court's narrow view, Vice Chancellor Low's rationale—that the request for proposal did not adequately consider the cost of potentially relocating a System-operated network hub from the building—was credible enough to deflect any inference of discriminatory intent "from within the System." But that gets the inquiry wrong. A procedural irregularity is *one* piece of circumstantial evidence for a court to consider—*it is not a necessary element*. The district court thus confined itself to a keyhole view, looking away from the mountain of undisputed evidence showing that the System was under unprecedented pressure to placate university donors, alumni, employees, and local politicians. Some of this opposition was coded; others more brazen; all of it motivated by animus towards the Church.

It is hardly surprising that the System's decisionmaker could point to the seemingly neutral rationale of a cost-avoidance deficiency in the

original request for proposal. But courts have long recognized that public officials will almost always offer a plausible (albeit, pretextual) excuse for a discriminatory decision. That is what makes circumstantial evidence indispensable. The Equal Protection Clause would be toothless if it required an admission of bias or a smoking gun. For that reason, Supreme Court precedent demands more than a blinkered focus on procedural irregularities; it calls for a hard look at whether the facts, taken together, suggest even the slightest motivation to discriminate.

Here, the sequence of events speaks volumes. The Church was the winning bidder. Donors and alumni declared they were "shocked" and "horrified" by the decision, with one cutting the University of Maine out of their will. Professors piled on the Board of Trustees, declaring they were "appalled." And then Vice Chancellor Low stepped in, ignored the rules governing procurement appeals, considered appeals that his sworn testimony showed he was prohibited from considering, overruled the experts in the procurement office, and reversed the award—although the network hub's relocation was both optional and negotiable. Triggered by unprecedented political and financial pressure, that cascade of events more than suffices to support an inference of discriminatory intent. The

district court sliced the facts too thin and missed the point: In an Equal Protection analysis, courts must look at the entire picture.

The district court erred in denying the Church's motion for a preliminary injunction to halt the liquidation of the Hutchinson Center, and this Court should reverse.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant filed its complaint in the United States District Court for the District of Maine on November 19, 2024. Appellant's complaint brought claims under the First and Fourteenth Amendments, 42 U.S.C. § 1985, and other state laws. The district court had jurisdiction over Appellant's claims under 28 U.S.C. §§ 1331 and 1343. The district court denied Appellant's motion for a preliminary injunction on May 7, 2025, and Appellant timely filed its notice of appeal that same day. This Court has jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUE

Under the Equal Protection and Free Exercise Clauses, courts may rely on both direct and circumstantial evidence to determine whether an adverse government action was motivated at least in part by a discriminatory purpose. Calvary Chapel Belfast was the winning bidder to purchase a University of Maine System-owned property, yet the System revoked the Church's award after receiving unprecedented backlash from the disappointed bidders, donors, employees, alumni, politicians, and vocal community members—all of which was driven by animus towards the Church and its religious views. In denying the Church equitable relief, the district court downplayed the circumstantial evidence of the extraordinary public pressure on the System and instead found "no impermissible religious animus from within the System" or "procedural irregularity" with its decision.

The question presented is whether an adverse government decision that is made in gross violation of the plain text of the rules applicable to the process and immediately after—and in direct response to—an unprecedented level of hostile constituent opposition is direct and circumstantial evidence of discriminatory intent under *Village of*

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

## STATEMENT OF THE CASE

### A. Background

### 1. The System's Sale of the Hutchinson Center.

In January 2024, the University of Maine System issued on behalf of the University of Maine (UMaine) a competitive request for proposal (RFP) to buy or lease the Frederick Hutchinson Center. App.228-281. Located in the Midcoast town of Belfast, the Hutchinson Center had declined in usage since the pandemic as courses shifted online, so UMaine closed the facility in 2023. App.020.

The System's Office of Strategic Procurement, comprised of "strategic sourcing experts," is responsible for drafting, soliciting, and evaluating RFPs. App.631. For the Hutchinson Center's RFP (RFP 2024-048), the office's experts structured the bid process on a 100-point scale, which evaluated, among other factors, the highest submitted purchase price and financing requirements. App.235. The highest-scoring bidder would secure the right to negotiate with the System to finalize a contract. App.238.

The scoring criteria also considered how the respondent would lease space for the System to maintain a "Networkmaine" network hub located inside a small room in the Hutchinson Center. App.258. The network hub provides internet connectivity for Midcoast schools, libraries, and community centers. App.258. The proposed arrangement for the hub was detailed in a draft lease agreement and consisted of two phases: (1) a lease to keep the hub inside the Hutchinson Center, and (2) the option to build a utility shed on the property and relocate the hub there. App.258-259.

Despite referencing the network hub's *potential* relocation, RFP 2024-048 provided the System with complete discretion to leave the hub inside the Hutchinson Center during the lease's 20-year term, with the unilateral option to extend for two additional 20-year terms. App.259. Thus, the System had the unreviewable and unilateral discretion to keep the hub in place for a total of *60 years*. As the System's Vice Chancellor of Finance confirmed, the System was not obligated to relocate the hub *at any point during the life of the lease*. App.555-556.

The System received three bids in response to RFP 2024-048: a creative real property offer from Future of the Hutchinson Center

Steering Committee/Waterfall Arts (FHC-WA), App. 323-373, a purchase offer from Waldo Community Action Partners (WCAP), App.374-399, and a purchase offer from Defendant-Appellant Calvary Chapel Belfast. App.282-322.

The Church is a nonprofit local independent church that is part of the global Calvary Chapel association, a network of churches committed to Biblical teaching and Christ-centered community outreach. App.016-017. Led by Pastor Greg Huston, the Church offers a variety of ministries to meet the needs of the Belfast area, including a homeschool co-op and an addiction-recovery program. App.016-017. The Church also had planned to open a community resource center with a literacy program for special needs children. App.017.

### 2. The Church's Winning Bid to Purchase the Hutchinson Center.

On August 14, 2024, the System's Senior Director of Strategic Sourcing, Robin Cyr, notified the Church that it had won "the right to negotiate terms and conditions for RFP 2024-048 … because it produced the top-scoring response." App.090.

According to the System's press release announcing the Church's winning bid, "[k]ey factors" that distinguished its proposal included the

Church's offer of "a $1 annual lease agreement *in perpetuity* for a carve-out of space so the UMS can continue to maintain internet connectivity for midcoast schools, libraries and community centers through a NetworkMaine access hub historically located at the center." App.091 (emphasis added).

### 3. "Appalled and Horrified": The Unprecedented Backlash against the Church's Winning Bid.

Immediately after the System announced the Church's winning bid, donors, alumni, faculty, and community members flooded the System with complaints. *E.g.*, App.466-482. Largely directed to the Board of Trustees, UMaine's president, and the System's strategic-procurement office, App.643, nearly all the complaints focused on the Church's religious identity and beliefs. App.466-482.

One UMaine donor castigated the Board of Trustees as "completely out of touch," App.633, declaring that the "[t]he views held by this organization [the Church] are antithetical to all humanists." App.633. The donor then declared that he "will be directing our lawyer to remove the University from our will and hope that you will come to your senses." App.633-634. Another donor informed the Board that she was "horrified" the System "is planning to sell the Hutchinson Center to Calvary Baptist

[sic] Church." App.634. She declared that her spouse is an alumnus and that they "donate to the University every year." She repeated: "I am horrified. Shocked. Horrified." App.634. Another donor announced that, "[a]s a result of the University's behavior," they "will not be donating to the University anymore, not currently nor in the future." App.634. The donor requested that their "name [be] removed from all further correspondence or monetary solicitations." App.634. The donor concluded: "In the long run, the University of Maine will lose support, monetary and otherwise, from those currently or would in the future, support the University." App.634.

Alumni and current professors also were incensed about the Church's winning bid. One alumnus complained to the Board of Trustees and Robin Cyr, the System's Senior Director of Strategic Procurement, that it was "very difficult to reconcile the sale of the Hutchinson Center to an organization that actively and publicly discredits science, and that undermines so many values claimed in the University of Maine's mission and land grant purpose." App.639. A senior professor emailed the Board, stating that they were "very disappointed with the prospect of a Christian Nationalist group setting up a foundational school in the area." App.635.

The professor declared that "[i]t would be a disgrace for the [Hutchinson Center] to end up as a conduit for this kind of ideology." App.635. Another UMaine professor informed the Board that they were "appalled and horrified" that the System would sell the Hutchinson Center "to a group that espouses beliefs completely antithetical to our system mission." App.637. The professor then declared: "This is the only time in my two decades teaching for UMS that I have been ashamed to be a Black Bear." App.637.

Lawmakers also voiced their opposition to the Church's winning bid. Chip Curry, a state senator who represents Belfast (and who sits on the board of WCAP, one of the disappointed bidders, App.028), publicly criticized the award, complaining: "At this point, transferring [the Hutchinson Center] from public access and gifting it to a religious organization, any religious organization, seems completely inappropriate." App.028. And state representative Stanley Zeigler emailed UMaine's president, stating that he was "disappointed" in the "hypocrisy involved" in the sale "to an entity that is exclusive and is going to set up a private religious school." App.641. Zeigler noted that he "supported [the System] for the last years in the legislature," but "it

would appear that [public education] isn't a priority for you, especially in Waldo County." App.641. System officials understood Zeigler's comments as a threat to withhold funding for the System because of the award to the Church. App.641-642.

Vocal community members likewise protested the Church's winning bid. One community member complained that she was "deeply disappointed" that the System decided to "sell that outstanding property to a private church that does not represent the broader community of Belfast and Mid-Coast." App.633. Another critic deduced that System officials had been "receiving many emails from people upset with the idea that UMS would even entertain the thought of selling [the Hutchinson Center] to Calvary Chapel." App.636. Indeed, Cyr later testified that she had never received so much public opposition to a bid award. App.643.

In fact, Cyr testified that the System received so many negative comments that it had to create a formal response plan to address the backlash, *the first time she had ever done so*. App.643. As part of that plan, the System issued a public statement in "response" to "at least 135 citizen comments" that "have been sent to the System about the pending sale," declaring that "[t]he university cannot discriminate, including on

the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." App.100-101.

The outrage was not only directed at the System. Online news articles about the Church's winning bid were laced with comments attacking the Church. One commenter declared that "[t]hese evangelists from the Calgary [sic] are just another religious cult that believes in magical thinking." App.027. Another commenter accused "one member of [the Church's] congregation" of "making anti-lgbtq comments on a public Facebook post." App.027. Another called the Church "hypocritical fake Christians" and a "[t]otal death cult." App.027 note 3. And another said "Boo UMaine" for "[e]nabling a little fascist factory." App.027.

### 4. The System's Experts Deny the Disappointed Bidders' Discriminatory Protest Appeals.

The two disappointed bidders, FHC-WA and WCAP, joined the campaign against the Church's winning bid. Four days after the System announced the Church's award, FHC-WA submitted a formal Notice of Protest to Rachel Piper, the System's Executive Director of Strategic Procurement and Services. App.094-096. In its protest letter, FHC-WA contended that its bid deserved a higher score because its proposal would allow the System to keep the existing Networkmaine internet hub at the

Hutchinson Center for the full lease term, thus sparing the System the costs of relocating the hub. App.095.

But FHC-WA also attacked the Church's religious beliefs, arguing that the Church "cannot in good faith guarantee nondiscrimination as required in the Lease Agreement." App.095. In support of that conclusion, FHC-WA declared that "CCB and its parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." App.095. FHC-WA thus contended that, in its view, the Church "simply cannot" "warrant nondiscrimination under the Lease Agreement." App.095.

In a three-page letter that meticulously addressed each of FHC-WA's points, Piper denied the protest, explaining that in the procurement process, cost savings are referred to as value-added propositions; and if the System planned to consider cost avoidance as part of the evaluation criteria, it would have added that to the RFP. App.210-212. Piper also added that "[n]one of the proposals received resulted in any reconsideration of the need for Phase 2." App.211. In response to FHC-WA's bigoted attacks on the Church, Piper stated that "[t]o date, there

16

has been no evidence or claims of discrimination by the awardee." App.211.

The other disappointed bidder, WCAP, also submitted a bid protest to Piper. WCAP likewise attacked the Church, declaring that "[a] Church by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in its nondiscrimination section of the lease." App.097-099. In a detailed letter, Piper also rejected WCAP's bid protest, determining that, "[a]fter a thorough review of the solicitation process and all related requirements," "the award [to the Church] will be upheld as originally issued." App.210.

### 5. The System's Vice Chancellor Revokes the Church's Winning Bid.

After the System's strategic-sourcing experts upheld the Church's award, FHC-WA and WCAP escalated their appeals to the System's Vice Chancellor of Finance and Administration, Ryan Low. App.103-113.

Second-level bid protests ordinarily did not land on Low's desk. By his own account, Low had reviewed "maybe 8 to 12" such appeals during his 15 years with the System. App.596. He also testified that he "had no involvement in pulling the team together or putting the RFP together."

App.597. But this time, the System's usual protest reviewer, Gretchen Catlin, had recused herself from the process, citing her prior involvement in drafting the original RFP, which left Low to handle the appeal. App.202.

At the time he undertook the review, Low acknowledged that he was fully aware of the surrounding controversy against the Church. App.592. He testified that he "watch[es] a lot of news" and "consume[s] a lot of information." App.598. And he had seen the public reaction, read "comments," and understood the "theme" of the attacks against the Church. App.592.

The disappointed bidders expanded on that "theme" in their second-level appeal letters to Low. Along with reasserting its rejected protest about the network hub, FHC-WA specifically informed Low that, "[a]s you are no doubt aware, tempers and frustrations with the award decision are running high in the community and presumably within the University of Maine as well." App.103. FHC-WA then expressed hope that Low's "review will result in a change in the award," that he would "ameliorate this situation," and "put the community and the University back on the same path together." App.103. FHC-WA further declared

that the System's decisions were "patently absurd" and that "the University is unfortunately demonstrating stubborn closemindedness in the service of an institution with an opposite mission." App.105.

WCAP echoed this discriminatory sentiment, suggesting in its second-level appeal letter that the System's decision to stick with the Church's award was not "what is best for the community." App.111. WCAP pleaded with the System to "ensure … accessibility for all supporting diversity and inclusion." App.111. And WCAP noted that if the System would "think about the true intent of the location and its mission … this should be a different choice." App.111.

Rather than deferring to the experts in the Office of Strategic Procurement, which rejected the initial protests in accordance with the "process and specifications," and "[a]fter a thorough review of the solicitation process and all related requirements," App.430-433, Low summarily reversed course and revoked the Church's winning bid. App.434. Low informed the Church that he rescinded its award "in response" to the second appeals lodged by FHC-WA and WCAP. App.434. Low noted that FHC-WA's protest had "merit … with regards to the Networkmaine internet hub." App.434. He provided no additional

explanation. Instead, he stated that "all decisions by the Vice Chancellor for Finance and Administration are final." App.434. That same day, the System announced it would restart the sale process for the Hutchinson Center. App.118.

Low explained his rationale for rescinding the Church's award in a letter to FHC-WA. He stated that he "agree[d]" with FHC-WA's assertion that the RFP's evaluation criteria did not "allow for due consideration" of "all material relevant financial details," including the "maintenance in perpetuity of the Networkmaine internet hub." App.436. He presumed that, based on his reading of the RFP and its addenda, "the existing Networkmaine hub within the Hutchinson Center would need to be relocated to a secured purpose-built utility building" in the event of a real property sale. App.116. He thus concluded that the "relocation expenses" should have been factored into the evaluation criteria. App.116.

Although he based his decision on his belief that the network hub "would need to be relocated," App.116, *Low later acknowledged under oath that the draft lease agreement already provided UMaine with the unilateral option to keep the network hub inside the Hutchinson Center for the 60-year life of the lease.* App.573. He also confirmed that UMaine

was under no legal obligation to incur any expense to relocate the hub because the System's draft lease agreement allowed the hub to remain in place. App.573. And he agreed that it was solely in UMaine's discretion whether to exercise the option to relocate the hub. App.573-574.

Moreover, despite his purported (and, in any event, admittedly mistaken) beliefs, Low did not consider that RFP 2024-048 explicitly required the System to negotiate the terms of the lease with the winning bidder, App.559-573, or that the System's procurement policies expressly contemplate that parties may begin negotiations before and after a proposal is accepted so long as such negotiations do not "significantly alter the original proposal." App.221, 238. Low did not explain why negotiating with the Church to keep the hub in the Hutchinson Center "in perpetuity," as indicated the System's press release and provided in the lease agreement, App.569, would significantly alter the original proposal. *It didn't.*

In fact, Low's determination that keeping the network hub in place would significantly alter the RFP contrasts with the position of Rachel Piper, the System's procurement expert, who testified that "discussion and negotiation" would take place between the System and the awarded

party, during which "there would have been changes to this lease and additions to this lease to identify any areas of disagreement or misunderstanding." App.712.

Moreover, Low's decision directly violated the rules governing appeals to the RFP, and he considered and granted an appeal he was prohibited from considering. The plain text of RFP 2024-048 required that any protests to the specifications of RFP 2024-048 be submitted at least five days prior to any response, and it prohibited the System from considering any protests to the specifications after that deadline.

> Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal Submission noted in Section 1.7.1. *No protest against the award due to the specifications shall be considered after this deadline.*

App.232 (emphasis added).

Section 1.9 of RFP 2024-048, which governs all responses submitted to RFP 2024-048 (App.233 ("General Submission Provisions")), outlines the process for submitting responses, how responses are reviewed, and prohibits certain challenges for respondents who submitted a response to RFP 2024-048.

> By submitting a response, the Respondent agrees and assures that the specifications are adequate, and the Respondent

22

accepts the terms and conditions herein. *Any exceptions should be noted in your response.*

App.233 (emphasis added).

Low himself admitted, under oath, he had no authority to even consider the appeals that were submitted to him:

Q. And because FHC-WA's objection to cost avoidance measures, or the lack thereof, was not timely submitted, under Section 1.8 of the RFP, the University could not consider those objections when they were ultimately submitted after the fact. Isn't that a fact, sir?

A. *If they had not challenged the cost avoidance five days before, yes.* I agree.

Q. Thank you, sir. *And yet you not only considered FHC-WA's appeal as to cost avoidance measures, but you ultimately granted it and you rescinded the award to Calvary Chapel on that basis. Isn't that true?*

A. *That's correct.*

App.588 (emphasis added).

Additionally, *independent of any specification appeal*, Section 1.9.4 of RFP 2024-048 *still* required exceptions to the terms and conditions of the RFP to be stated with the responses thereto. No exceptions to the Lease terms of the RFP, allowing the System the option to maintain the hub in place for 60 years, were submitted with any responses to the RFP. App.582, 659-660. Exceptions stated after the fact, after Calvary Chapel won the first bid, were untimely and could not have been considered,

pursuant to the plain terms of the RFP. App.233. Yet Low's sworn testimony confirmed that RFP 2024-048 prohibited the System from considering *any* protests, *not only to the specifications*, but also to the *terms* and *conditions* of the RFP, after a Respondent submitted a response to RFP 2024-048. Low testified that these requirements of the text of RFP were binding on the System and himself as a decisionmaker. App.579. The sworn testimony from other System officials likewise demonstrates that the System was prohibited from even considering any appeals that were untimely submitted. App.657, 685, 720.

The record further demonstrates that no respondent submitted a timely appeal to the terms, conditions, or specifications of the RFP. App.582. Thus, under the System's own sworn testimony and the plain terms of the RFP, the appeals that were submitted were not permitted to even be considered. Yet, despite the untimely nature of the submitted appeals and the plain import of the rules applicable to those appeals, every System official testified that the appeals presented and the premise behind Low's decision to rescind the Church's award were objections to the terms, conditions, and specifications of the RFP. App.679-681, 693-694, 707. Low admitted that his sole rationale for rescinding the Church's

award was related to a term, condition, and specification of the RFP. App.585-587, 588. Low also admitted in his sworn testimony that he was prohibited from considering the appeals to the terms, conditions, and specifications. App.582-585, 588-590.

The upshot of all this: because Low admitted that (a) the "costs savings" issues were part of the terms, conditions, and specifications of RFP 2024-048 and (b) no objections had been lodged with the System prior to responses being submitted to RFP 2024-048, Low was prohibited from considering those appeals, *and he plainly admitted this much under oath. Yet he considered and granted one anyway*. In other words, Low's decision to rescind Calvary Chapel's award took a procedural and substantive wrecking ball to RFP 2024-048's mandatory process.

Nevertheless, despite all of these irregularities, on October 4, 2024, the System issued a new RFP for the sale of the Hutchinson Center (RFP 2025-031). App.140. The award was sent to a different bidder. WCAP, the previously disappointed bidder who had complained about the Church's religious beliefs, was awarded the right to purchase the Hutchinson Center. App.166-167. FHC-WA, the other disappointed bidder who also

complained about the Church's religious beliefs, applauded the decision to rescind the Church's award and give it to (non-religious) WCAP.[2]

## B. Procedural History

On November 19, 2024, the Church filed suit in the U.S. District Court for the District of Maine, alleging, among other claims, that the System revoked the award to appease the vociferous public backlash from its discriminatory constituents in violation of the Fourteenth Amendment's Equal Protection Clause and the First Amendment's Free Exercise Clause. App.010-076. The Church moved for a temporary restraining order and a preliminary injunction, seeking to halt the Hutchinson Center's sale pending the outcome of litigation. App.168.

The district court first denied the Church's motion for a temporary restraining order, concluding that, based on the limited record, the Church was unlikely to succeed on the merits of its Equal Protection and Free Exercise claims. *See Calvary Chapel Belfast v. Univ. of Maine Sys.*, 2025 WL 71701 (D. Me. Jan. 10, 2025). Add.029-052.

---

[2] Penobscot Bay Pilot, *University of Maine decides to sell Hutchinson Center in Belfast to Waldo Community Action Partners* (Nov. 17, 2024), https://www.penbaypilot.com/article/university-maine-selects-waldo-community-action-partners-hutchinson-center-belfast/252551.

The parties then engaged in limited discovery, after which the district court held an evidentiary hearing on March 4, 2025. The district court heard testimony from Greg Huston, the Church's pastor; Defendant Ryan Low, the System's Vice Chancellor of Finance and Administration; Defendant Robyn Cyr, the System's Senior Director for Strategic Sourcing; and Defendant Rachel Piper, the System's Strategic Director for Procurement and Chief Procurement Officer. Add.001.

On May 7, 2025, the district court denied the Church's motion for a preliminary injunction, finding that the Church was unlikely to succeed on the merits of its Equal Protection and Free Exercise claims due to "the absence of any direct or circumstantial evidence to connect community animus to the System's actions." Add.027-028. The district court cited case law where, in its reading, "public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose." Add.017. These cases, the court gathered, "establish the requirement of a showing connecting the animus in the community to the government action for that action to constitute a violation of law." Add.017. Applying its "connection" rule, the court largely limited its analysis to two arguments the Church made in its post-hearing brief: that the System did not have

to rescind the RFP because the draft lease already provided the option to keep the hub inside the building in perpetuity, and that the System should have rejected FHC-WA's and WCAP's bid protests as untimely "specification protests." Add.019.

In rejecting the first argument, the court concluded that the parties never contemplated that the network hub could remain inside the Hutchinson Center, despite the unilateral 60-year "option" in the draft lease agreement, Add.020-021, and it accepted Low's rationale that his only reason for revoking the Church's winning bid was for "cost savings," Add.024. As to the second argument, the court concluded that "the System's consideration of the disappointed bidders' protests" was not "evidence of discriminatory animus." Add.024-025.

Lastly, the court touched on the "alleged religious bias" in a cursory paragraph, concluding that "the Church has produced no evidence of impermissible religious animus from within the System," and that "the alleged substantive and procedural departures are not probative of any intent by the System to discriminate on the basis of religion or adopt the community's religious animus." Add.026.

## STANDARD OF REVIEW

The Court reviews the denial of a preliminary injunction for abuse of discretion. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). "Under that rubric, findings of fact are reviewed for clear error and issues of law are reviewed de novo." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005). "In the gray area between those two poles, the Court affords considerable deference to the trial court's balancing of equities," but it "will set aside such judgment calls if the trier has *ignored pertinent elements deserving significant weight*, considered improper criteria, or, though assessing all appropriate and no inappropriate factors, plainly erred in balancing them." *Waldron v. George Weston Bakeries Inc.*, 570 F.3d 5, 8–9 (1st Cir. 2009) (cleaned up) (emphasis added).

## SUMMARY OF THE ARGUMENT

The district court abused its discretion by denying the Church's motion for a preliminary injunction.

I. The district court committed an error of law by requiring the Church to make a direct "showing connecting the animus in the community to the government action" to raise an inference of discriminatory intent. The district court's novel rule contradicts

*Arlington Heights* and the decisions of numerous courts of appeals, which instruct courts to engage in a sensitive inquiry into *all* available direct and circumstantial evidence that may be probative of a discriminatory purpose. *See* 429 U.S. at 266. By holding that a plaintiff must prove a direct connection between community animus and specific procedural irregularities, the district court fused two *Arlington Heights* factors together into a single mandatory element, thereby erecting a nearly insurmountable evidentiary barrier. No circuit has ever applied such a rule. This Court should not be the first.

II. The district court compounded its legal error by disregarding the cumulative weight of evidence showing that the System, against the findings of its own procurement experts and in violation of its own rules, revoked the Church's winning bid while under unprecedented pressure from donors, alumni, faculty, and the disappointed bidders—all of whom attacked the Church's religious identity and beliefs. The district court likewise erred by accepting the System's justification for the revocation— the cost of relocating a network hub—while downplaying that the System had *already drafted and included in the FRP* a long-term lease option that could keep the hub in place in perpetuity and that, in any event,

such matters were expressly negotiable with the winning bidder. Had it applied all the *Arlington Heights* factors, the district court should have found that the Church proffered sufficient direct and circumstantial evidence to raise the inference that the System's revocation of the Church's winning bid was made at least in part to effectuate the discriminatory demands from donors, alumni, faculty, legislators in charge of the System's funding, and vocal community members.

III. The System's discriminatory decision cannot withstand strict scrutiny. Even if "cost savings" was an interest sufficiently compelling to justify violating the Church's constitutional rights, the System had several non-discriminatory options at its disposal, including negotiating with the Church and exercising the draft lease agreement's option to keep the network hub in place.

IV. The Church met all criteria warranting preliminary injunctive relief. Absent an injunction, the Church will continue to suffer irreparable harm through the continued infringement upon its fundamental constitutional rights. Conversely, an injunction poses no harm to the System but instead would further the strong public interest in preventing government-sanctioned religious discrimination.

## ARGUMENT

**I.  The Church has established a strong likelihood that it will prevail on the merits of its Equal Protection Clause claim.**

The district court denied the Church equitable relief solely because it found "no evidence of impermissible religious animus from within the System" and because the procedural irregularities surrounding the revocation of the award "are not probative of any intent by the System to discriminate on the basis of religion or to adopt the community's religious animus." Add.026. The district court's cramped analysis not only misapplied the Supreme Court's equal protection jurisprudence; it is at odds with this Court's observation that "[w]hile procedural abnormalities can provide a basis for finding discriminatory intent, such abnormalities are only relevant *within a larger scope.*" *Macone v. Town of Wakefield*, 277 F.3d 1, 6 (1st Cir. 2002) (citing *Arlington Heights*, *supra*, 429 U.S. at 267) (emphasis added).

**A.  Circumstantial evidence is sufficient to prove that a government decisionmaker was motivated at least in part by discriminatory intent.**

To establish an equal protection violation, a plaintiff must show (1) that they were treated differently from others similarly situated and (2) that the selective treatment was based on either an impermissible

consideration, such as race or religion, or an intent to inhibit or punish the exercise of constitutional rights. *See Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995). The System's equal protection violation arises from "a facially neutral [procurement procedure] that is enforced in a discriminatory manner." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199–200 (2d Cir. 2014).

Critically, a plaintiff bringing an intentional discrimination claim need not prove that the challenged decision "rested solely on" a discriminatory purpose. *Arlington Heights*, 429 U.S. at 265. Instead, a plaintiff need only show that the "the decisionmaker … selected or reaffirmed a particular course of action *at least in part* 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added).

In determining whether a government decision was motivated at least in part by a discriminatory purpose, courts look to both direct and circumstantial evidence. *See Chabad Lubavitch,* 768 F.3d at 199 (citing *Arlington Heights,* 429 U.S. at 266); *see also* Ivan E. Bodensteiner & Rosalie Berger Levinson, 3 *State and Local Government Civil Rights*

*Liability* § 5:20 ("The evidence described in *Village of Arlington Heights* is a form of direct evidence, which includes circumstantial evidence."). The importance of circumstantial evidence is a matter of common sense: "[F]ew are anxious to own up to a discriminatory intent and direct evidence of discrimination is hard to come by." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012). As Judge Posner observed, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir. 1987). For that reason, courts must engage in "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Ultimately, "[t]he inquiry is practical." *Feeney*, 442 U.S. at 279 n.24. "What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid." *Ibid.*

In assessing discriminatory intent in the land-use context,[3] courts consider

---

[3] Courts evaluating intentional discrimination claims under the Equal Protection Clause, RLUIPA, and the Fair Housing Act (FHA) all apply the *Arlington Heights* factors. *See, e.g.*, *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (applying *Arlington Heights* to FHA and Equal Protection claims); *Chabad Lubavitch*, 768 F.3d at 198–

the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body *and community members*, . . . whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available.

*Chabad Lubavitch*, 768 F.3d at 199 (emphasis added); *see also Arlington Heights*, 429 U.S. at 266. "These elements are non-exhaustive," *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 268), and "a plaintiff need not establish any particular element in order to prevail," *id.* (citation omitted).

> **B.** **The district court erred as a matter of law by requiring a provable connection between the religiously hostile community animus and the System's alleged procedural irregularities.**

In applying the "sequence of events" factor, courts "often consider evidence of community animus preceding a government's actions." *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1282 (11th Cir. 2022). This Court has suggested but never held that

---

99 (same for RLUIPA nondiscrimination claim); *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263–64 (4th Cir. 2019) (same). Because this case concerns government action affecting the purchase and use of real property, the appellate courts' analyses under RLUIPA and the FHA are also persuasive here.

"[e]vidence indicating that the legislators bowed to an impermissible community animus, most commonly manifested by an unusual level of constituent pressure, may warrant … an inference [of discriminatory intent]." *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998).

But other courts of appeals have repeatedly concluded that "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997). *See, e.g.*, *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 366 (4th Cir. 2008) ("[I]t is well-established that community views may be attributed to government bodies when the government acts in response to these views."); *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("In our opinion it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals."); *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284 (11th Cir. 2006) (same); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1225 (2d

Cir. 1987) (same). This line of authority makes clear that when an adverse government decision is made in the backdrop of biased constituent pressure, and the decision is responsive to their impermissible demands, then that sequence of events is sufficient to raise an inference of intentional discrimination.

In conflict with those decisions, the district court concluded that to establish discriminatory intent, a plaintiff must meet the "*requirement* of a showing *connecting* the animus in the community to the government action." Add.017 (emphasis added). That conclusion is incorrect. And the cases that the district court relied on to fashion its novel rule that "public pressure" must be "combined" with "procedural anomalies" lend it no support. Add.017.

To begin with, the district court noted (Add.017) that discriminatory intent was found in *Association of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Regulations & Permits Administration*, because one of the decisionmakers "duly noted" the local opposition to an AIDS hospice facility and "remarked that community opinion would play a role in the decision." 740 F. Supp. 95, 105 (D.P.R. 1990). But nothing in that case stands for the proposition that there must be an on-the-record

link between the public opposition and the adverse decision. Indeed, the *A.F.A.P.S.* court considered the decisionmaker's comment to be just one factor; it also found that the agency "was pressured and lobbied by opponents of the hospice to deny the A.F.A.P.S. permit" to be "undeniable," *id.* at 104, that "[o]pposition to the hospice was repeatedly expressed in a manner demonstrating an intent to discriminate against AIDS patients," *id.* at 104–05, and that the agency "received pressure from political leaders who themselves expressed concern over public opposition to an AIDS hospice," *id.* at 105. "After considering the evidence in its totality," the court stated, it "cannot avoid the conclusion that A.R.P.E. acted in furtherance of the misguided and discriminatory notions held by many Luquillo residents concerning AIDS patients or at least bowed to political pressure exerted by these residents." *Id.* at 104.

The district court's reliance (Add.017) on *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982), is likewise off point. There, the plaintiff alleged that a town's decision to withdraw from a multi-municipality housing authority, the consequence of which effectively blocked the construction of a public housing project, was racially motivated in response to local opposition. *See* 682 F.2d at 1058–59.

Although the Fourth Circuit noted that town officials, including the mayor, made "'camouflaged' racial expressions," *id.* at 1066, and that the town conducted a first-ever "opinion poll" as part of the decision-making process, *id.*, those facts were just one of many evincing discriminatory intent, including racially coded comments by residents at a public hearing. *See id.* Taken together, the court of appeals concluded that "[t]here can be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition." *Id.* Nothing in the Fourth Circuit's reasoning implies that a nexus is required between community animus and procedural irregularities.

Similarly flawed is the district court's reading of *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256 (4th Cir. 2019). There, the Fourth Circuit applied the *Arlington Heights* framework and found that a church sufficiently pled a RLUIPA discrimination claim by alleging that a county board of appeals denied its rezoning petition after hearing vociferous religiously and ethnically charged opposition to the petition. *See* 915 F.3d at 264. The court of appeals noted that "a government decision influenced by community members' religious bias is

39

unlawful, even if the government decisionmakers display no bias themselves," *id.* at 263, and although it observed that "[s]uch impermissible influence *may* be inferred where expressions of community bias are followed by irregularities in government decision-making," *id.* (emphasis added), it pronounced no hard-and-fast rule that the community animus *must* be followed by irregularities or substantive departures from procedure.

In fact, and as discussed below, the Fourth Circuit went on to examine several factors raising a plausible suspicion of improper intent, including that the board denied the petition even though the county's planning department director did not oppose it, *see* 915 F.3d at 264, and the pressure caused by the religiously hostile neighbors' "ongoing involvement in the dispute." *Id.* at 265. Although the court of appeals characterized these facts as "irregularities," it never suggested—much less held—that community animus and procedural anomalies must be tethered to be probative of discriminatory intent.

In short, none of above cases supports the district court's novel rule that community animus must be connected to procedural irregularities to be probative of a discriminatory purpose.

By contrast, at least four courts of appeals have expressly affirmed that an adverse government action made in the wake of vociferous community opposition is sufficiently probative of discriminatory intent. In *Innovative Health, supra,* the Second Circuit upheld the lower court's grant of a preliminary injunction for a drug and alcohol rehabilitation center whose application for a building permit was revoked by city officials after they received "strong opposition" from community members, who protested "having a drug- and alcohol-dependency treatment center in the downtown location." 117 F.3d at 42, 49. Responding to the city's contention that the plaintiff produced no evidence of discriminatory intent in denying the building permit, the court of appeals noted that "[t]here is little evidence in the record to support the ZBA's decision on any ground other than the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and alcohol-addicted neighbors." *Id.* at 49.

The Second Circuit did not probe for specific procedural irregularities following the community hostility but affirmed the lower court's conclusion that "defendants bowed to the political pressure exerted by certain members of the community," based on its findings

> that defendants' interpretation of the Zoning Ordinance was highly questionable, that defendants *were operating in the context of intense political pressure from important components of the community* against IHS' relocation to the South Broadway site, and that defendants inexplicably failed to defer to the Commissioner of Building, an agency entitled to their deference, which had determined and then confirmed with public counsel that IHS' use was permitted.

*Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 243 (S.D.N.Y. 1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997) (emphasis added). "This constellation of factors," the lower court held, "leads to the conclusion that the defendants permitted illegal prejudices to influence their decision-making process, which is *all that plaintiffs are required to show*." *Id.* (emphasis added). *See also Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 611 (2d Cir. 2016) (holding that a plaintiff can establish a prima facie case of intentional discrimination "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those *to whom the decision-makers were knowingly responsive*." (cleaned up) (emphasis added)); *id.* at 608 (upholding the district court opinion that was "*focused closely* on the nature of the citizen complaints regarding R–M zoning," which "expressed concerns about … changing Garden City's 'character' and 'flavor.'").

In *Avenue 6E Investments, supra*, the Ninth Circuit reversed the dismissal of disparate-treatment claims brought by two real estate developers who contended that the City of Yuma's refusal to rezone land to permit higher-density development was in response to racially charged opposition from constituents. *See* 818 F.3d at 493. Citing cases from sister circuits, the Ninth Circuit noted that "[t]he presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views." *Id.* at 504–05 (citing *Innovative Health,* 117 F.3d at 49; *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *Town of Clarkton,* 682 F.2d at 1066)); *see also id.* at 505 (noting that "the relevant cases clearly hold that a city's denial of a zoning change following discriminatory statements by members of the public supports a claim of discriminatory intent").

The Ninth Circuit then examined the sequence of events under *Arlington Heights*, finding that the developers sufficiently pleaded that "the City discriminated against them by denying their application *in order to appease its constituents*, despite knowing that opposition to the application was based largely on racial animus, and despite the

43

recommendations of its zoning commission and planning staff and its regular practice." 818 F.3d at 504 (emphasis added).

Pre-*Arlington Heights* decisions also affirm that government actors who buckle under the weight of discriminatory public pressure, and adopt its desired outcome, allowed animus to unconstitutionally taint state action. *E.g.*, *Dailey v. City of Lawton*, *supra*, 425 F.2d at 1039–40 (holding that the planning commission's and city council's denial of a building permit and zoning change to construct low-income housing project was "a direct result of the bias and prejudice on the part of the owners of other property in North Addition, which feeling carried over to the members of those bodies"); *United States v. City of Black Jack*, 508 F.2d 1179, 1188 n.3 (8th Cir. 1974) (noting that "improper purpose may be shown circumstantially," and thus observed that "uncontradicted evidence indicate[d] that, at all levels of opposition, race played a significant role" in the adoption of a zoning ordinance that blocked the construction of low-income housing); *id.* (holding that to prove discriminatory intent, "it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals." (quoting *Dailey*, 425 F.2d at 1039)).

The Second, Eighth, Ninth, and Tenth Circuits thus instruct that evidence of community animus is sufficient to support a finding of discriminatory intent even without direct proof of bias by the decisionmakers themselves or any direct connection to procedural irregularities. The district court's denial of equitable relief on the finding of "no impermissible religious animus from within the System," Add.026, thus conflicts with the well-established principle that "it is enough … to show that the local officials are effectuating the discriminatory designs of private individuals." *Dailey*, 425 F.2d at 1039.

The district court's contrary rule—that a plaintiff must connect community animus directly to a specific procedural irregularity— effectively immunizes government actors who can acquiesce to discriminatory public pressure so long as they leave no paper trail and devise a savvy excuse. That approach raises the evidentiary bar far beyond what the Supreme Court requires under *Arlington Heights*.

**C.    The district court erred by discounting the cumulative weight of probative evidence showing that the System's revocation of the Church's award was motivated at least in part by discriminatory intent.**

When applying the *Arlington Heights* factors in the land-use context, *see Chabad Lubavitch, supra*, 768 F.3d at 199, the clear

inference from the cumulative weight of evidence shows that if Calvary Chapel Belfast were not a Christian church with traditional religious beliefs, then the disappointed bidders would not have protested the Church's winning bid. Nor would donors, alumni, and faculty have pummeled the System's Board of Trustees and UMaine's president with complaints. And, most importantly, the System would not have revoked the Church's winning bid over the optional relocation of a network hub. Yet the district court discounted all this anti-religious backlash as irrelevant because the System itself (supposedly) did not share it, or—more appropriately—did not express it openly, and because it found no procedural irregularities or substantive departures with the System's decision. The district court's limited analysis and accompanying conclusions are both incorrect.

1. **The specific sequence of events shows that the System bowed to unprecedented pressure from donors, alumni, and vocal community members, all of which was steeped in religious animus.**

The district court erred in disregarding the specific sequence of events showing that the System revoked the Church's winning in the wake of unprecedented constituent opposition that was infected with discriminatory animus.

Like the city officials in *Innovative Health*, who received "intense political pressure from the surrounding community" "and "letters … replete with discriminatory comments … based on stereotypes and general, unsupported fears," 117 F.3d at 49, the System's Board of Trustees, UMaine's president, and the procurement officers immediately received a tidal wave of religiously hostile opposition after announcing the Church's winning bid:

- o Donors announced that they "will not be donating to the University anymore, not currently nor in the future," App.469, with one directing their attorney to cut UMaine out of their will, App.467;
- o Professors declared that they were "appalled and horrified," App.241, and denounced the Church as "a Christian Nationalist group" and the System's sale as "a disgrace," App.203;
- o Alumni complained, without evidence, that the Church "actively and publicly discredits science" and "undermines so many values." App.475; and
- o Legislators made veiled threats to withhold future funding. App.481.

All this vitriol landed squarely in the inboxes of the System's decisionmakers. Further, the Church was publicly derided as a "death cult," App.027 n.3, and the System was publicly accused of "[e]nabling a little fascist factory," App.027.

The System's senior procurement director, Robin Cyr, testified that she had never before experienced such vociferous opposition to a bid

award. App.633. Indeed, the backlash was so intense that the System took the extraordinary step of developing a formal crisis response plan. App.636. And like the Yuma City Council in *Avenue 6E*, which was "was fully aware of these concerns," 818 F.3d at 507, Vice Chancellor Low was fully aware of the religiously discriminatory backlash against the Church when he abruptly revoked the Church's winning bid, App.598.

Moreover, the two disappointed bidders, FHC-WA and WCAP (who ultimately "won" the bid), not only protested the award to the Church but reinforced and escalated the community hostility by lobbing discriminatory attacks on the Church's religious beliefs. App.094-099, 103-111. After the System's strategic-procurement experts rejected their appeals, both FHC-WA and WCAP elevated their protests to Vice Chancellor Low using even more incendiary language. FHC-WA reminded Vice Chancellor Low that "tempers and frustrations with the award decision are running high in the community," and urged that a reversal of the award would "ameliorate this situation" and "put the community and the University back on the same path together." App.103. FHC-WA further criticized the System for its "stubborn closemindedness" in siding with "an institution with an opposite

48

mission." App.105. WCAP's appeal took the same tack, pressing Low to reconsider the award on the ground that it was not "what is best for the community" and urging the System to "support[] diversity and inclusion" by making "a different choice." App.111.

Although Low predictably testified that he purportedly rejected the disappointed bidders' religiously discriminatory arguments, App.614, "quite obviously, discrimination is rarely admitted." *Mhany*, 819 F.3d at 610. In any event, the relentless opposition from the disappointed bidders is analogous to that of the bigoted neighbors in *Jesus Christ Is the Answer*, whose "ongoing involvement in the dispute, right up through the dismissal of the second petition," raised the inference that the zoning board of appeals was "influenced" by their vociferous opposition. 915 F.3d at 265.

As the Supreme Court observed, "[w]hat … [an] official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid." *Feeney*, *supra*, 442 U.S. at 279 n.24; *accord Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of *what actually happened* rather than evidence describing the subjective state of mind of

the actor." (emphasis added)). Here, when the moment came to decide, Low reversed the Church's winning bid, effectively granting the desired outcome of not only the disappointed bidders but UMaine donors, alumni, and faculty, all of whom were motivated by religious animus towards the Church. App.637-642. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). And he ignored all of the System's own rules to reach that discriminatory result. App.582-590.

Because Low abruptly reversed course in the face of vociferous discriminatory pressure, the System's revocation of the Church's winning bid amidst such opposition more than raises an inference of discriminatory intent. *E.g.*, *Avenue 6E*, 818 F.3d at 504; *Innovative Health*, 117 F.3d at 49. The district court's disregard for this highly probative evidence warrants reversal. *Cf. Jean v. Nelson*, 711 F.2d 1455, 1492 (11th Cir. 1983) ("In misapprehending the purpose of historical background, the district court failed properly to credit this evidence.").

**2. The System revoked the Church's award after overruling the findings of its strategic-procurement experts.**

Rather than examining the totality of the circumstances, the district court confined (Add.019) its analysis to the arguments presented in the parties' post-hearing briefs while disregarding the entire evidentiary record, which revealed that the System's revocation of the Church's award was both substantively flawed and wholly unnecessary. Most significantly, the System's reversal of the Church's winning bid came after its own strategic-procurement experts—those who drafted the RFP, evaluated the bids, and negotiated with the respondents—rejected the appeals by the disappointed bidders on the basis of a detailed analysis of why the appeals were unfounded and inconsistent with the RFP rules. App.427-433.

Numerous courts of appeals have found that a government agency's deviation from the recommendation of its own experts is probative evidence of discriminatory intent. *See, e.g.*, *Avenue 6E*, *supra*, 818 F.3d at 507 (noting that "[a] city's decision to disregard the zoning advice of its own experts can provide evidence of discriminatory intent"); *Jesus Christ Is the Answer*, *supra*, 915 F.3d at 264–65 (concluding that "the fact that

the Board disagreed with a County official who has relevant expertise and a formal role as the Board's advisor is enough to raise a plausible suspicion of improper motive"); *Innovative Health, supra*, 117 F.3d at 49 (finding zoning board of appeals decision "to be highly suspect" after overruling the commissioner and counsel's approval of project, who had "carefully reviewed HIS's application and gave detailed explanations for their approval").

Here, Rachel Piper, the System's chief procurement officer, rejected the disappointed bidders' appeals "[a]fter a thorough review of the solicitation process and all related requirements." App.427, 430. In fact, Piper went so far as to provide a line-by-line response to the allegations in each protest letter. App.427-433. Piper explained that FHC-WA's cost-related objection lacked merit because cost avoidance was not among the stated evaluation criteria in the RFP. App.428. She likewise rejected WCAP's protest appeal, reaffirming that the Church's award was proper and thus would stand. App.433.

Nevertheless, and just like the Yuma City Council's discriminatory decision in *Avenue 6E*, which "ran contrary to … the recommendation of City planning staff," 818 F.3d at 507, Vice Chancellor Low summarily

overruled the System's own strategic-procurement experts and found that FHC-WA's complaint about the network hub had merit. What makes Low's decision even more troubling is that he admitted to having no prior involvement in the RFP, App.597, and that he seldom adjudicated second-level award appeals. App.596. In fact, Low testified that in his 15 years at the System, he only adjudicated "maybe 8-to-12" such appeals. App.596.

The contrast is stark. Rachel Piper, one of the System's "strategic sourcing experts," App.631, evaluated FHC-WA's and WCAP's bid protests "[a]fter a thorough review of the solicitation process and all related requirements," App.212, and reaffirmed the Church's award. On the other hand, Vice Chancellor Low, who reports directly to the (besieged) Board of Trustees, overruled Piper's decision without a full presentation of the parties' prior negotiations, App.436, and in total disregard for the System's own rules and procedures, App.588.

In light of the vociferous backlash directed at the System's Board of Trustees and UMaine's president, Low's reversal against the findings of the procurement experts raises a powerful inference that the System revoked the Church's winning bid at least in part to appease its donors,

alumni, and political allies. *Cf. Mhany, supra*, 819 F.3d at 611 ("[T]he district court was entitled to conclude, based on the *Arlington Heights* factors, that something was amiss here, and that Garden City's abrupt shift in zoning in the face of vocal citizen opposition to changing the character of Garden City represented acquiescence to race-based animus.").

### 3. The System bypassed its procurement policies and the terms of the RFP to revoke the Church's award.

The district court concluded that "the alleged substantive and procedural departures are not probative of any intent by the System to discriminate on the basis of religion or adopt the community's religious animus." Add.026. Even if it had been correct in concluding that direct proof connecting community animus to procedural irregularities or departures is required (which, as shown above, is not the law), the district court nevertheless erred in accepting at face value Low's excuse for revoking the Church's winning bid while overlooking that the revocation was an extraordinary and drastic response to an easily negotiable logistical detail.

Although a district court's findings are reviewed for clear error, the Court may set aside such findings if it "form[s] a strong, unyielding belief that a mistake has been made." *Cumpiano v. Banco Santander*, 902 F.2d 148, 152 (1st Cir. 1990). As the Supreme Court observed, clear error review "is a demanding test, but *it is not a rubber stamp.*" *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18–19 (2024) (emphasis added). That being so, a court of appeals "may well find clear error even in a finding purportedly based on a credibility determination" when "[d]ocuments or objective evidence … contradict the witness' story" or "the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. Bessemer City*, 470 U.S. 564, 575–76 (1985). The district court's finding of no irregularities concerning the network hub is clearly erroneous.

To begin with, the district court erred in dismissing as non-probative the System's refusal to negotiate with the Church over the location of the hub. The original RFP expressly provided that the parties may negotiate "an acceptable contract" for both parties, although "negotiations may not significantly vary the content, nature or requirements of the proposal…." App.087. The district court accepted the

55

System's post-hoc argument that keeping the hub in place would have significantly altered the original RFP. Add.018. *It would not.*

Rachel Piper, the System's procurement expert, testified that "discussion and negotiation" would take place between the System and the awarded party, during which "there would have been changes to this lease and additions to this lease to identify any areas of disagreement or misunderstanding." App.712. Given that the System's own procurement expert expressly expected (based on the plain terms of the RFP) that the parties would negotiate to make "changes" and "additions" to the lease, App.712, the System's "significant alteration" excuse is pretextual.

The System's position is further undermined by the fact that RFP 2024-048 expressly provided it with unilateral and complete discretion to leave the network hub in place for the life of the lease agreement, and thus never incur any relocation costs. App.128. Low himself admitted that the lease agreement included in the RFP expressly preserved that option. App.554-557. The district court nevertheless downplayed the unequivocal terms of the RFP's lease option, finding that both Low and Piper "testified credibly" that they believed the hub would remain in the Hutchinson Center for the short term and then be relocated to an

outbuilding, Add.020-021, and that "contemporaneous documentation" reflected "the general understanding" by all parties that the hub eventually would be relocated, Add.021. The district court thus concluded that "the isolated use of the term 'option' in a draft lease that was never executed" was not "probative of pretext or discriminatory animus." Add.024.

That reasoning strains credulity. A draft lease provision that grants the System unilateral discretion to leave the network hub in place—for up to *six decades*—cannot be waved away as a mere "isolated" word. Rather, the entirety of the six-decade option was allocated its own separately numbered and headed section in the lease, highlighting *with emphasis* the option for two 20-year renewals. App.128. Moreover, it is not the word "option" alone that matters but the power it confers. Having written that discretion into the agreement, the System clearly retained power to pursue the very outcome it later claimed was disqualifying. And for its part, the Church indicated its flexibility over the hub's location. App.568-569. Above all, the RFP provided that the parties would negotiate to finalize "an acceptable contract." App.087. So that combination—a contractually permitted option, a willing lessor, and a

negotiable final contract—shows that leaving the hub in place was not a "substantial" alteration to the RFP but a logistical issue to be ironed out during final negotiations.

Additionally, the record evidence demonstrates that the System blew up its entire procurement process to reach the decision to rescind the Church's award. RFP 2024-048 required that any protests to the specifications of RFP 2024-048 be submitted at least five days prior to any response, and it prohibited UMS from considering any protests to the specifications after that deadline. App.081. Section 1.9 of RFP 2024-048 also outlines the process for submitting responses, how responses are reviewed, and prohibiting certain challenges for respondents who submitted a response to RFP 2024-048. App.082.

Additionally, *independent of any specification appeal*, Section 1.9.4 of RFP 2024-048 *still* required exceptions to the terms and conditions of the RFP to be stated with the responses thereto. No exceptions to the Lease terms of the RFP, allowing the System the option to maintain the hub in place for 60 years, were submitted with any responses to the RFP. App.582, 659-660. Exceptions stated after the fact, after Calvary Chapel won the first bid, were untimely and could not have been considered,

pursuant to the plain terms of the RFP. App.082. And, Low's sworn testimony confirmed that RFP 2024-048 prohibited the System from considering any protests *not only to the specifications*, but also to the *terms* and *conditions* of the RFP, after a Respondent submitted a response to RFP 2024-048. Every System official to testify confirmed under oath that the prohibition on considering untimely appeals was binding on the System. App.579, 657, 685, 720.

The record further demonstrates that no respondent submitted a timely appeal to the terms, conditions, or specifications of the RFP. App.582. Thus, under the System's own sworn testimony and the plain terms of the RFP, the appeals that were submitted were not permitted to even be considered. Yet, despite the untimely nature of the submitted appeals and the plain import of the rules applicable to those appeals, every System official testified that the appeals presented and the premise behind Low's decision to rescind the Church's award was based upon objections to the terms, conditions, and specifications of the RFP. App.679-681, 693-694, 707. And Low admitted that his sole rationale for rescinding the Church's award was rooted in a term, condition, and specification of the RFP. App.585-587, 588. Low also admitted in his

sworn testimony that he was prohibited from considering the appeals to the terms, conditions, and specifications. App.582-585, 588-590.

In short, despite the System's sworn testimony that the "costs savings" issues were part of the terms, conditions, and specifications of RFP 2024-048, that no objections had been lodged with the System prior to responses being submitted to RFP 2024-048, and that the System was prohibited from considering those appeals, *Low admitted under oath* that *he considered and granted one anyway*. In other words, Low's decision to rescind the Church's award took a procedural and substantive wrecking ball to RFP 2024-048's mandatory process.

If ever circumstantial evidence of discriminatory motive could be demonstrated through procedural irregularities, changing the entire process mid-game surely counts. The System had to ignore its own negotiated terms, ignore the fact that it reserved for itself the unilateral right to avoid any relocation costs, and ignore its own rules to rescind the Church's award. That is not merely an irregularity—it is a wholesale revocation of the process to reach the desired and discriminatory result.

The subsequently issued request for proposal, RFP 2025-031, further confirms that lease negotiations over the network hub's location

are neither novel nor extraordinary. An addendum to that RFP expressly specifies that the System intended to share the hub space with the new owner and that those terms would be negotiated with the successful bidder. App.150. It is telling that the System was willing to negotiate the hub with the second RFP's (non-religious) winning bidder under the very same contractual expectations that had been grounds for rescinding the Church's award. What changed? The identity of the winning bidder.

In short, the district court should have concluded that, "based on the *Arlington Heights* factors, something was amiss here." *Mhany*, *supra*, 819 F.3d at 611. Once the bid protests reached the desk of Vice Chancellor Low, who reports directly to the Board of Trustees, a negotiable logistical provision in an addendum to the RFP abruptly became a fatal flaw. The district court erred in both accepting the System's inconsistent post-hoc rationale and overlooking the procedural wrecking ball wielded by the System to appease religious bias.

### 4. The discriminatory impact of the System's decision was clearly foreseeable.

Further supporting an inference of discriminatory intent is Vice Chancellor Low's decision to revoke the Church's winning bid despite his knowledge, or at least the foreseeability, of the obvious effect on the

Church's plan to purchase the Hutchinson Center. To support a finding of discriminatory intent, courts may consider the normal inferences to be drawn from the foreseeable consequences of the government's action. *See Church of Scientology of Georgia, Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1374 (N.D. Ga. 2012). "This inference is justifiable because governmental institutions must be presumed to have knowledge of the natural and foreseeable consequences of their action or inaction[.]" *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978).

Here, the foreseeable consequence of the revocation is probative that the System effectuated the discriminatory demands of its constituents. Low was fully informed about the religiously motivated opposition to the Church's winning bid, App.592, and thus he could have foreseen that revoking the award would placate the discriminatory demands of the legion of donors, alumni, faculty, community members, and purse-string-wielding legislators, all of whom lashed out at the System for selling the property to the Church. Indeed, FHC-WA urged Low that revoking the Church's award would "put the community and

the University back on the same path together," App.416, and WCAP similarly pressed Low to do "what is best for the community." App.424.

In light of that knowledge, and in his "unguided and unfettered discretion," *Jean*, 711 F.2d at 1502, Low chose what the donors, alumni, faculty, community members, legislators, and disappointed bidders all wanted: revocation. He sought no clarification about the network hub. Nor did he invite the Church to the negotiation table. And he did not consider that the draft lease agreement allowed the hub to be kept in place for up to 60 years. App.555-556. Instead, he pulled the plug. That knowledge, foreseeability, and a refusal to mitigate together permits the inference that preventing the Church from purchasing the Hutchinson Center was not just foreseen but intended.

### 5. The System ignored less discriminatory avenues.

The System "ignored less [discriminatory] options which would have furthered its policies as effectively as the more [discriminatory] option it chose." *City of Indianapolis*, 573 F.2d at 413. Most notably, the Church expressly offered to maintain the network hub on-site indefinitely and at a nominal cost. App.569. That offer was consistent with the draft lease agreement, which gave the System sole discretion to

keep the hub in place for the duration of the lease, effectively negating any concern about the estimated $500,000 to relocate the hub. App.385. The original RFP also authorized the parties to negotiate "an acceptable contract" so long as negotiations did not "significantly vary the content, nature or requirements of the proposal." App.497.

Despite this flexibility, the System refused to engage with the Church. Instead, it opted for the bluntest tool in the shed. Even if Vice Chancellor Low's cost concerns were justifiable, his unfettered decision to revoke rather than negotiate was an unnecessary step that supports the inference of discriminatory intent. *Accord Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 989 (9th Cir. 2006) (finding that county imposed substantial burden under RLUIPA where religious group "readily agreed to every mitigation measure suggested by the Planning Division, but the County, without explanation, found such cooperation insufficient").

## II. For the same reasons set forth in its Equal Protection claim, the Church is likely to prevail on its Free Exercise claim.

The district court concluded that the Church is unlikely to succeed on its Free Exercise claim because it did not "adduce evidence that the System decided to rescind the Church's award of RFP #2024-048 because

of religious animosity." Add.026. That conclusion is likewise erroneous. A government agency violates the Free Exercise Clause "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). "[A]s in equal protection cases, [the Court] may determine the [government's] object from both direct and circumstantial evidence." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (citing *Arlington Heights, supra*, 429 U.S. at 266).

Here, the district court erred by not considering the full weight of cumulative evidence showing that the System revoked the Church's winning bid at least in part to appease the religiously discriminatory opposition from its donors, alumni, legislators, and vocal community members. *Cf. Lukumi*, 508 U.S. at 541 (noting the "evidence of significant hostility exhibited by residents … toward the Santeria religion and its practice of animal sacrifice"). Revoking the Church's award on account of its religious identity is precisely the kind of non-neutral, religiously motivated government action that the Free Exercise Clause forbids. And, as argued below, the System's decision cannot withstand strict scrutiny.

## III. The System's revocation of the Church's winning bid cannot withstand strict scrutiny.

Because the System discriminated against the Church on the basis of its religious status and beliefs and interfered with its fundamental right to religious worship, strict scrutiny applies. *See Lukumi*, 508 U.S. at 546. The System therefore must prove that its revocation of the Church's winning bid was narrowly tailored to further a compelling government interest. *See Lowe v. Mills*, 68 F.4th 706, 717 (1st Cir. 2023). The System cannot meet that demanding burden. Appeasing discriminatory community animus furthers no government interest, and the System must do more than assert a general interest in cost savings. *Accord Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974).

Even if cost savings were a compelling interest, less discriminatory avenues were available to mollify any concerns about the cost of relocating the network hub. *See supra* III(C)(5). Therefore, revoking the Church's winning bid was not the least restrictive means of furthering any interest in cost reduction.

## IV. The Church meets the remaining factors for injunctive relief.

The district court did not address the remaining factors for injunctive relief, having concluded that the Church was unlikely to

succeed on the merits of its claims. Add.027. But the record demonstrates that the Church satisfies the other factors.

First, the Church suffers irreparable constitutional injury each day that passes because every day that passes, and every Sunday that goes by, the Church is losing out on the ability to fulfill its mission, is seeing people turn away, and losing the opportunity to exercise its sincere religious convictions, mandate, and mission to minister to those people. App.516-518, 536-543. The loss of constitutional rights is per se irreparable harm. *E.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The balance of harms and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, "the government has no legitimate interest in pursuing unconstitutional agency action; it is always in the public interest to prevent the violation of a party's constitutional rights." *Doe v. Trump*, 766 F. Supp. 3d 266, 286–87 (D. Mass. 2025) (cleaned up). Thus, the Church satisfies the remaining factors as well.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand for the district court to issue a preliminary injunction.

Dated: July 20, 2025

Stephen C. Whiting
WHITING LAW FIRM
75 Pearl St., Ste. 207
Portland, ME 04101
207-780-0681
steve@whitinglawfirm.com

/s/ Daniel J. Schmid

Mathew D. Staver,
  *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,998 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: July 20, 2025

/s/ Daniel J. Schmid

Daniel J. Schmid

*Attorney for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 20, 2025

/s/ Daniel J. Schmid

Daniel J. Schmid

*Attorney for Appellant*

No. 25-1452

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

CALVARY CHAPEL BELFAST,
*Plaintiff-Appellant,*

v.

UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE
UNIVERSITY OF MAINE SYSTEM; RYAN LOW, individually and in their
official capacity as Vice Chancellor for Finance and Administration, University of
Maine; RACHEL PIPER, in their official capacity as Executive Director of
Strategic Procurement and Services, University of Maine System; ROBIN CYR, in
their official capacity as Senior Director of Strategic Procurement, University of
Maine System; DEREK HOUTMAN, in their official capacity as Associate
Strategic Sourcing Director, University of Maine System,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maine, Bangor Division
Case No. 1:24-cv-00392-SDN (Hon. Stacey D. Neumann)

---

# ADDENDUM

---

Stephen C. Whiting
WHITING LAW FIRM
75 Pearl St., Ste. 207
Portland, ME 04101
(207) 780-0681
steve@whitinglawfirm.com

Mathew D. Staver,
  *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

Dkt. 63, Order On Motion Preliminary Injunction……………………….001

Dkt. 48, Order on Motion for Temporary Restraining Order…………..029

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| CALVARY CHAPEL BELFAST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00392-SDN |
| | ) | |
| UNIVERSITY OF MAINE SYSTEM, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER ON MOTION FOR PRELIMINARY INJUNCTION</u>

Calvary Chapel Belfast ("the Church") seeks a preliminary injunction to restore its winning bid for the purchase of the Hutchinson Center, a property owned by the University of Maine System ("the System"). The Church alleges the System discriminated against the Church in violation of the Equal Protection Clause and the Free Exercise Clause when the System cancelled and restarted the bidding process. After first awarding the Church's bid, the System issued a second request for proposal ("RFP") and ultimately awarded the bid to another entity (*see* ECF No. 3). On a limited paper record, the Court previously denied the Church's request for a temporary restraining order, concluding the Church had not demonstrated a likelihood of success on the merits or irreparable harm (*see* ECF No. 48). The Court held an evidentiary hearing on March 4, 2025, where it received the testimony of Greg Huston (the Church's Pastor), Defendant Ryan Low (the System's Vice Chancellor of Finance and Administration), Defendant Robyn Cyr (the System's Senior Director for Strategic Sourcing), and Defendant Rachel Piper (the System's Strategic Director for Procurement/Chief Procurement Officer) (*see* ECF No.

**Addendum - 001**

56). The Court found all witnesses credible. After carefully considering the evidence and arguments presented by the parties, the Court DENIES the Church's Motion for Preliminary Injunction (ECF No. 3), concluding the Church has not demonstrated a likelihood of success on the merits of its equal protection and free exercise claims.

## I.      Factual Background

The Court repeats the facts as recited from its Order on Motion for Temporary Restraining Order (ECF No. 48, "TRO Order"), adding to those facts where appropriate based on the evidence presented at the March 4, 2025, hearing.

This matter arises out of the System's efforts to sell its Hutchinson Center property located in Belfast, Maine. The Hutchinson Center opened in 2000 and served over 16,000 students at its height, but the Center closed in 2023 after several years of declining use. Decl. Gretchen Catlin ("Catlin Dec.") ECF No. 38-1, at ¶ 3. The System decided to sell the Hutchinson Center using the System's procurement process. *Id.*

The Church is led by Pastor Greg Huston, who has served in that role for eight years. Hr'g Tr. 13:21-14:2. Pastor Huston is also the Chief Executive Officer of the Church, overseeing church operations and preaching on Sunday mornings. Hr'g Tr. 14:3-11. The Church does not currently own a building, but instead rents various facilities to conduct its services and ministries. *See* Hr'g Tr. 18:21-23. The Church holds multiple gatherings every week with hundreds of people in attendance. Hr'g Tr. 14:12-24. The weekly worship gathering is at full capacity in its current rental facility, and the parking lot is full, so the Church has been shuttling people in from other facilities. H'rg Tr. 19:5-9. Pastor Huston testified that the cramped environment is uncomfortable for newcomers to the Church and that new people walk into the Church or drive into the parking lot, see how crowded it is, and leave before the service—leaving the Church unable to fulfill its mission to

2

**Addendum - 002**

minister to as many people as possible. Hr'g Tr. 19:10-13, 36:18-22. The Church has new people attempting to join the congregation every week. Hr'g Tr. 34:19-21. Every year, the Church rents out a local school for its Easter service and sees the congregation almost double. Hr'g Tr. 36:2-7. Additionally, the Church livestreams and radio broadcasts its services for out-of-state attendees, but those services are also heavily utilized by local community members who are unable to make it to the service or who are uncomfortable being crammed in the Church's current facility. Hr'g Tr. 39:24-40:14. The Church's ability to fulfill its religious mission of providing counsel and help to all who seek its services is hampered by its inadequate rental space. *See* Hr'g Tr. 40:7-45:6.

The Church runs a cooperative program for homeschooled students that it has had to cap at 100 students and run out of a separate facility due to space concerns. Hr'g Tr. 19:15-18. The homeschool cooperative program has a waiting list for families the Church currently is unable to accommodate. Hr'g Tr. 43:14-22. The Church also runs programming for those in recovery from addiction and for families with children and those programs are also negatively affected by issues with the Church's current physical space. Hr'g Tr. 41:1-42:21.

In January 2024, the Church learned the System was planning to sell the Hutchinson Center and was excited about the opportunity to purchase it. Hr'g Tr. 14:25-15:5. The Church had rented the Hutchinson Center in the past and ran all its services and additional ministries through the Center for three years. Hr'g Tr. 15:6-20. The Church was familiar with the space and saw its potential to meet the Church's growing needs to accommodate its congregation and ministries. *See* Hr'g Tr. 15:16-16:1.

The System issued RFP #2024-048, University of Maine, Hutchinson Center Real Estate Offer, on January 17, 2024. Catlin Dec. ¶ 6; Verified Compl. (ECF No. 1) at ¶ 33 &

3

**Addendum - 003**

Ex. A (ECF No. 1-1); Joint Hr'g Ex. 2. The purpose of the RFP was to solicit interest in the Hutchinson Center property, and the System was willing to consider purchase and sale offers, lease offers, and creative real property offers. Ex. A; Catlin Dec. ¶ 6; Joint Hr'g Ex. 2. The bid process for RFP #2024-048 was structured on a 100-point scale, which the System used to evaluate the degree to which each submitted proposal met specific criteria set forth by the System. Verified Compl. ¶ 34; Ex. A; Joint Hr'g Ex. 2. The System would award the winning bidder the right to negotiate a final contract for the sale, lease, or other property offer. Catlin Dec. ¶ 7; Joint Hr'g Ex. 2.

Section 2.4 of RFP #2024-048 provides: "Such negotiations may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at ¶ 2.4; Joint Hr'g Ex. 2 at § 2.4. It further provides: "[T]he University may cancel the [RFP] at its sole discretion." Ex. A at § 2.4; Joint Hr'g Ex. 2 at § 2.4.

Section 1.8 of the RFP provides the process and remedies for "specification protests." Joint Hr'g Ex. 2 at § 1.8. A respondent to the RFP may submit a "specification protest" if the respondent "feels that the specifications are written in a way that limits competition." *Id*. According to the language of RFP #2024-048, "[s]pecification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal . . . . No protest against the award due to the specifications shall be considered after this deadline." *Id*. Defendant Rachel Piper, the System's Strategic Director for Procurement/Chief Procurement Officer, testified that specification protests are appropriate when a "potential respondent who is interested in providing a response to a solicitation sees something that is written within the RFP specifications that would prohibit them from submitting and, therefore, limit

4

competition." Hr'g Tr. (ECF No. 60) 202:1-5. Specification protests give potential respondents "the opportunity to reach out to the University Strategic Procurement office and identify which areas they feel are restrictive in competition." Hr'g Tr. 202:5-8. As an example of a specification protest, Ms. Piper provided a hypothetical RFP for office supply delivery that specified the office supplies should be delivered in a yellow truck with a man with a mustache on it. Hr'g Tr. 202:9-19. In this hypothetical, Staples and OfficeMax would be unable to respond despite being able to deliver office supplies in a white van. Hr'g Tr. 202:20-24.

The System follows an internal, administrative appeal process for procurement awards, set forth in the System's Administrative Practice Letter VII-A. *See* Catlin Dec. ¶ 12; Status Report Nov. 21, 2024 (ECF No. 16) at ¶ 3 and Ex. 1 (ECF No. 16-2); Joint Hr'g Ex. 1. The appeals process has two levels, and the second level is final. *See* Catlin Dec. ¶ 5; Decl. Ryan Low ("Low Dec.") ECF No. 38-2, at ¶ 5; Joint Hr'g Ex. 1 at 6-7. Gretchen Catlin, the System's Chief Facilities and General Services Officer, normally serves as the decisionmaker at the second level of procurement awards appeals. *See* Catlin Dec. ¶ 5; Low Dec. ¶ 5; Joint Hr'g Ex. 1 at 6-7. However, because she was heavily involved in developing RFP #2024-048, Ms. Catlin recused herself from serving as the decisionmaker in the second level of appeal for this RFP in February of 2024, long before proposals were due. Catlin Dec. ¶¶ 1, 4-5. Due to Ms. Catlin's recusal, Ryan Low, the System's Vice Chancellor for Finance and Administration, served as the final decisionmaker for the appeal of RFP #2024-048. Catlin Dec. ¶ 5. As soon as Ms. Catlin recused herself, Vice Chancellor Low stopped participating in all System discussions and meetings about the Hutchinson Center. Low Dec. ¶ 6.

**Addendum - 005**

The System issued Addendum 4 to RFP #2024-048 on April 18, 2024. Catlin Dec. ¶ 8 and Ex. 1; *see* Joint Hr'g Ex. 2. Addendum 4 addressed the Networkmaine regional internet hub located within the Hutchinson Center. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. The internet hub facilitates regional internet access to public and private educational institutions in the Belfast, Camden, and Rockland areas. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. Addendum 4 required relocating the internet hub from within the Hutchinson Center to an external purpose-built utility building. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. On May 30, 2024, the System circulated a draft lease for its continued access to the internet hub in the eventual purpose-built utility building to be built on the Hutchinson Center property and for within the Hutchinson Center while relocation to the purpose-built building was in process. Catlin Dec. ¶ 9; *see* Joint Hr'g Ex. 2. The draft lease contains the following language:

> Currently located within the Hutchinson Education Center, the University will continue to operate the hub in room 100Y Phase 1 plan noted below with an option to permanently relocate the hub as outlined in the Phase 2 plan below.
>
> **PHASE 1:**
> Currently proposed to continue the operation of the hub within the Hutchinson Center in a room labeled as room 100Y on Appendix A.
>
> The University of Maine System requires a ["]carve out" that will include room 100Y and the external generator, shown on the first-floor plan to house data communications equipment servicing community anchor institutions throughout the greater Belfast, Camden, and Rockland regions in Maine. This distribution hub is maintained by the University of Maine System IT Department.
>
> **PHASE 2:**
> To ensure the provision of connectivity services to the greater coastal area, the University proposes the relocation of the hub from its current site within the Hutchinson Center to a purpose-built utility building. This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site.

**Addendum - 006**

> The proposed pre-fabricated equipment shelter of concrete/fiberglass construction, measuring approximately 20 feet by 12 feet, will be situated within a fenced area approximately 45 feet by 45 feet. This relocation will grant the University uninterrupted access to the hub, 24 hours a day, 7 days a week, 365 days a year.
>
> To facilitate this relocation, the University of Maine System seeks to establish a lease agreement or easement to house an equipment shelter adjacent to the barn located on the northeast corner of the Hutchinson Center property along with an easement that allows for access for utility trucks and University vehicles to gain access to the fenced in area. The equipment shelter will be independently connected to power, complete with its own meter, and data lines, run aerially and perhaps underground, from the main road. Furthermore, the University will install a new generator to ensure continued operation of the hub during power outages. Negotiations may include the transfer of the existing diesel generator, which has a limited runtime and was solely dedicated to supporting the connectivity hub within the building, to the new owners of the Hutchinson Center.
>
> Until all site prep work, shelter placement and connectivity hub equipment relocation is completed, the University will need to retain 24x7x365 access to room 100Y in the Hutchinson Center and have 24x7 access to the facility to support the network.

Joint Hr'g Ex. 2.

Jason Stutheit, a Church congregant, led the preparation of the Church's proposal for RFP #2024-048, which the Church submitted on March 28, 2024. Verified Compl. ¶ 44; Joint Hr'g Ex. 3. The Church began to liquidate assets to make a competitive offer, including selling its current property (a utility trailer and a shipping container) for a total of $115,000 in June 2024. Verified Compl. ¶ 44. On August 1, 2024, TD Bank informed the Church it would provide financing for $750,000 to acquire the Hutchinson Center. Verified Compl. ¶ 44.

Robyn Cyr, the System's Director of Strategic Sourcing, contacted Mr. Stutheit on April 18, 2024, to inquire whether Addendum 4 would necessitate any changes to the Church's submission. Verified Compl. ¶ 115 and Ex. K (ECF No 1-11) at 3; Hr'g Ex. 21. Mr. Stutheit responded via email, "It does not change our submission. As you had stated in a

7

previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r access in the interim." Verified Compl. ¶ 116 and Ex. K at 2; Hr'g Ex. 21.

The System received three offers in response to RFP #2024-048: a purchase and sale offer from the Church, a purchase and sale offer from Waldo Community Action Partners ("WCAP"), and a creative real property offer from Future of the Hutchinson Center Steering Committee/Waterfall Arts ("FHC-WA"). Catlin Dec. ¶ 10; Joint Hr'g Exs. 3-5. By letter dated August 14, 2024, Ms. Cyr notified the Church that the System was awarding the Church the right to negotiate terms and conditions for the purchase of the Hutchinson Center because it produced the top scoring response. Catlin Dec. ¶ 11. The letter further states:

> This award notice does not constitute an agreement and does not obligate the University to enter into any agreement with the awardee or any other vendor. Any actual contract executed by the University pursuant to the RFP is contingent on the ability of the parties to reach agreement on final terms and conditions and approval by the initiative sponsor. The University will proceed with the present award so long as it determines, in its sole discretion, that doing so is in the best interest of the University.

Verified Compl. Ex. B (ECF No. 1-2); Catlin Dec. ¶ 11. The System publicly announced its decision to sell the Hutchinson Center to the Church in a press release issued on August 15, 2024. Verified Compl. ¶ 48 and Ex. C (ECF No. 1-3). In the press release, the System stated the key factors distinguishing the Church's winning proposal included the Church's offer of a $1 annual lease agreement in perpetuity for the Networkmaine hub, the Church's waiver of its right to have the property inspected, and the Church's offer of $250,000 in earnest money. Verified Compl. ¶ 49.

On August 19, 2024, FHC-WA timely submitted to the System's Executive Director of Strategic Procurement and Services, Rachel Piper, a Notice of Protest appealing the

**Addendum - 008**

award of the bid. Verified Compl. ¶ 50 and Ex. D (ECF No. 1-4); Catlin Dec. ¶ 12; Hr'g Ex. 7. In its protest letter, FHC-WA argued that the System should have scored its bid higher because FHC-WA proposed to allow the System to maintain the existing Networkmaine internet hub within the Hutchinson Center for the life of the lease, saving the System the costs of moving the internet hub. Ex. D at 2; Joint Hr'g Ex. 7 at 2. FHC-WA's protest letter also asserts the hub lease is "problematic" for the Church because the draft lease agreement requires the lessor to refrain from discriminating on the basis of protected classes including sex and sexual orientation, and FHC-WA claimed in its letter that the Church and its "parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." Joint Hr'g Ex. 7 at 2. Ms. Piper denied FHC-WA's protest, stating that if the System had planned to consider cost avoidance, the point scale would have reflected cost avoidance. Catlin Dec. ¶ 14 and Ex. 2; Joint Hr'g Ex. 11.

On August 20, 2024, WCAP timely submitted to Ms. Piper a protest letter appealing the award of the bid. Verified Compl. ¶ 58 and Ex. E (ECF No 1-5); Joint Hr'g Ex. 8. WCAP's protest letter contains a bulleted list of bases for its appeal, including the following: "A Church by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in the nondiscrimination section of the lease." Ex. E at 3; Joint Hr'g Ex. At 3. Ms. Piper denied WCAP's protest. Catlin Dec. ¶ 15; Joint Hr'g Ex. 12.

Following the public announcement of the Church as the winning bidder, members of the public made negative comments regarding the System's award of RFP #2024-048 to the Church, including on social media in response to a news article about the System's decision. Verified Compl. ¶ 63. On August 21, 2024, a Maine State Senator who represents

**Addendum - 009**

Belfast and sits on WCAP's Board of Directors publicly criticized the award to the Church, stating that transferring the Hutchinson Center from public access and "gifting" it to a religious organization seemed "completely inappropriate." Verified Compl. ¶ 64. On August 22, 2024, the System posted another press release announcing it had denied the two protests and was moving ahead with its negotiations with the Church. Verified Compl. ¶ 66 and Ex. F (ECF No. 1-6); Joint Hr'g Ex. 20. The press release also stated the System had received "at least 135 citizen comments" about the pending sale, and further stated that "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2; Joint Hr'g Ex. 20 at 2.

On September 3, 2024, both WCAP and FHC-WA timely submitted to Vice Chancellor Low second appeals of the RFP award. Verified Compl. ¶ 71; Catlin Dec. ¶¶ 16, 18; Joint Hr'g Exs. 9-10. WCAP's second protest letter included an appeal to the System to consider "what is best for the community," and "adherence to the University's mission to public education and accessibility for all supporting diversity and inclusion." Verified Compl. ¶ 79 and Ex. H (ECF No 1-8) at 3; Joint Hr'g Ex. 10 at 3. Vice Chancellor Low saw no merit in WCAP's second appeal and denied it. Low Dec. ¶ 11; Catlin Dec. ¶ 19; Joint Hr'g Ex. 13 at 2.

FHC-WA's second appeal letter specifically noted that "tempers and frustrations with the award decision are running high in the community," and expressed hope that a reversal of the award would "ameliorate this situation and put the community and the University back on the same path together." Verified Compl. ¶ 74 and Ex. G (ECF No 1-7) at 1; Joint Hr'g Ex. 9 at 1. Vice Chancellor Low saw no merit to most of the points in FHC-WA's appeal but was intrigued by one point related to the Networkmaine hub. Low Dec.

**Addendum - 010**

¶ 12; *see* Joint Hr'g Ex. 13 at 3. Contrary to Addendum 4 of the RFP, which specified that the Networkmaine hub would be relocated from within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center, FHC-WA proposed leaving the Networkmaine hub in its current location within the Hutchinson Center for the life of the lease. Low Dec. ¶ 12; *see* Joint Hr'g Ex. 9 at 2-3. It appeared to Vice Chancellor Low that if it were possible to adopt FHC-WA's proposal to leave the Networkmaine hub in place, the System would save about $500,000 in costs that the System would otherwise incur in building a new facility and relocating the hub. Low Dec. ¶ 12. Vice Chancellor Low asked Dr. Robert Placido, the System's Chief Information Officer, if the proposal to leave the hub in place was possible and workable for the System. Low Dec. ¶ 13. Dr. Placido told Vice Chancellor Low that such an arrangement was realistic and that Dr. Placido would be comfortable with that arrangement. Low Dec. ¶ 13. Vice Chancellor Low was aware generally that the RFP was a topic of discussion in the community and in the local press but tried to distance himself from those discussions and articles as much as possible. Low Dec. ¶ 7; Hr'g Tr. 100:4-15.

Vice Chancellor Low disagreed with Ms. Piper's rationale that the RFP process should not have considered cost avoidance measures, instead reasoning that "[i]f the System could avoid the $500,0000 cost of moving the [Networkmaine] hub, then [the System] would be significantly better off." Low Dec. ¶ 14. Vice Chancellor Low further reasoned that, if the System went ahead with the Church's bid of $1 million and incurred the unnecessary cost of $500,000 to move the internet hub, the value to the University of the Church's bid would be reduced to $500,000, less than the System's approximately $900,000 debt remaining on the Hutchinson Center. Low Dec. ¶ 14. Before rescinding the Church's award and beginning the RFP process anew, Vice Chancellor Low conferred

**Addendum - 011**

with the System's general counsel because he wanted to make sure he was following the appropriate steps. Hr'g Tr. 112:16-113:8. On September 12, 2024, Vice Chancellor Low issued a letter to each bidder explaining his decision to rescind the award to the Church. Verified Compl. ¶ 86 and Ex. I (ECF No. 1-9); Joint Hr'g Ex. 13. Vice Chancellor Low testified that the Church's status as a religious organization and the community opposition did not have any role in his decision. Hr'g Tr. 116:19-25.

The System issued a new RFP for the sale of the Hutchinson Center, RFP #2025-031, on October 4, 2024, with responses due November 1, 2024. Verified Compl. ¶¶ 135-36 and Ex. N (ECF No 1-14); Joint Hr'g Ex. 23. The new RFP solicited only real property offers. Catlin Dec. ¶ 23; Joint Hr'g Ex. 23 at 3. It also outlined a mandatory leaseback provision for the Networkmaine hub, requiring the winning bidder to lease back 120 square feet of closet space to the System for an annual fee of no more than $3,000. Verified Compl. ¶ 138; Joint Hr'g Ex. 23 at 3. The lease term would extend for five years, with potential renewals upon mutual agreement. *See* Joint Hr'g Ex. 23 at 3. RFP #2025-031 assigned the following point values: eighty-five points for purchase price, ten points for contingencies, and five points for Networkmaine Lease Cost. Verified Compl. ¶ 137; Joint Hr'g Ex. 23 at 7.

On October 17, 2024, the System released a questions and answers sheet entitled "Addendum 2" to RFP #2025-031. Verified Compl. ¶ 139 and Ex. O (ECF No. 1-15). Addendum 2 addresses a question about the apparent discrepancy between the 120 square feet called for in the lease for the Networkmaine hub and the building drawings, which show the closet where the hub is located measured 248 square feet. Ex. O at 1. In response, the System clarified the closet has 248 square feet of space, but the Networkmaine hub equipment only requires 120 square feet, therefore the System "is

12

**Addendum - 012**

willing to share the space with the new owner." *Id.* Addendum 2 further states, "The final terms of the lease will be negotiated with the awarded respondent." *Id.*

The System received three bids in response to RFP #2025-031 from the same three bidders that responded to the first RFP: the Church, FHC-WA, and WCAP. *See* Catlin Dec. ¶ 25. The Church submitted a new bid in response to the second RFP, this time offering a purchase price of $1.1 million, a free lease to the System of the data closet space, and payment of all utilities relating to the Networkmaine hub. Verified Compl. ¶¶ 155-58. The System awarded the right to negotiate a final agreement for the sale of the Hutchinson Center to WCAP, which bid a purchase price of $3.06 million—more than $1 million higher than any other bid and almost $2 million higher than the Church's bid—and which scored the highest based on the selection criteria. Verified Compl. ¶¶ 159-60; Catlin Dec. ¶ 26; Low Dec. ¶ 25 and Ex. 3. The System notified the Church of this decision by letter dated November 15, 2024. Verified Compl. ¶ 159 and Ex. R (ECF No. 1-18).

On November 20, 2024, the Church submitted a protest to Ms. Piper appealing the System's decision to award the bid to WCAP. Status Report (ECF No. 19) at ¶ 1. Ms. Piper denied the protest on December 2, 2024. *Id.* ¶ 3. Vice Chancellor Low received the Church's appeal of Ms. Piper's denial on December 5, 2024. Low Dec. ¶ 21. Vice Chancellor Low denied the Church's appeal on December 17, 2024 because he "did not find any errors in the process for RFP #2025-031 and, thus, determined the award was appropriately granted to WCAP based on the substantial profit differential." Low Dec. ¶ 24.

## II.    Procedural History

The Church commenced this action on November 19, 2024, by filing its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction

**Addendum - 013**

(ECF Nos. 1, 3). The Court held a telephone conference of counsel on November 20, 2024, at which the parties agreed to delay these proceedings while the Church protested the award decision through the System's internal appeal process (*see* ECF No. 15). The Court ordered the parties to file status reports every three weeks and ordered Defendants to notify the Court of any appeal determinations within forty-eight hours of such determination (ECF No. 18). On December 17, 2024, the Church filed a Notice of Final Denial of Calvary Chapel Belfast's Administrative Appeal and Motion for Hearing on Motion for Temporary Restraining Order (ECF No. 28). The Court held oral argument on the Motion for Temporary Restraining Order on January 6, 2025, (ECF No. 47) and issued its Order denying the Motion for Temporary Restraining Order on January 10, 2025 (ECF No. 48).

Thereafter, the Court held an evidentiary hearing on the Church's Motion for Preliminary Injunction on March 4, 2025 (ECF No. 56). The parties filed post-hearing briefs on the Motion for Preliminary Injunction on March 31, 2025, (ECF Nos. 61, 62), and the matter is now ripe for decision.

### III.    Discussion

#### A.    Legal Standard

The Court applies the same legal standard to determine whether to issue a preliminary injunction as it used on the Motion for Temporary Restraining Order, albeit now with the benefit of a more developed factual record. *See Monga v. Nat'l Endowment for the Arts*, 323 F.Supp.3d 75, 82 (D. Me. 2018) ("To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction."). "The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation" and allowing the Court to

14

**Addendum - 014**

provide an effective remedy upon full adjudication of the merits. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). However, "[i]njunctive relief is an extraordinary and drastic remedy that is never awarded as of right." *Calvary Chapel of Bangor v. Mills*, 459 F.Supp.3d 273, 282 (D. Me. 2020) (quoting *Monga*, 323 F.Supp.3d at 82). The Church has the burden to establish: (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm," (3) "the balance of the equities tip in [its] favor," and (4) "the injunction is in the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

### B.  Likelihood of Success on the Merits

Although the Church brings eight counts in its Verified Complaint, it seeks a preliminary injunction only as to its equal protection and free exercise claims. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3, at 3. The Court considers each in turn.

### 1.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment demands that "similarly situated persons are to receive substantially similar treatment from their government." *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)). The elements of an equal protection claim are: "(1) the [party], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race,

15

**Addendum - 015**

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 132-33 (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (quoting *Rubinovitz*, 60 F.3d at 910) (alteration in original).

Direct evidence of discriminatory intent is rarely available. *See Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection."). However, some "[p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory purpose need not be the sole, dominant, or primary concern to demonstrate a violation; such purpose is impermissible if it was a "motivating factor" behind a government action. *See id.* at 265-66. Discriminatory purpose may be shown by circumstantial as well as direct evidence. *Id.* at 266. Circumstantial evidence of discriminatory purpose may include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Valentin v. Town of Natick*, 633 F.Supp.3d 366, 374 (D. Mass. 2022) (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68) (alterations in original). Substantive departures from normal procedures may also be relevant evidence of discriminatory purpose, "particularly if the factors usually considered important by the

16

**Addendum - 016**

decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267.

In its Order on Motion for Temporary Restraining Order, the Court surveyed case law where public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose. TRO Order at 13-16. As the surveyed cases make plain, impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share those views. However, these cases also establish the requirement of a showing connecting the animus in the community to the government action for that action to constitute a violation of law. *See Ass'n of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Regalamentos & Permisos (A.R.P.E.)*, 740 F.Supp. 95, 105 (D.P.R. 1990) (finding discriminatory intent where there is public opposition on impermissible grounds and a decisionmaker stated that public opinion would be taken into account, there was a pretextual reason for denying the application that had not been raised previously, and the agency could have granted the application if it wanted to); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding discriminatory intent where decisionmakers themselves made racially charged comments and decisionmakers conducted an unprecedented public opinion poll after race-based opposition surfaced); *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263-65 (4th Cir. 2019), *as amended* (Feb. 25, 2019) (finding plaintiffs stated a plausible claim of officials' discriminatory animus where the decision-making board denied a zoning application for its church even though the county official in charge of planning did not oppose it and after opposed neighbors made ethnically and religiously disparaging

17

remarks during the board hearing); *Valentin*, 633 F.Supp.3d at 375 (finding plaintiffs adequately stated a claim of discriminatory intent where their permit was denied amid racist public backlash and unusual procedural hurdles raised by the Planning Board).

Often, the connection between the community animus and the government action is a procedural irregularity, a hurdle that deviates from the procedural norms, or a substantive departure from factors usually considered important to the decisionmaker. *See Town of Clarkton*, 682 F.2d at 1066 (deployment of a never before used public opinion poll); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 264-65 (the Board did not follow the recommendations and positions of two county officials with expertise); *Valentin*, 633 F.Supp.3d at 375 (subjecting plaintiffs to an excessive number of public hearings). Sometimes the government officials themselves make statements that indicate they are taking the public animosity into account in their decision-making or the officials themselves share in the animosity. *See A.F.P.S.*, 740 F.Supp. at 105 (decisionmaker stated public opinion would play a role in the decision-making); *Town of Clarkton*, 682 F.Supp.2d at 1066 (defendants themselves made racially "camouflaged" statements).

In support of its request for a temporary restraining order the Church argued that, when the System rescinded its initial award to the Church rather than negotiate the Networkmaine hub's permanent location directly with the Church, the System engaged in a procedural irregularity showing evidence of the System's religious bias against the Church. *See* TRO Order at 17. In issuing its Order denying the temporary restraining order, the Court examined the record evidence and concluded the System had not deviated from procedure and had in fact followed the terms of the RFP because the RFP prohibited "significant changes" to the RFP terms, and leaving the hub in place indefinitely would be a significant change. *Id.* at 17-19. Further, the Court concluded there

18

**Addendum - 018**

was no evidence "to suggest any party, let alone the System—the party in charge of the RFP and owner of the property—had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it by way of its appeal to the original RFP." *Id*. at 18.

The Church now argues evidence of the System's religious animus can be inferred from both a substantive deviation—the System did not have to rescind the RFP to keep the hub in place because of the language of the draft lease circulated with Addendum 4— and a procedural deviation—FHC-WA and WCAP's appeals should not have been considered at all because they were untimely "specification protests" and should have been submitted before the RFP closed. The Court considers each in turn.

### a.    Alleged Substantive Deviation: The Draft Lease

On the augmented record following the evidentiary hearing on the Church's request for a preliminary injunction, the Church now argues the System was never required to move the Networkmaine hub and had indeed contemplated leaving it inside the Hutchinson Center. Pl.'s Post-Hr'g Prelim. Injunction Brief (ECF No. 62) ("Church's Brief") at 4-7. The Church bases this argument on language contained in the draft lease circulated with Addendum 4 to RFP #2024-048. The Church argues Vice Chancellor Low's stated rationale for rescinding the award to the Church because of FHC-WA's proposal to leave the hub in place was pretext for impermissibly adopting the community's religious animus, because the System, by way of the draft lease language, already had the right to keep the hub in place. Church's Brief at 7-9. The System argues that, despite the language of the draft lease, the evidence establishes that everyone understood through Addendum 4 of RFP #2024-048 that the System would be moving the hub to an outside purpose-built utility building, not leaving it in place like FHC-WA proposed. Therefore, according to the System, Vice Chancellor Low's stated reason for

19

rescinding the award was the true reason for the rescission, not religious animus. Def.'s Post-Hr'g Brief (ECF No. 61) ("System's Brief") at 13-17.

The draft lease circulated with Addendum 4 to the RFP reads as follows: "Currently located within the Hutchinson Education Center, the University will continue to operate the hub in room 100Y Phase 1 plan noted below with an option to permanently relocate the hub as outlined in the Phase 2 plan below." Joint Hr'g Ex. 2. It goes on to describe the treatment of the hub in the two phases: Phase 1 would require a "carve out" lease of the closet currently containing the hub and Phase 2 proposes constructing the utility building on the Hutchinson Center property rather than an off-site location. *Id.*

As the Church argues, the draft lease's use of the phrase "an option to permanently relocate the hub" appears to leave the choice of whether to move the hub out of the closet and into an external building on the property up to the System's discretion and therefore also contemplates the inverse—leaving the hub in place within the Hutchinson Center. *See id.* Vice Chancellor Low acknowledged that the draft lease language could have been so interpreted. Hr'g Tr. 75:22-24 ("It was my belief that [keeping the hub in place] was not what my intent was. But under your reading, could we have literally done that? Yes."). Regardless of the language contained in the draft lease, the evidence shows that all the parties involved—including the Church—understood that the hub would be moved out of the Hutchinson Center.

Vice Chancellor Low testified credibly that, at the time he made the decision to grant FHC-WA's appeal and rescind the Church's bid award, he understood the hub would remain in the Hutchinson Center in the short term and then be moved to a location outside the Hutchinson Center building. Hr'g Tr. 109:7-110:16. Ms. Piper also testified credibly that at the time she was reviewing WCAP and FHC-WA's appeals, she believed

20

**Addendum - 020**

the System was going to proceed in the two phases outlined in the draft lease: first, the hub would stay inside the Hutchinson Center, then it would be moved to an "outbuilding." Hr'g Tr. 204:24-205:13. Ms. Piper understood the hub relocation as "not a matter of if [the hub would be relocated] but when." Hr'g Tr. 205:3. Pastor Huston also understood the hub would be moved out of the Hutchinson Center. Hr'g Tr. 27:17-20, 49:4-8.

Beyond the testimony, contemporaneous documentation also reflects the general understanding by all, including the Church, that with the initial RFP the System would proceed to the Phase 2 plan and move the hub from inside the Hutchinson Center. Joint Ex. 3 at 16; Joint Ex. 6 at 6. The Church points to the System's award deck and August 22, 2024, press release as evidence that the Church offered to leave the hub in place inside the Hutchinson Center in perpetuity. Church's Brief at 6. An examination of the award deck and the press release belies this argument, however. Under the "[o]ther key considerations" heading of the scoring summary of the Church's proposal, the award deck states the following regarding the Church's treatment of the Networkmaine hub: "[The Church] has requested to negotiate the terms of Phase 2 regarding the building location, the annual lease is $1.00 for Phase 1 & 2 plus utilities . . . ." Joint Ex. 6 at 6. The reference to the building location in the award deck shows that the Church and the System understood the hub would be relocated to a new "building."

The press release states that proposals relating to the hub were "key distinguishing characteristics" between bids. Specifically, the press release states:

> The top-scoring proposal offered a $1 annual lease agreement in perpetuity for a carve-out of space so the UMS can continue to maintain internet connectivity for midcoast schools, libraries and community centers through a Networkmaine access hub historically located at the center. This was more favorable than the proposal from WCAP, which offered to lease the space back to the System at a rate of $2 per square foot annually.

**Addendum - 021**

Joint Ex. 20 at 1. In context, the press release explains a key distinguishing characteristic of the Church's proposal regarding the hub was that the proposal involved a less expensive lease "in perpetuity" for the university than the next-highest-scoring bidder. The Church offer of a lease "in perpetuity" for one dollar per year compared to WCAP's offer of a lease at two dollars per square foot was a key distinguisher—not that the Church offered to keep the hub inside the Hutchinson Center "in perpetuity." It is neither a surprise nor a suggestion of a different interpretation of the clause that the press release declined to mention the plan to move the hub outside the building. Because all parties understood Phase 2 to be inevitable, the distinguishing feature of the Church's bid was its relative economic benefit for the System, the less expensive lease.

Additionally, two emails sent by Mr. Stutheit on behalf of the Church to Robyn Cyr demonstrate that the Church understood the hub would be relocated from inside the Hutchinson Center to an on-site utility building. Joint Ex. 3 at 16; Joint Ex. 21 at 2. On June 3, 2024, Mr. Stutheit wrote to Ms. Cyr:

> As far as location we would like to put the ground lease location in the Northwest corner of the lot between the current sign and the property adjacent to Sweetser Dr. to keep it out of usable space. We would want the University to plant shrubs around the perimeter for improved esthetics.

Joint Ex. 3 at 21. Second, Mr. Stutheit's April 18, 2024, email to Ms. Cyr references providing the system with twenty-four-hour access to the hub "in the interim." Joint Ex. 21 at 2. His use of the term "interim" is evidence that Mr. Stutheit understood the hub would move elsewhere after phase one – the "interim" phase – concluded.

The ultimate inquiry when deciding whether the Church has adduced enough evidence of an equal protection violation is not whether the System substantively departed from the terms of RFP #2024-048, but whether such a substantive departure, if

22

**Addendum - 022**

one occurred at all, is evidence of pretext disguising discriminatory animus. *See Vill. of Arlington Heights*, 429 U.S. at 267 ("[s]ubstantive departures may also be relevant" evidence of discriminatory purpose). Here, the only evidence the Church posits to demonstrate the System contemplated leaving the hub in place before FHC-WA proposed doing so is the use of the term "option" in the draft lease circulated with Addendum 4. However, the great weight of the evidence, including the credible testimony of all the witnesses and the contemporaneous documents submitted to the Court, does not support this conclusion. All individuals and parties involved in the RFP process, including the Church, believed at the time of the original RFP that the System would relocate the hub from inside the Hutchinson Center to another building. The language of the draft lease, taken as a whole, is at best unclear. Another passage of the draft lease compares moving the hub to the outside building on the property to moving the hub off the site altogether. *See* Joint Ex. 2. ("To ensure the continued provision of connectivity services to the greater coastal area, the University proposes the relocation of the hub from its current site within the Hutchinson Center to a purpose-built utility building. This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site."). The fact that some language in the draft lease could at a later date be read to allow for the hub to remain in the Hutchinson Center does not mean that was the understanding of the parties—and in particular Vice Chancellor Low—when the System rescinded the initial RFP award.

Even if the Court were to conclude now that, pursuant to the terms in the draft lease, the System could have unilaterally decided to leave the hub inside the Hutchinson Center, such a finding does not equate to a conclusion that the System's rescission of the initial RFP was a "substantive departure" where "the factors usually considered important

23

**Addendum - 023**

by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267. The fact that Vice Chancellor Low may have been mistaken about whether he was required to rescind the award to the Church in order to leave the hub in place permanently would not change the analysis. The record demonstrates Vice Chancellor Low made the decision to rescind the award and issue a new RFP based on one of the same factors the second-appeal-level administrator would usually consider—cost savings. The Church did not produce evidence indicating such a decision-maker would not have considered that important factor.

The Court does not conclude the isolated use of the term "option" in a draft lease that was never executed is probative of pretext or discriminatory animus.

### b. Alleged Procedural Deviation: Protest Consideration

The Church argues the System deviated from its normal procedures by even considering WCAP and FHC-WA's award protests because, according to the Church, the protests were actually untimely specification protests, and this deviation is evidence of pretext disguising discriminatory animus. Church's Brief at 10-18. The Church further argues that if the protests were not specification protests, they were exceptions to the terms of the RFP, which were due at the time of the proposals. As such, according to the Church, the System should not have considered the protests because, by submitting a response to RFP #2024-048, all respondents agreed to the terms and conditions and agreed that the specifications, including the scoring system, were adequate. *Id*. The System argues it properly considered the appeals because they were award protests, not specification protests, and the disappointed bidders could not have known how the scoring would be applied until after the bids were evaluated. System's Brief at 10-13.

**Addendum - 024**

As explained above, section 1.8 of the RFP provides the process and remedies for "specification protests." Joint Hr'g Ex. 2 at § 1.8. A respondent to the RFP may submit a "specification protest" if the respondent "feels that the specifications are written in a way that limits competition." *Id.* "Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal . . . . No protest against the award due to the specifications shall be considered after this deadline." *Id.*

While it is true that Vice Chancellor Low admitted in his testimony that he believes cost avoidance measures are specifications in an RFP, Hr'g Tr. 90:16-90:21, the Church has not explained, nor can the Court glean, how the specifications in the RFP were written in a way that limits competition. The Church has focused its argument on 1.9.4 of RFP #2024-048. That section provides: "By submitting a Response, the Respondent agrees and assures that the specifications are adequate, and the Respondent accepts the terms and conditions herein. Any exceptions should be noted in your response[.]" Joint Hr'g Ex. 2 at § 1.9.4. There is no evidence that FHC-WA or WCAP noted any exceptions to the specifications and terms and conditions in their bids to the RFP. The Church argues that, by virtue of submitting bid proposals to the original RFP, FHC-WA and WCAP waived any right to protest the specifications, terms, and conditions, of which cost savings is one. Church's Brief at 10-18.

The Court disagrees. As Ms. Piper explained, FHC-WA and WCAP could not have known in advance how the scoring criteria would be applied to their responses. Hr'g Tr. 204:1-19. If bidders were required to note their concerns about how the scoring criteria would apply to their cost-savings proposals or other aspects of their bids, Section 2.5 of the RFP providing the procedures for awards protests would be rendered meaningless.

25

**Addendum - 025**

After all, the scoring criteria determine whether a bid is awarded: if bidders could never protest the application of the scoring criteria, they could never protest an award. *See* Joint Hr'g Ex. 2 at § 2.5. Moreover, as with substantive departures, what is relevant about procedural departures is not any alleged departure from procedure itself, but whether a departure from procedure is probative of pretext that masks discriminatory intent. *See Vill. of Arlington Heights*, 429 U.S. at 267. The Court does not conclude the System's consideration of the disappointed bidders' protests is evidence of discriminatory animus.

### c. Alleged Religious Bias

In its Order on Motion for Temporary Restraining Order, the Court found no evidence of bias from within the System and found no procedural irregularity probative of the System's intent to adopt the bias of outside parties. TRO Order at 19-21. On the augmented record, the Church has produced no evidence of impermissible religious animus from within the System, and the Court has concluded the alleged substantive and procedural departures are not probative of any intent by the System to discriminate on the basis of religion or adopt the community's religious animus. Therefore, the Court does not conclude the Church is likely to succeed on the merits of its Equal Protection Clause claim for relief.

### 2.    Free Exercise

Under the Free Exercise Clause, governmental bodies must act neutrally toward religious beliefs and "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Governmental actions that are not neutral "trigger

**Addendum - 026**

strict scrutiny under the Free Exercise Clause." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

In its Order on Motion for Temporary Restraining Order, the Court explained that in order to succeed on its free exercise claim, the Church would have to adduce evidence that the System decided to rescind the Church's award of RFP #2024-048 because of religious animosity. TRO Order at 21-22. The Court has concluded, above, that the Church has not carried this burden. Therefore, the Court cannot conclude the Church is likely to succeed on the merits of its free exercise claim.

### C.    Other Factors

Having concluded the Church has not demonstrated a likelihood of success on the merits of its claims, the sine qua non of the preliminary injunction analysis, *New Comm Wireless Servs., Inc*, 287 F.3d at 9, the Court does not address the remaining factors and does not revisit its conclusion on whether the Church has demonstrated irreparable harm.

### IV.    Conclusion

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank*, 672 F.3d at 8 (quoting *Voice of the Arab World, Inc.*, 645 F.3d at 26). In the absence of any direct or circumstantial evidence to connect community animus to the System's actions that would enable the Court to conclude the Church is likely to succeed on the merits of its Equal Protection Clause or

Free Exercise Clause Claims due to Defendants' religious discrimination, the Church's motion for a preliminary injunction is DENIED.

SO ORDERED.

Dated this 7th day of May, 2025.

/s/ Stacey D. Neumann
STACEY D. NEUMANN
UNITED STATES DISTRICT JUDGE

Addendum - 028

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| CALVARY CHAPEL BELFAST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 1:24-cv-00392-SDN |
| | ) |
| UNIVERSITY OF MAINE SYSTEM, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

Calvary Chapel Belfast ("the Church") brought an eight count Verified Complaint (ECF No. 1) against the University of Maine System ("the System"), its Board of Trustees, and four University of Maine administrators in their official capacities seeking injunctive relief to enjoin Defendants from moving forward with negotiations to sell the Hutchinson Center to another purchaser, specific performance requiring Defendants to proceed with negotiating the sale with the Church, and other relief the Court may find necessary and proper. Before the Court is the Church's Motion for Temporary Restraining Order[1] under Fed. R. Civ. P. 65. The Court heard oral argument on the matter on January 6, 2025. For the reasons set forth below, the Church's motion is denied.

## I.    Factual Background

The Court draws the facts from the Verified Complaint, the parties' declarations, and the attached exhibits.

---

[1] The Church's motion requests both a temporary restraining order and a preliminary injunction. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3. In this order, the Court addresses only the Church's motion for a temporary restraining order, not its motion for a preliminary injunction. An evidentiary hearing on the motion for preliminary injunction will be scheduled as soon as practicable for the Court and the parties.

**Addendum - 029**

This matter arises out of the System's efforts to sell its Hutchinson Center property in Belfast, Maine. The Hutchinson Center opened in 2000 and served over 16,000 students at its height, but the center closed in 2023 after several years of declining use. Decl. Gretchen Catlin ("Catlin Dec.") ECF No. 38-1, at ¶ 3. The System decided to sell the Hutchinson Center using its procurement process. *Id.*

The System issued RFP #2024-048, University of Maine, Hutchinson Center Real Estate Offer, on January 17, 2024. Catlin Dec. ¶ 6; Verified Compl. (ECF No. 1) at ¶ 33 and Ex. A (ECF No. 1-1). The purpose of the RFP was to solicit interest in the Hutchinson Center property, and the System was willing to consider purchase and sale offers, lease offers, and creative real property offers. Ex. A; Catlin Dec. ¶ 6. The bid process for RFP #2024-048 was structured on a 100-point scale, which the System used to evaluate the degree to which each submitted proposal met specific criteria set forth by the System. Verified Compl. ¶ 34; Ex. A. The System would award the winning bidder the right to negotiate a final contract for the sale, lease, or other property offer. Catlin Dec. ¶ 7. Section 2.4 of RFP #2024-048 provides: "[s]uch negotiations may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at ¶ 2.4. It further provides, "the University may cancel the RFB, at its sole discretion." *Id.*

The System follows an internal, administrative appeal process for procurement awards, set forth in the System's Administrative Practice Letter VII-A. *See* Catlin Dec. ¶ 12; Status Report Nov. 21, 2024 (ECF No. 16) at ¶ 3 and Ex. 1 (ECF No. 16-2). The appeals process has two levels, and the second level is final. *See* Catlin Dec. ¶ 5; Decl. Ryan Low ("Low Dec.") ECF No. 38-2, at ¶ 5. Gretchen Catlin, the System's Chief Facilities and General Services Officer, normally serves as the decisionmaker at the second level of

**Addendum - 030**

procurement awards appeals. *See* Catlin Dec. ¶ 5; Low Dec. ¶ 5. However, because she was heavily involved in developing RFP #2024-048, Ms. Catlin preemptively recused herself from serving as the decisionmaker in the second level of appeal for this RFP in February of 2024. Catlin Dec. ¶¶ 1, 4-5. Due to Ms. Catlin's recusal, Ryan Low, the System's Vice Chancellor for Finance and Administration, served as the final decisionmaker for the appeal of RFP #2024-048. Catlin Dec. ¶ 5. As soon as Ms. Catlin recused herself, Vice Chancellor Low stopped participating in all System discussions and meetings about the Hutchinson Center. Low Dec. ¶ 6.

The System issued Addendum 4 to RFP #2024-048 on April 18, 2024. Catlin Dec. ¶ 8 and Ex. 1. Addendum 4 addressed the Networkmaine regional internet hub located within the Hutchinson Center. Catlin Dec. ¶ 8 and Ex. 1. The internet hub facilitates regional internet access to public and private educational institutions in the Belfast, Camden, and Rockland areas. Catlin Dec. ¶ 8 and Ex. 1. Addendum 4 required relocating the internet hub from within the Hutchinson Center to an external purpose-built utility building. Catlin Dec. ¶ 8 and Ex. 1. On May 30, 2024, the System circulated a draft lease for its continued access to the internet hub in the purpose-built utility building and within the Hutchinson Center while relocation to the purpose-built building was in process. Catlin Dec. ¶ 9.

The Church prepared a proposal for RFP #2024-048 led by a Church congregant, Jason Stutheit. Verified Compl. ¶ 44. The Church began to liquidate assets to make a competitive offer, including selling its current property, a utility trailer, and a shipping container for a total of $115,000 in June 2024. Verified Compl. ¶ 44. On August 1, 2024, TD Bank informed the Church it would provide financing for $750,000 to acquire the

3

**Addendum - 031**

Hutchinson Center. Verified Compl. ¶ 44. The Church timely submitted its proposal to RFP #2024-048. Verified Compl. ¶ 45.

Robyn Cyr, the System's Director of Strategic Sourcing, contacted Jason Stutheit, the Church's liaison for the RFP, on April 18, 2024 to inquire whether Addendum 4 would necessitate any changes to the Church's submission. Verified Compl. ¶ 115 and Ex. K (ECF No 1-11) at 3. Mr. Stutheit responded, "[i]t does not change our submission. As you had stated in a previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r access in the interim." Verified Compl. ¶ 116 and Ex. K at 2.

The System received three offers in response to RFP #2024-048: a purchase and sale offer from the Church, a purchase and sale offer from Waldo Community Action Partners ("WCAP"), and a creative real property offer from Future of the Hutchinson Center Steering Committee/Waterfall Arts ("FHC-WA"). Catlin Dec. ¶ 10. By letter dated August 14, 2024, Ms. Cyr notified the Church that the System was awarding the Church the right to negotiate terms and conditions for the purchase of the Hutchinson Center because it produced the top scoring response. Catlin Dec. ¶ 11. The letter further states:

> This award notice does not constitute an agreement and does not obligate the University to enter into any agreement with the awardee or any other vendor. Any actual contract executed by the University pursuant to the RFP is contingent on the ability of the parties to reach agreement on final terms and conditions and approval by the initiative sponsor. The University will proceed with the present award so long as it determines, in its sole discretion, that doing so is in the best interest of the University.

Verified Compl. Ex. B (ECF No. 1-2); Catlin Dec. ¶ 11. The System publicly announced its decision to sell the Hutchinson Center to the Church in a press release issued on August 15, 2024. Verified Compl. ¶ 48 and Ex. C (ECF No. 1-3). In the press release, the System stated the key factors distinguishing the Church's winning proposal included the Church's

**Addendum - 032**

offer of a $1 annual lease agreement in perpetuity for the Networkmaine hub, the Church's waiver of its right to have the property inspected, and the Church's offer of $250,000 in earnest money. Verified Compl. ¶ 49.

On August 19, 2024, FHC-WA timely submitted a Notice of Protest to the System's Executive Director of Strategic Procurement and Services, Rachel Piper. Verified Compl. ¶ 50 and Ex. D (ECF No. 1-4); Catlin Dec. ¶ 12. In its protest letter, FHC-WA argued that the System should have scored its bid higher because of FHC-WA's proposal to allow the System to maintain the existing Networkmaine internet hub within the Hutchinson Center for the life of the lease, saving the System the costs of moving the internet hub. Ex. D at 2. FHC-WA's protest letter also asserts the hub lease is "problematic" for the Church because the draft lease agreement requires the lessor to refrain from discriminating on the basis of protected classes including sex and sexual orientation, and the Church and its "parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." *Id.* Ms. Piper denied FHC-WA's protest, stating that if the System had planned to consider the cost avoidance, it would have been reflected in the point scale. Catlin Dec. ¶ 14 and Ex. 2.

On August 20, 2024, WCAP timely submitted a protest letter to Ms. Piper. Verified Compl. ¶ 58 and Ex. E (ECF No 1-5). WCAP's protest letter contains a bulleted list of bases for its appeal, including the following: "[a] Church by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in the nondiscrimination section of the lease." Ex. E at 3. Ms. Piper denied WCAP's protest. Catlin Dec. ¶ 15.

Members of the public made negative comments regarding the System's award of RFP #2024-048 to the Church, including on social media in response to a news article

5

**Addendum - 033**

about the System's decision. Verified Compl. ¶ 63. On August 21, 2024, Maine State Senator Chip Curry, a Democrat who represents Belfast and sits on WCAP's Board of Directors, publicly criticized the award to the Church, stating that transferring the Hutchinson Center from public access and "gifting" it to a religious organization seems "completely inappropriate." Verified Compl. ¶ 64. On August 22, 2024, the System posted another press release announcing it had denied the two protests and was moving ahead with its negotiations with the Church. Verified Compl. ¶ 66 and Ex. F (ECF No. 1-6). The press release also stated the System had received "at least 135 citizen comments" about the pending sale, and further stated that "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2.

Both WCAP and FHC-WA timely submitted second appeals of the RFP award to Vice Chancellor Low on September 3, 2024. Verified Compl. ¶ 71; Catlin Dec. ¶¶ 16, 18. WCAP's second protest letter included an appeal to the System to consider "what is best for the community," and "adherence to the University's mission to public education and accessibility for all supporting diversity and inclusion." Verified Compl. ¶ 79 and Ex. H (ECF No 1-8) at 3. Vice Chancellor Low saw no merit in WCAP's second appeal and denied it. Low Dec. ¶ 11; Catlin Dec. ¶ 19.

FHC-WA's second appeal letter specifically noted that "tempers and frustrations with the award decision are running high in the community," and expressed hope that a reversal of the award would "ameliorate this situation and put the community and the University back on the same path together." Verified Compl. ¶ 74 and Ex. G (ECF No 1-7) at 1. Vice Chancellor Low saw no merit to most of the points in FHC-WA's appeal but was intrigued by one point related to the Networkmaine hub. Low Dec. ¶ 12. Contrary to the

RFP in Addendum 4, which specified that the Networkmaine hub be relocated from within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center, FHC-WA proposed leaving the Networkmaine hub in its current location within the Hutchinson Center for the life of the lease. Low Dec. ¶ 12. It appeared to Vice Chancellor Low that if it was possible to adopt FHC-WA's proposal to leave the Networkmaine hub in place, the System would save about $500,000 in the costs that the System would otherwise incur in building a new facility and relocating the hub. Low Dec. ¶ 12. Vice Chancellor Low asked Dr. Robert Placido, the System's Chief Information Officer, if the proposal was possible and workable for the System. Low Dec. ¶ 13. Dr. Placido told Vice Chancellor Low that such an arrangement was realistic and that Dr. Placido would be comfortable with that arrangement. Low Dec. ¶ 13. Vice Chancellor Low was generally aware that the RFP was a topic of discussion in the community and articles in the local press but tried to distance himself from those discussions and articles as much as possible. Low Dec. ¶ 7.

Vice Chancellor Low disagreed with Ms. Piper's rationale that the RFP process should not have considered cost avoidance measures, instead reasoning that "[i]f the System could avoid the $500,0000 cost of moving the [Networkmaine] hub, then [the System] would be significantly better off." Low Dec. ¶ 14. Vice Chancellor Low further reasoned that, if the System went ahead with the Church's bid of $1 million and incurred the unnecessary costs of $500,000 to move the internet hub, the value to the University would be reduced to $500,000, less than the System's approximately $900,000 debt remaining on the Hutchinson Center. Low Dec. ¶ 14. On September 12, 2024, Vice Chancellor Low issued a letter to each bidder explaining his decision to rescind the award to the Church. Verified Compl. ¶ 86 and Ex. I (ECF No. 1-9). In his Declaration submitted

**Addendum - 035**

to this Court, Vice Chancellor Low specifically declares the fact that the Church is a religious organization, its religious status and beliefs, its religious expression, and the community comments played no role in his decision to grant FHC-WA's appeal and rescind the award to the Church. Low Dec. ¶¶ 17-20.

The System issued a new RFP for the sale of the Hutchinson Center, RFP #2025-031, on October 4, 2024, with responses due November 1, 2024. Verified Compl. ¶¶ 135-36 and Ex. N (ECF No 1-14). The new RFP solicited only real property offers. Catlin Dec. ¶ 23. It also outlined a mandatory leaseback provision for the Networkmaine hub, requiring the winning bidder to lease back 120 square feet of closet space to the System for an annual fee of no more than $3,000. Verified Compl. ¶ 138. The lease term would extend for five years, with potential renewals upon mutual agreement. *Id.* RFP #2025-031 assigned the following point values: eighty-five points for purchase price, ten points for contingencies, and five points for Networkmaine Lease Cost. Verified Compl. ¶ 137.

On October 17, 2024, the System released a questions and answers sheet entitled "Addendum 2" to RFP #2025-031. Verified Compl. ¶ 139 and Ex. O (ECF No. 1-15). Addendum 2 addresses a question about the apparent discrepancy between the 120 square feet called for in the lease for the Networkmaine hub and the building drawings, which show the closet where the hub is located to contain 248 square feet of space. Ex. O at 1. In response, the System clarified the closet has 248 square feet of space, but the Networkmaine hub equipment only requires 120 square feet, therefore the System "is willing to share the space with the new owner." *Id.* Addendum 2 further states "[t]he final terms of the lease will be negotiated with the awarded respondent." *Id.*

The System received three bids in response to RFP #2025-031 from the same three bidders that responded to the first RFP, the Church, FHC-WA, and WCAP. *See* Catlin Dec.

8

**Addendum - 036**

¶ 25. The Church submitted a new bid in response to the second RFP, this time offering a purchase price of $1.1 million, a free lease to the System of the data closet space, and to pay for all utilities relating to the Networkmaine hub. Verified Compl. ¶¶ 155-58. The System awarded the right to negotiate a final agreement for the sale of the Hutchinson Center to WCAP, which bid a purchase price of $3.06 million, more than $ 1 million higher than any other bid and almost $2 million higher than the Church's bid, and which scored the highest based on the selection criteria. Verified Compl. ¶¶ 159-60; Catlin Dec. ¶ 26; Low Dec. ¶ 25 and Ex. 3. The System notified the Church of this decision by letter dated November 15, 2024. Verified Compl. ¶ 159.

The Church submitted a protest of the award to WCAP to Ms. Piper on November 20, 2024. Status Report (ECF No. 19) at ¶ 1. Ms. Piper denied the protest on December 2, 2024. *Id.* ¶ 3. Vice Chancellor Low received the Church's appeal of Ms. Piper's denial on December 5, 2024. Low Dec. ¶ 21. Vice Chancellor Low denied the Church's appeal because he "did not find any errors in the process for RFP #2025-031 and, thus, determined the award was appropriately granted to WCAP based on the substantial profit differential." Low Dec. ¶ 24.

## II.   Procedural History

The Church commenced this action on November 19, 2024, by filing its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction (ECF Nos. 1, 3). The Court held a Telephone Conference of Counsel on November 20, 2024, at which the parties agreed to delay these proceedings while the Church protested the award decision through the System's internal appeal process (*see* ECF No. 15). The Court ordered the parties to file status reports every three weeks and ordered Defendants to notify the Court of any appeal determinations within forty-eight hours of such

Addendum - 037

determination (ECF No. 18). On December 17, 2024, the Church filed a Notice of Final Denial of Calvary Chapel Belfast's Administrative Appeal and Motion for Hearing on Motion for Temporary Restraining Order (ECF No. 28). The Court held a Telephone Conference of Counsel on December 18, 2024, at which the parties agreed to a briefing schedule and date for oral argument on the instant Motion (ECF Nos. 32, 36).

### III.   Discussion

### A. Legal Standard

A temporary restraining order operates to "preserve the status quo, freezing an existing situation" allowing the Court to provide an effective remedy upon full adjudication of the merits. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). However, "[i]njunctive relief is an extraordinary and drastic remedy that is never awarded as of right." *Calvary Chapel of Bangor v. Mills*, 459 F.Supp.3d 273, 282 (D. Me. 2020) (quoting *Monga v. Nat'l Endowment for the Arts*, 323 F.Supp.3d 75, 82 (D. Me. 2018)). When evaluating whether to grant a temporary restraining order, the Court applies the same four-factor analysis as that used for a preliminary injunction. *Monga*, 323 F.Supp.3d at 82. It is Plaintiff's burden to establish: "[1] [it] is likely to succeed on the merits, [2] [it] is likely to suffer irreparable harm, [3] the balance of the equities tip in [its] favor, and [4] that the injunction is in the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc.*

10

**Addendum - 038**

*v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

## B. Likelihood of Success on the Merits

Although the Church brings eight counts in its Verified Complaint, it seeks a Temporary Restraining Order only as to its Equal Protection and Free Exercise claims. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3, at 3. The Court considers each in turn.

### 1. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment demands that "similarly situated persons are to receive substantially similar treatment from their government." *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)). The elements of an equal protection claim are: "(1) the [party], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 132-33 (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (quoting *Rubinovitz*, 60 F.3d at 910) (alteration and omission in *Rubinovitz*) (emphasis in *Buchanan*).

The System agrees the Church was similarly situated to the other bidders, WCAP and FHC-WA. Defs.' Mem. Law Opposing Pl.'s Mot. TRO Prelim. Inj. ("Opp'n") ECF No.

11

**Addendum - 039**

38 at 11. The System argues the Church has put forth no evidence of selective treatment or discriminatory intent and that all bidders were treated equally throughout the process. *Id.* To the Church, the System's entire course of conduct is probative of discriminatory intent and Vice Chancellor Low's decision to grant FHC-WA's second appeal and rescind the Church's award must be viewed as only part of the equal protection violation.

The Court is mindful that direct evidence of discriminatory intent is rarely available. *See Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection."). However, "proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory purpose need not be the sole, dominant, or primary concern to demonstrate a violation; such purpose is impermissible if it was a "motivating factor" behind a government action. *See id.* at 265-66. Discriminatory purpose may be shown by circumstantial as well as direct evidence. *Id.* at 266. Circumstantial evidence of discriminatory purpose may include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Valentin v. Town of Natick*, 633 F.Supp.3d 366, 374 (D. Mass. 2022) (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68).

The Church argues the comments of the public and the other bidders, combined with what the Church alleges were procedural anomalies in the System's process, demonstrate the System made its decision to rescind its initial award to the Church

**Addendum - 040**

because of the Church's religious status and views, and therefore violated the Equal Protection Clause. To support this argument, the Church highlights case law where public pressure combined with procedural anomalies were held sufficient to show discriminatory purpose.

In *Ass'n of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Regalamentos & Permisos (A.R.P.E.)*, the court found discriminatory intent in violation of the Fair Housing Act after trial where the A.R.P.E. denied a special use permit for the operation of a hospice center for AIDS patients. 740 F.Supp. 95, 104-05 (D.P.R. 1990). The hospice center faced local opposition including "petitions, picket lines, graffiti, an administrative complaint, letters to various public bodies, a local court action, . . . appearances on local television programs," and even threats to supporters of the hospice center. *Id.* at 99. The A.R.P.E. ultimately denied the special use permit purportedly because the land was zoned for agricultural use. *Id.* at 100. The court found discriminatory intent and the justification for denying the permit due to the agricultural zoning classification was pretextual because: (1) "local opposition was duly noted by A.R.P.E. decisionmakers, one of whom publicly remarked that community opinion would play a role in the decision;" (2) "prior to the denial of the use permit there is no evidence that the [agricultural] zoning classification was a factor in A.R.P.E.'s decisonmaking;" (3) the "A.R.P.E. clearly had authority to grant the special use permit if it wished to;" and (4) the zoning regulations were selectively enforced against the hospice center. *Id.* at 105. In its analysis, the court stated that while "a decisionmaker is not to be saddled with every prejudice and misapprehension of the people [they serve,] . . . **a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process**." *Id.* at 104 (emphasis in original). The

13

**Addendum - 041**

court further stated, "if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." *Id.*

In *Smith v. Town of Clarkton*, the Fourth Circuit upheld a district court's finding that municipal officials' decision to block development of an affordable housing project was racially motivated in violation of the Equal Protection Clause. 682 F.2d 1055, 1065-67 (4th Cir. 1982). In that case, there was evidence that the defendant government officials themselves had made racially "camouflaged" statements. *Id.* at 1066. Further, the government officials conducted an unprecedented "opinion poll" immediately after "expressions of racial oppositions . . . surfaced." *Id.* The court concluded "[t]here c[ould] be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition." *Id.*

In *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, the Fourth Circuit held the plaintiffs stated a plausible claim for relief of religious discrimination under the Religious Land Use and Institutionalized Persons Act (RLUIPA) at the motion to dismiss stage. 915 F.3d 256, 263 (4th Cir. 2019), *as amended* (Feb. 25, 2019). There, the Fourth Circuit observed "[d]epartures from normal procedures can suggest that the decision was based on unlawful motives, as can '[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.'" *Id.* (quoting *Vill. of Arlington Heights*, 429 U.S. at 267). The Fourth Circuit highlighted that "a government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves." *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448

14

**Addendum - 042**

(1985)). Under the motion to dismiss standard of review, the Fourth Circuit determined the plaintiffs adequately stated a claim of discriminatory intent where neighbors' expressions of animus preceded irregularities in the board's decision-making process when the board denied a zoning application for the church despite the county official showing no opposition and where neighbors made ethnically and religiously disparaging remarks during the board hearing. *Id.* at 263-65.

In *Valentin v. Town of Natick*, the plaintiffs' Equal Protection Clause claim survived a motion to dismiss when their special permit application for a condominium development with affordable housing units was denied amid racist public backlash and procedural hurdles raised by the Planning Board. 633 F.Supp.3d at 375. The plaintiffs in that case were subjected to twenty-nine public hearings over sixteen months in contrast to a comparator project the board had approved after only ten hearings over six months. *Id.* at 372. The *Valentin* court cited to *LeBlanc-Sternberg v. Fletcher* for the proposition that a plaintiff can establish a prima facie showing of discriminatory intent "by showing that animus against the group 'was a significant factor in the position taken' by . . . decision-makers themselves <u>or by those to whom the decision-makers were knowingly responsive</u>." *Id.* at 375 (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)) (emphasis in *Valentin*).

From these cases it is clear that impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share them. However, it is equally clear there must be some showing connecting the animus in the community to the government action. *See A.F.P.S.*, 740 F.Supp. at 105 (finding discriminatory intent where there is public opposition on impermissible grounds and a

**Addendum - 043**

decisionmaker stated that public opinion would be taken into account, there was a pretextual reason for denying the application that had not been raised previously, and the agency could have granted the application if it wanted to); *Town of Clarkton*, 682 F.2d at 1066 (finding discriminatory intent where decisionmakers themselves made racially charged comments and decisionmakers conducted an unprecedented public opinion poll after race-based opposition surfaced); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 263-65 (finding plaintiffs stated a plausible claim of officials' discriminatory animus where the decision-making board denied a zoning application for its church even though the county official in charge of planning did not oppose it and after opposed neighbors made ethnically and religiously disparaging remarks during the board hearing); *Valentin*, 633 F.Supp.3d at 375 (finding plaintiffs adequately stated a claim of discriminatory intent where their permit was denied amid racist public backlash and unusual procedural hurdles raised by the Planning Board). Often, the connection between the community animus and the government action is a procedural irregularity or hurdle that deviates from the procedural norms. *See Town of Clarkton*, 682 F.2d at 1066 (deployment of a never before used public opinion poll); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 264-65 (the Board did not follow the recommendations and positions of two county officials with expertise); *Valentin*, 633 F.Supp.3d at 375 (subjecting plaintiffs to an excessive number of public hearings). Sometimes the government officials themselves make statements that indicate they are taking the public animosity into account in their decision-making or the officials themselves share in the animosity. *See A.F.P.S.*, 740 F.Supp. at 105 (decisionmaker stated public opinion would play a role in the decision-making); *Town of Clarkton*, 682 F.Supp.2d at 1066 (defendants themselves made racially "camouflaged" statements).

**Addendum - 044**

### a. Alleged Procedural Irregularity

The Church argues that the public opposition to its initial award of the Hutchinson Center "infected the entire process" as evidenced by the alleged procedural irregularity of the RFP and award process. The Church argues the procedural irregularity in this case occurred when the System decided to rescind its initial award rather than negotiate the Networkmaine hub remaining in place indefinitely with the Church.[2] Church's Motion at 8. The System contends that keeping the Networkmaine hub in the Hutchinson center would have significantly altered the original RFP, running afoul of the RFP's terms. Opp'n at 11-12. Section 2.4 of RFP #2024-048 provides "negotiations [with the successful bidder] may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at 11, ¶ 2.4. The Church replies that the parties had already begun to negotiate the location of the hub even before the System rescinded the award. Reply Supp. Church's Motion ("Reply") ECF No. 45 at 9.

This reply argument is based on Jason Stutheit's April 2024 email exchange with Robyn Cyr regarding the hub. Reply at 9. However, the April 2024 email exchange between Mr. Stutheit and the System was in the context of the System's Addendum 4, which proposed the System leasing the Hutchinson Center closet space for the Networkmaine hub while it constructed an outside purpose-built structure on the property for the hub. Mr. Stutheit's email stated, "[Addendum 4] does not change our submission. As you had stated in a previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r

---

[2] Counsel for the Church clarified at the January 6, 2025 oral argument on its motion that it does not contend that the second RFP process, RFP #2025-031, and ultimate award to WCAP was discriminatory. Rather, it argues the second RFP process never should have occurred in the first place.

**Addendum - 045**

access *in the interim*." Verified Compl. ¶ 116 and Ex. K at 2 (emphasis added). But this exchange and any final negotiations were based solely on the System's plan to ultimately relocate the hub to a purpose-built structure at an estimated System expense of $500,000. Negotiation on these terms – keeping the hub in the Hutchinson center "in the interim" while the new structure was built – would not have run afoul or been a material change to the original RFP, as such a leasing structure was specifically provided for in the RFP by way of Addendum 4. There is no evidence at this stage to suggest any party, let alone the System – the party in charge of the RFP and owner of the property – had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it by way of its appeal to the original RFP. Under the specific terms of the original RFP, there could be no significant changes to the RFP terms. Ex. A at ¶ 2.4. Not only would suddenly housing the Networkmaine hub in the Hutchinson Center for the life of the lease itself have been a material change to the project (and thus the RFP), the estimated cost savings of $500,000 would have significantly changed the proposal and therefore also been in violation of the RFP's directive to disallow any significant term changes. Moreover, nothing in the current record, including Mr. Stutheit's email, indicates the Church necessarily would have agreed to such a material change, certainly not that the System could rely on it at a risk of $500,000. Additionally, it would have been unfair to FHC-WA to adopt its cost-savings approach but fail to evaluate its proposal with the cost-savings factored in.

Rather than indicating the Networkmaine hub issue was used as a pretext for religious discrimination as the Church posits, the System's decision to issue the second RFP, RFP #2025-031, instead demonstrates that leaving the hub in place indefinitely to save $500,000 was the actual and not pretextual reason for the System to overturn its

18

**Addendum - 046**

original decision granting the Church the winning bid. By incorporating FHC-WA's idea on the hub location (and not simply awarding the bid to FHC-WA then or later) the System's use of a second RFP gave all bidders a chance to make a new proposal that included leaving the hub in its position inside the Hutchinson Center.[3]

The Church also alleges the fact that the System assigned a relatively low point value to "Networkmaine Lease Cost" in the scoring criteria for RFP #2025-031 after overturning the initial award is evidence that the purported purpose of rescinding the initial award (the location of the hub) was pretextual, and the true reason was religious bias. RFP #2025-031 assigned eighty-five points for purchase price, ten points for contingencies, and five points for "Networkmaine Lease Cost," and required the Networkmaine hub lease to cost no more than $3,000 per year. Ex. N at 7. The Court does not view the point value assigned to the lease cost in the second RFP as unusual or evidence of pretext, however. Once the RFP incorporated the cost savings measure into all bids by requiring the hub to stay in place at a cost to the System of no more than $3,000 per year, the differences between bids on that score was limited to a relatively small universe of proposals. In all the bids under the second RFP, the System was "saving" $500,000. Heavily weighting purchase price to favor the proposal that resulted in the highest financial gain to the System does not indicate pretext.

### b. Alleged Religious Bias

Having examined the evidence the Church argues demonstrates there were procedural anomalies in the way the System handled the RFP process for the Hutchinson

---

[3] The Church further argues that the timing of Ms. Catlin's recusal as the decisionmaker at the second level appeal is another procedural anomaly. However, the only evidence before the Court on the timing of her recusal shows that she preemptively recused herself in February of 2024, Catlin Dec. ¶ 5, long before the initial award to the Church and long before the community backlash. The Court finds no anomaly in the timing of her recusal.

**Addendum - 047**

Center and finding none, the only evidence the Church produces that demonstrates religious bias comes wholly from parties outside the University of Maine System. However, unlike the cases cited, rather than *adopting* the community's animosity toward the Church, the System here specifically rejected such bias. The System, in its August 22, 2024 press release, responded to the comments expressing religious animosity as follows: "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2; *Accord Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudice, but neither can it tolerate it. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). Rather than taking community opposition into consideration, the System expressly rejected any community opposition based on religious bias. Additionally, Vice Chancellor Low tried to distance himself from community conversations and articles as much as possible. Low Dec. ¶ 7. He soundly rejected FHC-WA's and WCAP's arguments that did not concern Addendum 4, including arguments about the Church's religious status. Ex. I at 2 ("I find no merits in the arguments presented and must deny the requested appeal.") and 3 ("Though I found your other assertions to be *entirely unsubstantiated*, [because of the cost savings analysis], I am obligated to rescind the original award.") (emphasis added). Vice Chancellor Low did not review the 135 citizen comments the System received about the award to the Church. Low Dec. ¶ 20.

None of the Church's cited authorities stand for the proposition that the Court can conclude solely from public opposition that the System violated the Equal Protection Clause for following its own stated procedures to rescind the award to the Church. The fact that there was religious animosity present in the community and even argued to the

20

**Addendum - 048**

System as a basis for appeal cannot mean the System is locked into a decision that it determined would result in a substantial net financial loss for it when there is no other evidence to suggest it acted on impermissible motives. This is particularly true when here, as the evidence demonstrates, the System directly disavowed the religious animosity. Ex. F at 2; Ex. I at 2-3. In sum, the Church has not produced enough probative circumstantial evidence of impermissible religious bias for the Court to conclude that it is likely to succeed on the merits of its Equal Protection Clause claim for relief.

### 2. Free Exercise

Under the Free Exercise Clause, governmental bodies must act neutrally toward religious beliefs and "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Governmental actions that are not neutral "trigger strict scrutiny under the Free Exercise Clause." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

The Church's arguments that it will likely succeed on its Free Exercise Clause claim rely on the same arguments it makes in support of its Equal Protection Clause claim. Specifically, the Court would have to conclude based on the present record that the decision to rescind the Church's award was made because of religious animosity. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (applying the equal protection direct and circumstantial evidence analysis from *Vill. of Arlington Heights* to determine the "object" of a law under the Free Exercise Clause). The Church does not make any different arguments or highlight any different evidence in its arguments under its Free Exercise Clause claim that the system was motivated in whole

21

**Addendum - 049**

or in part to rescind the award because of the Church's religious status, practices, or beliefs. As discussed in detail above, though there is evidence of religious hostility from the community and from the disappointed bidders, there is no evidence of any animus on behalf of any defendant, nor are the alleged procedural anomalies merely pretext to cover for such animus or to bow to public pressure. Indeed, there is evidence the system specifically rejected the community hostility. The Court cannot conclude based on the actions of third parties alone that the System or any defendant took the actions it did because of the Church's religion. For these reasons, the Church has not carried its burden to demonstrate that it is likely to succeed on the merits of its Free Exercise Clause claim.

### C. Irreparable Harm

Having concluded that the Church has not carried its burden to demonstrate it is likely to succeed on the merits of either claim on which it bases its motion for a temporary restraining order, the "remaining factors [are now] matters of idle curiosity." *New Comm Wireless Servs., Inc.*, 287 F.3d at 9 (1st Cir. 2002) (citing *Weaver*, 984 F.2d at 12). The Court briefly addresses irreparable harm, but having concluded the Church is unlikely to succeed on the merits, does not address the remaining two factors.

"'Irreparable injury' . . . means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The Church argues that its injury is both constitutional and ongoing, therefore its harm is per se irreparable, citing to First Circuit case law for the proposition that "[i]t is well established that the loss of first amendment freedoms constitutes irreparable injury." *Maciera v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981). Even assuming for the purpose of this analysis that the Church has been injured at all, which it

22

**Addendum - 050**

has not established for purposes of a temporary restraining order, the injury is not ongoing. Here, any alleged injury happened at the moment the System rescinded its initial award of the RFP to the Church.[4] This is unlike a case where a plaintiff is under a continuing threat of being terminated from employment for refusing to align with a political party. *See Elrod v. Burns*, 427 U.S. 347, 351, 374 (1976).

Further, the Church has filed a Notice of Lis Pendens in the Waldo County Registry of Deeds and in this Court, giving subsequent purchasers notice of this dispute over the Hutchinson Center real estate. *See Forest City Chevrolet v. Waterford of Portland*, 172 F.Supp.2d 227, 231 (D. Me. 2001). If the Church ultimately prevails on the merits and the Court determines appropriate relief requires the unwinding of any sale between the System and WCAP, it can do so. *Id.* at 230-31. In sum, the Court cannot conclude the Church would suffer irreparable harm in the absence of extraordinary injunctive relief.

### IV.    Conclusion

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank*, 672 F.3d at 8 (quoting *Voice of the Arab World, Inc.*, 645 F.3d at 26). In the absence of any direct or circumstantial evidence to connect community animus to the System's actions that would enable the Court to conclude the Church is likely to succeed on the merits of its Equal Protection Clause or Free Exercise Clause Claims due to defendants' religious discrimination, the Church's motion for a temporary restraining order is DENIED.

**SO ORDERED.**

Dated this 10th day of January, 2025.

---

[4] Counsel for the Church agreed with this characterization of the timing of the alleged injury at the January 6, 2025 oral argument on this motion.

23

**Addendum - 051**

/s/ Stacey D. Neumann
**Stacey D. Neumann**
**United States District Judge**

**Addendum - 052**