# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

No. 25-1452

---

## CALVARY CHAPEL BELFAST
*Plaintiff-Appellant,*
*v.*
UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE UNIVERSITY OF MAINE SYSTEM; RYAN LOW, individually and in their official capacity as Vice Chancellor for Finance and Administration, University of Maine; RACHEL PIPER, in their official capacity as Executive Director of Strategic Procurement and Services, University of Maine System; ROBIN CYR, in their official capacity as Senior Director of Strategic Procurement, University of Maine System; DEREK HOUTMAN, in their official capacity as Associate Strategic Sourcing Director, University of Maine System,
*Defendants-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

---

**BRIEF OF APPELLEES UNIVERSITY OF MAINE SYSTEM, BOARD OF TRUSTEES, RYAN LOW, RACHEL PIPER, ROBIN CYR, AND DEREK HOUTMAN**

---

Melissa A. Hewey, Bar No. 40774
Jeana M. McCormick, Bar No. 1168137
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
*Counsel for Appellees University of Maine System, Board of Trustees, Ryan Low, Rachel Piper, Robin Cyr, and Derek Houtman*

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## No. 25-1452

_____

CALVARY CHAPEL BELFAST
*Plaintiff-Appellant,*
*v.*
UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE
UNIVERSITY OF MAINE SYSTEM; RYAN LOW, individually and in their
official capacity as Vice Chancellor for Finance and Administration, University of
Maine; RACHEL PIPER, in their official capacity as Executive Director of
Strategic Procurement and Services, University of Maine System; ROBIN CYR, in
their official capacity as Senior Director of Strategic Procurement, University of
Maine System; DEREK HOUTMAN, in their official capacity as Associate
Strategic Sourcing Director, University of Maine System,
*Defendants-Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

_____

**BRIEF OF APPELLEES UNIVERSITY OF MAINE SYSTEM, BOARD OF
TRUSTEES, RYAN LOW, RACHEL PIPER, ROBIN CYR, AND DEREK
HOUTMAN**

_____

Melissa A. Hewey, Bar No. 40774
Jeana M. McCormick, Bar No. 1168137
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Tel: (207) 772-1941
*Counsel for Appellees University of
Maine System, Board of Trustees, Ryan
Low, Rachel Piper, Robin Cyr, and
Derek Houtman*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF THE ISSUE ..................................................................... 3

STATEMENT OF THE CASE ....................................................................... 4

    I.      The System's Public Procurement Process ............................. 4

    II.     The First RFP Required Relocation of the Internet Hub ..................... 4

    III.    The Award and Appeal ........................................................ 5

    IV.    The Second RFP ................................................................. 12

    V.     The District Court's Decision ............................................... 13

SUMMARY OF THE ARGUMENT ................................................................ 15

ARGUMENT .............................................................................................. 17

    I.      Standard of Review .............................................................. 17

    II.     The Church Failed to Establish a Likelihood of Success on the Merits of its Equal Protection Clause Claim ................................. 17

        A. The District Court applied the correct legal standard to the Church's Equal Protection Clause claim ................................ 17

            i.     The District Court did not err in requiring the Church to connect the System's decision to the community animus ................................................................. 20

        B. The District Court's findings of fact are overwhelmingly supported by the record evidence and the District Court did not commit clear error in assessing the facts ....................... 29

i

i.     The System Followed the Proper Procedure ........................29

     a.  The Award Protests ................................................30

     b.  Mr. Low's Decision ..............................................34

ii.  The System's Decision was Not Affected by
Impermissible Animus ..............................................................39

III.    The Church Failed to Establish A Likelihood of Success on the
Merits of its Free Exercise Clause Claim ....................................42

IV.   The Remaining Factors Weigh Against a Preliminary Injunction ............43

CONCLUSION .................................................................................44

CERTIFICATE OF COMPLIANCE .........................................................46

CERTIFICATE OF SERVICE ................................................................47

# **TABLE OF AUTORITIES**

**Cases**

*Air Line Pilots Ass'n, Int'l. v. Guilford Transp. Indus., Inc.*,
399 F.3d 89 (1st Cir. 2005) ................................................................. 17

*Ass'n of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits
Admin. or Administracion de Reglamentos y Permisos (A.R.P.E.)*,
740 F. Supp. 95 (D.P.R. 1990) ..................................................... Passim

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
818 F.3d 493 (9th Cir. 2016) ............................................................... 28

*Bl(a)ck Tea Soc'y v. City of Boston*,
378 F.3d 8 (1st Cir. 2004) ................................................................... 17

*Buchanan v. Maine*,
464 F. 3d 158 (1st Cir. 2006) .............................................................. 18

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*,
768 F.3d 183 (2d Cir. 2014) ................................................................ 20

*Crosspoint Church v. Makin*,
719 F. Supp. 3d 99 (D. Me. 2024) ....................................................... 44

*Dailey v. City of Lawton*,
425 F.2d 1037 (10th Cir. 1970) ........................................................... 19

*Davis v. Coakley*,
802 F.3d 128 (1st Cir. 2015) ............................................................... 18

*Innovative Health Sys., Inc. v. City of White Plains*,
117 F.3d 37 (2d Cir. 1997) ............................................................ 26, 27

*Innovative Health Sys., Inc. v. City of White Plains*,
931 F. Supp. 222 (S.D.N.Y. 1996) ................................................. 26, 27

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland*,
915 F.3d 256 (4th Cir. 2019) ................................................... 25, 40, 41

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
584 U.S. 617 (2018) ................................................................ 42

*McGuire v. Reilly*,
260 F.3d 36 (1st Cir. 2001) ..................................................... 17

*Mhany Management, Inc. v. County of Nassau*,
819 F.3d 581 (2d Cir. 2016) ............................................... 27, 28

*New Comm Wireless Servs., v. SprintCom, Inc.*,
287 F.3d 1 (1st Cir. 2002) ....................................................... 17

*Rubinovitz v. Rogato*,
60 F.3d 906 (1st Cir. 1995) ..................................................... 18

*Smith v. Town of Clarkton, N. C.*,
682 F.2d 1055 (4th Cir. 1982) ..................................... 24, 25, 40, 41

*Valentin v. Town of Natick*,
633 F. Supp. 3d 366 ............................................... 19, 25, 40, 42

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1997) ......................................................... Passim

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
418 F.3d 36 (1st Cir. 2005) ................................................. 17, 29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................ 44

## INTRODUCTION

The controlling issue in this case is whether Ryan Low, the Vice Chancellor for Finance and Administration for the University of Maine System (the "System"), was motivated by discriminatory animus when he granted an appeal of an award in a Request for Proposal process involving the System's sale of the Hutchinson Center. The District Court found as fact that he was not motivated by discriminatory animus and, therefore, properly denied the motion of Plaintiff-Appellant Calvary Chapel Belfast (the "Church") for a preliminary injunction to prevent the System from negotiating the sale with the ultimately successful bidder.

Perhaps recognizing that the clear error standard of review governing the District Court's factual finding presents a virtually insurmountable barrier to prevailing on appeal, the Church attempts to manufacture a legal issue when there is none. The Church thus argues that the District Court erroneously imposed as a "single mandatory element," the legal requirement that it prove a direct connection between community animus and specific procedural irregularities. Appellant's Br. 30. But that is not what the District Court did. Rather, it began by recognizing that "discriminatory purpose need not be the sole, dominant, or primary concern" to demonstrate a violation of the Equal Protection Clause. Addendum ("Add.") 040. The District Court then specifically observed that case law establishes that "it is clear that impermissible animus in the community can be a basis for determining

1

that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share them," Add. 043, and that procedural irregularities can suggest that a legitimate reason is just pretext for discrimination, Add. 046. However, it determined as a fact that "there is no evidence of any animus on behalf of any defendant, nor are the alleged procedural anomalies merely pretext to cover for such animus or to bow to public pressure." Add. 050. There is competent evidence in the record to support that finding and the District Court's decision should be affirmed.

## STATEMENT OF THE ISSUE

1. Whether it was clear error for the District Court to conclude that the Plaintiff-Appellant Calvary Chapel Belfast failed to introduce sufficient evidence that the University of Maine System acted with discriminatory animus in the Request for Proposal process.

<u>**STATEMENT OF THE CASE**</u>

## I. The System's Public Procurement Process

This case arises out of the transparent public procurement process of the System, pursuant to which it issued a Request for Proposals ("RFP") to solicit real estate offers for the Hutchinson Center. The Hutchinson Center is a property in Belfast, Maine, owned by the System. Appendix ("App.") 202. It opened in 2000, and at its height, served more than 16,000 learners. App. 202. Over the past few years, use of the Hutchinson Center declined, and the decision was made to sell the property using the System's public procurement process. App. 202.

## II. The First RFP Required Relocation of the Internet Hub

The transaction at issue in this case is governed by RFP # 2024-048 (the "First RFP"), which includes language standard to all of the System's RFPs as well as information specific to this transaction. App. 228. On January 17, 2024, the System issued the First RFP to solicit interest in the Hutchinson Center property. App. 202. On April 18, 2024, the System issued Addendum 4 to the First RFP, which addressed the Networkmaine regional internet hub located within the Hutchinson Center. App. 202-203. As set forth in detail in Addendum 4, the internet hub is vital to facilitating internet access to public and private educational institutions in the Belfast, Camden, and Rockland regions. App. 203. Thus, to ensure continuity of internet access to these regions, Addendum 4 required

relocating the internet hub from within the Hutchinson Center to an outside purpose-built utility building. App. 203, 279-280.

The Respondents, including the Church, first became aware that the hub had to be moved when they received Addendum 4. App. 544. Addendum 4 did not make leaving the hub in room 100Y of the Hutchinson Center an option, App. 279, 546, and it was always the intention of the System to move the hub out of the Hutchinson Center, App. 705. The System let potential respondents know that, and the Church's Pastor, Greg Huston, understood that the hub would be moved from Room 100Y inside the Hutchinson Center to an outside location. App. 547. On May 30, 2024, the System circulated a draft lease for its continued access to the internet hub in the purpose-built utility building and within the Hutchinson Center while the relocation was in progress. App. 203.

## III.   The Award and Appeal

The System received three offers in response to the First RFP: (i) a purchase and sale offer from the Church; (ii) a purchase and sale offer from Waldo Action Community Partners ("WCAP"); and (iii) an "alternative creative real property offer"[1] from Future of the Hutchinson Center, Waterfall Arts ("FHC-WA"). App. 203, 323, 374. On August 14, 2024, the System issued its Award, giving the

---

[1] The System included an option for a so-called "Alternative Creative Real Property Offer specifically for individuals and entities who would not have the financial ability to provide conventional offers.   App. 691.

Church the right to negotiate a final agreement. App. 408. The System spelled out its consensus scoring of each proposal in the Award Deck. App. 400.

After the Church was awarded the right to negotiate, FHC-WA and WCAP both submitted protests. Under the procedure set forth in the First RFP, interested bidders, called Respondents, have two opportunities to submit protests. First, there is an opportunity at the beginning of the process to bring a Specification Protest to contest bid specifications that limit competition. Thus, Section 1.8, which is located in the pre-submission portion of the RFP, provides as follows:

> 1.8 Specification Protest Process and Remedies:
>
> *If a Respondent feels that the specifications are written in a way that limits competition*, a specification protest may be sent to the Office of Strategic Procurement to the email address provided on the cover page of this document. Specification Protests will be responded to within five (5) business days of receipt. Determination of protest validity as at the sole discretion of the University. . . . Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal Submission noted in Section 1.7.1. No protest against the award due to the specifications shall be considered after this deadline.

App. 232. (emphasis added).

The purpose of a Specification Protest is to allow a Respondent to raise issues about the RFP's requirements that might prevent it from submitting a bid before submissions are made so that the System can correct those issues if

justified. Rachel Piper, the Director of Strategic Procurement and Services,[2] the only witness with experience and knowledge of Specification Protests testified:

> So a specification protest is if a potential respondent who is interested in providing a response to a solicitation sees something that is written within the RFP specifications that would prohibit them from submitting and, therefore, limit competition, this allows them the opportunity to reach out to the University Strategic Procurement office and identify which areas they feel are restrictive in competition.

App. 699. The example she gave of how a specification might limit competition was a fictitious RFP for office supplies that included the requirement that delivery trucks be yellow and picture a man with a mustache – a requirement that has no substance but has the effect of eliminating all potential respondents except one. Add. 700. Under this hypothetical, a bidder with white delivery trucks could bring this as a specification protest to the Office of Strategic Procurement, by sending an email to the Strategic Sourcing Manager, at least five days before the time for submission of bids so that it could be addressed. App. 232.

The second type of protest provided for in the RFP is an Award Protest. The provision pertaining to the Award Protest is included in the evaluation and award process section of the RFP, in part 2, and provides:

> Respondents may appeal the award decision by submitting a written protest to the University of Maine System's University of Maine System's Executive Director of Strategic Procurement and Services

---

[2] Ms. Piper is generally very experienced with procurement as she has more than 11 years of experience in procurement at the System and 32 years of experience in procurement total. App. 696, 698.

within five (5) business days of the date of the award notice, with a copy of the protest to the successful Respondent. The protest must contain a statement of the basis for the challenge.

App. 238-239.

On August 19, 2024, FHC-WA submitted its Award Protest. App. 410. The protest was titled "Notice of Protest – Hutchinson Center RFP 2024-048 Award" and was sent to Ms. Piper, the Executive Director of Strategic Procurement and Services—where Respondents are directed to send Award Protests, and not to the Office of Strategic Procurement—where Respondents are directed to send Specification Protests. App. 410; *see also* App. 232, 238-239. FHC-WA summarized the basis of its appeal as follows:

> The other proposers each offered $1 million with no added value to the University.  Using the above numbers, our proposal offers the University at least $1.9 million. This includes $1 million in cash and savings on the internet hub of at least $900,000 in strategic value that can pay real dividends to the University in the future.

App. 412.

On August 20, 2024, WCAP submitted its Award Protest, captioned "WCAP Appeal for RFP 2024-48, University of Maine, Hutchinson Center Real Estate Offer", and stated that it was "submitting this letter as a formal appeal of the decision to move forward with negotiations with Calvary Chapel Belfast (CCB) in protest." App. 413. WCAP, like FHC-WA, sent its appeal to the Executive Director for Strategic Procurement and Services, not the Office of Strategic

Procurement. App. 413. In its appeal, WCAP raised several issues about the validity of the scoring.

On August 30, 2024, Ms. Piper issued her decisions, entitled "Response to Award Protest to RFP 2024-048" denying both appeals. App. 427, 430. Both FHC-WA and WCAP submitted appeals of her decision, which were considered by the System's Vice Chancellor for Finance and Administration and Treasurer, Ryan Low.[3]

Although Mr. Low did not find any merit in WCAP's appeal, and did not find merit in most of FHC-WA's appeal, he was intrigued by one point that FHC-WA made relative to placement of the internet hub. App. 440. Addendum 4 specified that the internet hub would be relocated from its current site within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center but FHC-WA proposed leaving the internet hub in its current site for the life of its lease. App. 440. It appeared to Mr. Low that if it was possible to do as FHC-WA proposed, the System would save approximately $500,000 in costs, based on the System's previous estimates of the cost for relocation. App. 440. Jeff Letourneau, Executive Director of Networkmaine, estimated that it would cost

---

[3] The Chief Facilities and General Services Officer would typically serve as the final decisionmaker on the second level of appeal in the procurement process; however, Ms. Catlin recused herself from this role in February 2024 due to her involvement in developing the First RFP. App. 202.

approximately $500,000 to move the internet hub, which accounted for moving fiber optic cables, a new generator, electrical work, site prep, and constructing the building. App. 440.

Mr. Low reached out to the System's Chief Information Officer, Robert Placido, Ph.D., and asked if FHC-WA's proposal was realistic and, specifically, if it was something the System could make work from an information technology standpoint. App. 441. Mr. Placido explained that the proposal was realistic and stated that he would be comfortable with that arrangement. App. 441.

As the System's Vice Chancellor for Finance and Administration, Mr. Low is responsible for the System's overall treasury operations, accounting, internal audit functions, policy development, budgeting, and consolidated internal and external financial reporting. App. 439. From his standpoint, he thought it was critical for the RFP process to consider cost avoidance measures such as the one FHC-WA proposed. App. 441. Put simply, if the System could avoid the approximate $500,000 cost of moving the internet hub, then it would be significantly better off. App. 441.

When Mr. Low made his decision, he looked for errors in the process, and when he assessed the cost avoidance issue, he determined that the First RFP's failure to consider cost avoidance measures that would benefit the System was an issue that warranted overturning the First RFP award. App. 441. The fact that the

Church is a religious organization or that there were public comments related to the award played no role in Mr. Low's decision to grant the appeal. App. 441-442. Indeed, none of the emails from citizens, former employees, legislators, or donors were sent to Mr. Low or included in the materials he reviewed in making his decision. App. 466, 470, 481, 605, 606. The only impermissible comments that Mr. Low reviewed were in WCAP's and FHC-WA's appeals, which he expressly rejected and determined had no merit. App 434.

In his letter to FHC-WA dated September 12, 2024, Mr. Low described his decision as follows:

> While I found the university's process had full transparency and integrity and adhered to long-standing public procurement policies, after a thorough review, I agree with your assertion that the evaluation criteria did not allow for due consideration of all materially relevant financial details associated with both the real property sale and the maintenance in perpetuity of the Networkmaine internet hub.

App. 436. Mr. Low went on to note that:

> Specifically, in Addendum 4, the University of Maine System (UMS) stated that in the event of a real property sale, its existing Networkmaine hub within the Hutchinson Center would need to be relocated to a secured purpose-build utility building on the property in order to maintain internet connectivity for midcoast institutions. As the addendum noted, "This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site." While other Respondents proposed favorable lease arrangements and access to the property, FHC-WA's creative alternative offer to allow the hub to permanently remain within the existing building would significantly reduce the cost of site work, new construction and relocation for the System.

App. 436. Mr. Low then addressed why his determination was different than Ms.

Piper's, explaining:

> In ruling on your Aug. 19, 2024 protest as it relates to this point, the Executive Director of Strategic Procurement dismissed FHC-WA's claim about "its value-added proposition" because the university's original RFP and related evaluation criteria had not taken so-called cost avoidance into consideration. While that is true, as vice Chancellor for Finance & Administration, I uniquely appreciate that the avoidance of hundreds of thousands of dollars in relocation expenses presents clear financial and operational benefits that are decidedly in the best interests of the System and thus should have been valued in the criteria by which all proposals were scored.

App. 436.

## IV.  The Second RFP

After the award for the First RFP was overturned on appeal, the System issued a new RFP, RFP # 2025-031 (the "Second RFP"). The provisions of the Second RFP with regard to location of the hub were the opposite of the First RFP. As Pastor Huston testified:

> Q.  So in the first RFP, the provision was that [the hub] would move outside the building, correct?
> A.  Yeah.
> Q.  And the second RFP was that it would stay within the building, right?
> A. Yes.

App. 547.

The System received three offers in response to the Second RFP. App. 206.

WCAP's offer of $3.06 million received the highest score and, thus, WCAP was

awarded the right to negotiate a final agreement for the Second RFP. App. 207.

The Church was the lowest scoring bidder with an offer of $1.1 million. App. 442.

The Church appealed the award of the Second RFP and Mr. Low received the

Church's second level appeal of the Second RFP on December 5, 2024. App. 442.

On December 17, 2024, Mr. Low denied the Church's appeal because he did not

find any errors in the process for the Second RFP. App. 442.

## V.    The District Court's Decision

On November 19, 2024, the Church filed a verified complaint in the United

States District Court for the District of Maine, alleging that the System's decision

to grant FHC-WA's Award Protest was unconstitutional because it was motivated

by religious animus in violation of the Equal Protection Clause and Free Exercise

Clause of the United States Constitution. App. 010, 051-057.[4] In support of its

claims, the Church alleged discriminatory animus in the community and in FHC-

WA's and WCAP's appeals, and procedural irregularities in the RFP process. App.

010, 051-057.

The District Court held oral argument on the Church's motion for temporary

restraining order on January 6, 2025. Add. 029. After the hearing, and on the paper

---

[4] The complaint includes other claims; however, the Church's motions for temporary restraining order and preliminary injunction were based solely on Counts I and II of the complaint for violation of the Equal Protection Clause and Free Exercise Clause.

record, the District Court denied the Church's motion, finding that "the Church has not produced enough probative circumstantial evidence of impermissible religious bias for the Court to conclude that it is likely to succeed on the merits of its Equal Protection Clause claim" and that it "has not carried its burden to demonstrate that it is likely to succeed on its Free Exercise Clause claim." Add. 049-050. Additionally, the District Court found that the Church failed to establish it would suffer irreparable harm absent injunctive relief. Add. 051.

The District Court held an evidentiary hearing on the Church's motion for a preliminary injunction on March 4, 2025, during which twenty-three joint exhibits were entered into evidence and the Court heard testimony from Pastor Huston, Mr. Low, Ms. Cyr, and Ms. Piper. Add. 001, App. 217-498. The District Court found all witnesses credible. Add. 002. The parties submitted post-hearing briefs, and the District Court issued a 28 page decision in which "[a]fter carefully considering the evidence and arguments presented by the parties," the District Court denied the motion for preliminary injunction, "concluding the Church has not demonstrated a likelihood of success on the merits of its equal protection and free exercise claims." Add. 002.

## SUMMARY OF THE ARGUMENT

The District Court's decision, after an evidentiary hearing and post-hearing briefing, cannot be overturned on appeal because the District Court did not abuse its discretion in concluding that the Church failed to meet its burden of demonstrating a likelihood of success on the merits of its claims. Indeed, the Church's Equal Protection and Free Exercise claims fail on the merits because the overwhelming record evidence shows that Mr. Low's decision to grant FHC-WA's Award Protest was based solely on the cost-savings of $500,000 to the System and was not motivated by discriminatory animus.

Faced with the record evidence that Mr. Low's decision was based solely on the cost-savings to the System, on appeal, the Church attempts to create an issue of law by erroneously stating that the District Court created a novel rule for assessing Equal Protection and Free Exercise claims. However, a review of the District Court's decision denying the Church's motion for a preliminary injunction demonstrates that is simply not true. The District Court applied the well-established law governing these claims, surveyed a number of similar cases, and analyzed all of the Church's circumstantial evidence to determine whether Mr. Low's decision was motivated by discriminatory animus. After analyzing the Church's evidence of alleged discriminatory animus and procedural irregularities, making credibility determinations, and assessing competing theories, the District

Court determined that the evidence did not support finding that the alleged procedural irregularities were probative of pretext or discriminatory animus, or that Mr. Low adopted or otherwise bowed to the discriminatory animus of others.

Because the Church failed to adduce sufficient evidence to demonstrate a likelihood of success on the merits of its claims, the District Court did not reach the remaining preliminary injunction factors. Even if it had, the remaining factors weigh in favor of the System because the Church failed to demonstrate irreparable harm or that that requested injunction would remedy the alleged injury. Additionally, the public interest is best served by allowing the System to move forward with negotiating the sale of the property with the rightful winner under the System's fair and transparent public procurement process.

The District Court did not abuse its discretion and its decision denying the Church's motion for a preliminary injunction must be upheld.

# ARGUMENT

## I. Standard of Review.

This Court reviews the denial of a preliminary injunction for abuse of discretion. *See, e.g.*, *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005). "Under that rubric, findings of fact are reviewed for clear error and issues of law are reviewed de novo." *Id.* (citing *Air Line Pilots Ass'n, Int'l. v. Guilford Transp. Indus., Inc.*, 399 F.3d 89, 95 (1st Cir. 2005); (*New Comm Wireless Servs., v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002)). "Judgment calls or issues that demand the balancing of conflicting factors are reviewed deferentially." *Id.* (citing *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). Therefore, this Court will set aside the District Court's denial of the preliminary injunction motion "only if the court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion." *Id.* (citing *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001)). Here, the District Court made no such missteps.

## II. The Church Failed to Establish a Likelihood of Success on the Merits of its Equal Protection Clause Claim.

### A. The District Court applied the correct legal standard to the Church's Equal Protection Clause claim.

The Church's first argument on appeal is that the District Court's factual conclusion that the System did not discriminate against the Church constitutes an

error of law because the District Court required the Church to show a connection

between the evidence it claimed showed discriminatory animus and the decision

that the System made to grant the appeal. The parties and the District Court agree

that a plaintiff may use circumstantial evidence to prove that a government

decision was motivated by discriminatory animus. In its Order denying the

preliminary injunction, the District Court correctly observed that to prove an Equal

Protection Clause claim, the Church must show that "(1) the [Church], compared

with others similarly situated, was selectively treated; and (2) that such selective

treatment was based on impermissible considerations such as race, religion, intent

to inhibit or punish the exercise of constitutional rights, or malicious or bad faith

intent to injure a person." Add. 015-016 (citing *Davis v. Coakley*, 802 F.3d 128,

132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir.

1995)). Moreover, "Plaintiffs claiming an equal protection violation must first

'identify and relate *specific instances* where persons *situated similarly in all*

*relevant aspects* were treated differently, instances which have the capacity to

demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." Add.

016 (quoting *Buchanan v. Maine*, 464 F. 3d 158, 178 (1st Cir. 2006) (quoting

*Rubinovitz*, 60 F.3d at 910)) (alteration in original).

Again, the parties and the District Court agree that "[d]iscriminatory purpose

may be shown by circumstantial as well as direct evidence." Add. 016 (citing *Vill.*

*of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1997)). In a case such as this one, circumstantial evidence is often relied upon because "[d]irect evidence of discriminatory intent is rarely available." Add. 016 (citing *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection.")). Even so, "some [p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Add. 016 (citing *Vill. of Arlington Heights.*, 429 U.S. at 265). Circumstantial evidence of a discriminatory purpose may include a number of factors such as "'[t]he historical background of the decision,' [t]he specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" Add. 016 (quoting *Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374 (D. Mass. 2022 (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68)). Additionally, "[s]ubstantive departures from normal procedures may also be relevant evidence of discriminatory purpose, 'particularly if the factors usually considered important by the decisionmaker strongly favor a

decision contrary to the one reached.'" Add. 016-017 (quoting *Vill. of Arlington Heights*, 429 U.S. at 267).[5]

As discussed in more detail below, the District Court's decision clearly followed this case law, pursuant to which it considered the Church's circumstantial evidence, but found as fact that Mr. Low's decision was not motivated by discriminatory animus.

### i. The District Court did not err in requiring the Church to connect the System's decision to the community animus.

In support of its motion for a preliminary injunction, the Church argued that the System discriminated against it in violation of the Equal Protection Clause as evidenced by the discriminatory animus in the community and the alleged procedural irregularities in the RFP process. Contrary to the Church's argument, the District Court did not require "a provable connection between the religiously

---

[5] On appeal, the Church cites to land-use cases from the Ninth, Fourth, and Second Circuits, to articulate factors that courts consider in the land-use context when assessing circumstantial evidence of discriminatory intent. Appellant's Br. 34-35. Specifically, the Church quotes *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014), which states "courts assessing discriminatory intent under RLUIPA's nondiscrimination provision have considered a multitude of factors, including the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available." These factors are not meaningfully different than the factors the District Court applied. Add. 016.

hostile community animus and the System's alleged procedural irregularities."
Appellant's Br. 35. Instead, after reviewing all of the evidence, including witness testimony, contemporaneous documents, and declarations, the District Court concluded that the alleged procedural irregularities were not probative of pretext or discriminatory animus, and that the evidence of community animus in this case was not enough for the District Court to find that the System and, specifically, Mr. Low, acted with discriminatory animus. Add. 024, 026.

Because the Church argued community animus and procedural irregularities to prove the System discriminated, "the Court surveyed case law where public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose." Add. 017. It noted that "[a]s the surveyed cases make plain, impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share those views." Add. 017. It then, however, went on to state: "However, these cases also establish the requirement of a showing connecting the animus in the community to the government action for that action to constitute a violation of law." Add. 017. The Church argues on appeal that it was an error of law for the District Court to require a connection between the community animus and the System's decision, and that the Church should prevail by merely proving that discriminatory animus existed in

21

the community. This argument, however, makes no sense because the issue is whether the System acted with animus so there must be a connection between community animus and the System's decision. Indeed, in all of the cited cases involving community animus, the courts, like the District Court here, looked to the different types of circumstantial evidence identified in *Arlington Heights* to determine whether the government action was affected by the community animus. In cases where the circumstantial evidence suggested that the government action was affected by the community animus, the courts found discrimination.

As the District Court put it, "[t]he fact that there was religious animosity present in the community and even argued to the System as a basis for appeal cannot mean the System is locked into a decision that it determined would result in substantial net financial loss for it when there is no other evidence to suggest it acted on impermissible motives." Add. 049. Trial courts must be allowed to reach this outcome in appropriate cases; otherwise, any time there is community animus, a government decisionmaker will be forced into a decision that counters the community animus, even if there are wholly unrelated and legitimate reasons to make a decision that results in the community's desired outcome.

As referenced above, the Supreme Court has identified types of circumstantial evidence that may be considered when assessing proof of discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252, 265 (1977). In *Arlington Heights*, the Court explained that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* at 267.

Thus, in addition to applying the relevant factors from *Arlington Heights*, the District Court "surveyed case law where public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose." Add. 017-018. The District Court noted that "*[o]ften*, the connection between the community animus and the government action is a procedural irregularity, a hurdle that deviates from the procedural norms, or a substantive departure from factors usually considered important to the decisionmaker." Add. 018 (emphasis added) (citing surveyed cases).

Contrary to the Church's assertion, the District Court's reading of the surveyed cases was fair and accurate. In *Ass'n of Relatives & Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Reglamentos y Permisos (A.R.P.E.)*, 740 F. Supp. 95 (D.P.R. 1990), the court held that the agency's decision to deny a permit for a care facility for terminally-ill AIDS patients was made with discriminatory intent. The court reached this determination based on several pieces of evidence, including that: the residents

who expressed discriminatory animus directly lobbied the decisionmakers; one decisionmaker stated "that public opinion was a consideration in the decisionmaking process"; the agency's rationale had been flooding, contagion and public opinion but changed to zoning to explain the permit denial; the agency could have granted a variance to allow for the requested zoning; and the "zoning regulation was strictly and selectively enforced against plaintiffs." *Id.* at 100, 104-106; s*ee also* Add. 041 (discussing case). Based on the totality of the evidence, the court reasonably concluded that the agency acted in furtherance of, or at least bowed to, the community animus and that the agency's stated reasons were pretext. *Id.* at 104.

In *Smith v. Town of Clarkton, N. C.*, 682 F.2d 1055, 1066 (4th Cir. 1982), the Fourth Circuit determined that the town's decision to block a housing project was motivated by racial animus. The determination was based on "evidence of other statements by citizens, including the defendants, which … were interpreted by the trial court as 'camouflaged' racial expressions" such as the mayor's testimony that he was "concerned about an influx of 'undesirables'". *Id.* Additionally, the court "view[ed] as significant the 'opinion poll,' conducted for the first time in the history of the small town of Clarkton immediately after expressions of racial opposition to the building of public housing units surfaced" which led to housing authority personnel recommending against the project based

solely on the results of the opinion poll. *Id.* With respect to the opinion poll, the court noted that "[s]uch deviations from the procedural norm by governmental decisionmakers in such circumstances are suspect when they lead to results impacting more harshly on one race than on another." *Id.*; *see also* Add. 042 (discussing case).

In *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland*, 915 F.3d 256, 263 (4th Cir. 2019), *as amended* (Feb. 25, 2019), the Fourth Circuit held that the plaintiff stated a plausible claim for relief at the motion to dismiss stage under the Religious Land Use and Institutionalized Persons Act where the county board of appeals heard public opposition to the church at a public hearing, the county board denied the church's petition even though the county director with relevant knowledge and expertise did not recommend denial, and the county board's decision to dismiss the church's second petition was contrary to the recommendation of the county board's legal expert. *Id.* at 263-264; *see also* Add. 042-043. Accordingly, the court held that the plaintiffs adequately stated a claim for discrimination. *Id.* at 264. Similarly, in *Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374-375 (D. Mass. 2022), the court held that the complaint adequately stated an Equal Protection Clause claim where the plaintiffs' permit for affordable housing was denied after public racial backlash and procedural hurdles,

namely an excessive number of public hearings. *See also* Add. 043 (discussing case).

On appeal, the Church argues for the first time that "at least four courts of appeals have expressly affirmed that an adverse government action made in the wake of vociferous community opposition is sufficiently probative of discriminatory intent." Appellant's Br. 41. However, the cases that the Church cites make clear that regardless of whether there is community animus, the ultimate issue remains whether the government – not the community -- acted with discriminatory intent.

For example, the Church cites *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997), which states the well-accepted legal principle discussed in the above cases: "a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." As the district court in that case explained further, "*plaintiffs must show more than that public opposition to IHS' proposed operations was discriminatory* because 'in the ordinary course of affairs a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents.'" *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 243 (S.D.N.Y. 1996),

*aff'd in part,* 117 F.3d 37 (2d Cir. 1997) (emphasis added) (quoting *Ass'n of Relatives*, 740 F. Supp. at 104); *see also* Add. 041 (discussing *Ass'n of Relatives*).

The Second Circuit found that "[t]here is little evidence in the record to support the ZBA's decision on any ground other than the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and alcohol-addicted neighbors." *Innovative Health Sys.,* 117 F.3d at 49. Moreover, it found "the ZBA's decision to be highly suspect in light of the requirements set forth in the zoning ordinance" and "[t]he lack of a credible justification for the zoning decision raises an additional inference that the decision was based on impermissible factors, namely the chemical-dependent status of IHS's clients." *Id.* at 49. *See also Innovative Health Sys.,* 931 F. Supp. at 243 ("*This constellation of factors* leads to the conclusion that the defendants permitted illegal prejudices to influence their decision-making process, which is all that plaintiffs are required to show.") (Emphasis added).

Likewise, the Church's reliance upon *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 611 (2d Cir. 2016) does not change the analysis. In that case, the Second Circuit explained that the district court applied the correct legal standard, "that Garden City officials knowingly acquiesced to race-based citizen opposition." *Id.* at 612. The Second Circuit identified "relevant considerations for discerning a racially discriminatory intent" including historical background,

27

procedural irregularities, and the legislative or administrative history "especially where there are contemporary statements by the decisionmaking body…." *Id*. 606 (quoting *Vill. of Arlington Heights*, 429 U.S. at 268). The appellant challenged the finding of discrimination but the appeals court held that "the district court was entitled to conclude, based on the *Arlington Heights* factors, that something was amiss here, and that Garden City's abrupt shift in zoning in the face of vocal citizen opposition to changing the character of Garden City represented acquiescence to race-based animus." *Id.* at 611.

The Church also relies upon *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493 (9th Cir. 2016), but that case was at the motion to dismiss stage, where the court accepted all of the factual allegations as true. *Id.* at 505 ("Unlike this case, the Supreme Court in *Arlington Heights* was required to review the district court's factual finding for clear error after a trial, while here we must accept Developers' allegations as true and review the district court's order de novo."). At the motion to dismiss stage, the court determined that the allegations, "[t]aken together…provide plausible circumstantial evidence that community opposition to Developers' proposed development was motivated in part by animus, and that the City Council was fully aware of these concerns when it took the highly unusual step of acceding to the opposition and overruling the recommendations of its zoning commission and planning staff." *Id.* at 507. By contrast, in this case there is

no contention that the Equal Protection claim was not properly pled; however, the Church failed, after a full evidentiary hearing, to prove that it was likely to succeed on the merits of that claim.

**B. The District Court's findings of fact are overwhelmingly supported by the record evidence and the District Court did not commit clear error in assessing the facts.**

Next, the Church argues that the District Court's factual findings constituted clear error. To the contrary, the evidence from the preliminary injunction hearing, including testimony from Pastor Huston, Mr. Low, Ms. Cyr, and Ms. Piper, along with contemporaneous documents and declarations comprising twenty-three joint exhibits, demonstrated that Mr. Low's decision to grant FHC-WA's Award Protest was based solely on the cost-savings factor and had nothing to do with the community animus about the Church's religion. Put differently, the Church failed to introduce evidence that demonstrated to the satisfaction of the factfinder that the System's decision was motivated by discriminatory animus and, therefore, it failed to meet its burden of showing a likelihood of success on the merits of its Equal Protection Clause claim. Based on the record evidence, the Church cannot meet its burden of demonstrating clear error. *See, e.g.*, *Wine & Spirits Retailers, Inc.*, 418 F.3d at 46.

**i.    The System Followed the Proper Procedure**

Contrary to the Church's strident protestations, there were no procedural irregularities here. The evidence at the hearing clearly established that that the System followed its RFP process, including treating WCAP's and FHC-WA's protests as Award Protests, and that when Mr. Low made his decision, he believed it was necessary to save the System $500,000. Accordingly, the District Court did not commit clear error in assessing the facts and concluding that the protests were Award Protests, and that Mr. Low's (and everyone else's) understanding that the internet hub was going to move outside of the Hutchinson Center was not probative of pretext or discriminatory animus.

### a. The Award Protests

After the System awarded the RFP to the Church, FHC-WA and WCAP submitted Award Protests pursuant to Section 2.5 of the RFP. In an attempt to show procedural irregularity, the Church erroneously argued that the protests were Specification Protests under Section 1.8 of the RFP and, thus, were untimely and should not have been considered. This argument is based on the Church's fundamental misunderstanding of a Specification Protest. Moreover, it ignores Mr. Low's correct and genuine understanding that the protests were Award Protests.

Under the plain language of Section 1.8, a Specification Protest is appropriate if it relates to a specification that limits competition. Section 1.8 provides, in pertinent part, "[i]f a Respondent feels that the *specifications are*

*written in a way that limits competition*, a specification protest may be sent to the Office of Strategic Procurement to the email address provided on the cover page of this document." App. 232 (emphasis added). Ms. Piper, the only witness with experience and knowledge related to Specification Protests, explained at the hearing "it might be challenging for folks who don't live with this language every day to understand that the specification protest is a clause within the RFP that is set up specifically to prohibit or allow people to bring forward to the University concerns where they feel that the specifications are limiting competition." App. 688. After Ms. Piper explained that a Specification Protest must be about a specification that limits competition, the Church's counsel suggested "all specifications of the RFP are specifically tailored to competition because the request for proposal is a competitive process…" to which she responded, "[n]o, I don't agree with what you're saying." App. 673.[6] Per Ms. Piper's example, a specification that limits competition is a requirement, such as that all vendors drive

---

[6] *See also* App. 701. (When asked if either or both protests should have been treated as a Specification Protest, Ms. Piper answered "[a]bsolutely not"); App. 688 ("It was clear to me that these letters that I received were valid award protests and would not – were not protests that would be categorized as specification protests."); App. 689 ("I don't believe that the award – I'm sorry, the protests that were received were specification protests as they are defined in our APL in our use and practice in the work that we do at the University."); App. 701 ("I don't think that either of the protests that were received met the definition of a specification protest. … It had to do with the award and the evaluation. And those are things that were unknown to all respondents until the award was made and subsequent material and how the award was made public to the parties who inquired.").

a yellow van, that would preclude vendors with white vans from responding to the RFP even if they were otherwise qualified to perform under the RFP. And, as the District Court noted, "the Church has not explained, nor can the Court glean, how the specifications in the RFP were written in a way that limits competition." Add. 025.

Under the Church's theory, all protests relate to the terms, conditions, or specifications of an RFP, and would be Specification Protests because the RFP process is a competitive process. This theory is plainly incorrect under the language of the RFP in Section 1.8 and Section 2.5. Whether intentionally or unintentionally, the Church refuses to acknowledge that FHC-WA's appeal was based on the scoring committee's application of the scoring criteria to its submission. Specifically, it was not until after the award was made that FHC-WA knew, or could have known, that it would not be awarded any points for cost avoidance measures included in its submission. Because FHC-WA could not have known this information five days prior to the submission deadline, it could not have filed a protest on that basis. *See also* App. 702 (Ms. Piper explaining when a respondent agrees to the scoring criteria, they are not agreeing to how the scoring criteria is going to be applied as they would not know how it is going to be applied until after the proposals are scored and an award is made).

The District Court considered the Church's argument but disagreed, citing to Ms. Piper's testimony and explaining that "[i]f bidders were required to note their concerns about how scoring criteria would apply to their cost-savings proposals or other aspects of their bids, Section 2.5 of the RFP providing the procedures for awards protests would be rendered meaningless." Add. 025.

In any case, whether the appeals were correctly characterized as Award Protests or not is immaterial because what matters here is that  Mr. Low, the final decisionmaker, *believed* that the protests were Award Protests under Section 2.5 and that they were properly before him for consideration. App. 601, 604, 605.[7] These were the materials that Mr. Low had before him at the time he considered the protests. App. 600-604. Accordingly, the District Court's conclusion that the

---

[7] Indeed, everyone involved at the time believed that FHC-WA's and WCAP's protests were Award Protests. This is evidenced by the fact that the Award Protests were submitted in accordance with the Award Protest procedure (i.e. they were submitted to Ms. Piper as the System's Executive Director of Strategic Procurement and Services within five days of the award and were not submitted to Ms. Cyr the Strategic Sourcing Manager), and the language used in the protests and the responses to the protests. *See, e.g.*, App. 676. (Ms. Piper explaining she "received two award protests after the award notification"); (Ex. 7, at p. 1) (App 410) ("This letter is notice of written protest of the award decision issued on August 14, 2024.); App. 416 ("This letter is a second notice of written protest of the award decision issued on August 14, 2024, regarding the Hutchinson Center in Belfast."); App. 427 ("I am responding to your letter received on August 19, 2024 representing The Future of the Hutchinson Center Steering Committee and Waterfall Arts, regarding the protest of the award for RFP 2024-048: University of Maine Hutchinson Real Estate Offer.").

System's consideration of the Award Protests is not evidence of discriminatory animus is not clearly erroneous. Add. 026.

### b. Mr. Low's Decision

Mr. Low granted FHC-WA's Award Protest to avoid the approximate $500,000 cost of moving the internet hub out of Room 100Y in the Hutchinson Center. App. 441, 572. In a further attempt to show procedural irregularity, the Church focused on the word "option" as it appears one time in the lease associated with Addendum 4, and completely disregards the fact that the System, including Ms. Piper and Mr. Low, and the Respondents, including the Church, understood that under the terms of the RFP, the internet hub was going to be moved outside of the Hutchinson Center. *See* Add. 020-021 (discussing testimony of Mr. Low, Ms. Piper, and Pastor Huston, all of whom believed during the First RFP that the data hub was going to be moved outside of the Hutchinson Center).

As Mr. Low testified, at the time he decided on the protests, it was his understanding "[t]hat we were going to proceed in two phases, an initial phase where we were going to stay in 100Y but then, ultimately, move to a location outside of the Hutchinson Center." App. 607. *See also* App. 607 ("My understanding was that we were proceeding at some point to phase 2 and moving the data center out of room 100Y to an off-site location."); App. 608. (explaining that at the time he made his decision, based on the lease, he understood "[t]hat in

the short term [the data hub] would be in room 100Y, and then it would move to a site outside of the Hutchinson Center building."). The District Court expressly found this testimony from Mr. Low to be credible. Add. 020.

When asked about the one reference to the word "option" in the lease, Mr. Low testified that the first time he understood that to mean a possible relocation of the internet hub was at his deposition. App. 608, 560. ("Q. And just like with the option to extend the lease term that we looked at a few minutes ago, sir, you understood what the 'option to permanently relocate' the internet hub meant in this context, didn't you? A. No. I'm going to say – when I reviewed the materials, when I sat down to look at this, everything in the materials that I review[ed] led me to believe that there was going – this was going to move to phase 2. So, I mean, I understand the word 'option.' I see what it literally says. But my thinking was all this was moving towards phase 2.").[8]

While the Church wants to suggest that this could not be so, the evidence shows that everyone, including the Church, shared this belief. When Pastor Huston was questioned on direct about the lease, he testified that he understood the lease to

---

[8] At the hearing, the Church's counsel tried to suggest that the lease should be given more weight than all of the other documents because the lease is what the parties would have signed. Yet, as Ms. Piper pointed out, the lease was a draft lease and not a final lease, App. 709, 712, and the language in Addendum 4, which was copied and pasted into the Award Deck, was very clear that the internet hub was going to be moved in Phase 2, App. 228, 279, 400, 409.

mean "[t]hat the hub would stay there [in Room 100Y] until it was moved at a certain point." App. 525. Then again, during cross-examination, Pastor Huston testified that when he received Addendum 4, he understood that, ultimately, the hub would be moved outside. App. 547. *See also* Add. 021 (finding that "Pastor Huston also understood the hub would be moved out of the Hutchinson Center.").

Because it was Mr. Low's understanding at the time that the RFP required the internet hub to be moved outside of the Hutchinson Center, he believed that he needed to grant FHC-WA's protest for the System to avoid the $500,000 cost. Notwithstanding the Church's adamance that the lease allowed the System to keep the internet hub in Room 100Y inside the Hutchinson Center for the term of the lease (as opposed to, for example, giving the System the option to move the internet hub from Room 100Y to a purpose-built utility building *on* the Hutchinson Center property rather than from Room 100Y to a location *off* of the Hutchinson Center property—which Addendum 4 and the lease both referenced as being a costlier option), at the time the decision was made, Mr. Low, along with Ms. Piper and the Respondents, believed it was going to be moved. As the District Court found, "[t]he language of the draft lease, taken as a whole, is at best unclear." Add. 023.

After Mr. Low reviewed FHC-WA's appeal, including its proposal to keep the internet hub inside the Hutchinson Center to avoid the $500,000 costs, he

"reviewed the other proposals to see if [he] could understand how that was being handled across all three proposals." App. 609. Mr. Low did not see anything in the other proposals committing to leaving the internet hub inside the Hutchinson Center. App. 609.[9] Where Mr. Low, and the System, operated with the understanding that under the first RFP the internet hub was going to be moved from Room 100Y, it was not something that could be negotiated with the winning bidder. Section 2.4 of RFP # 2024-048 provides "negotiations [with the successful bidder] may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the

---

[9] While the Church appears to suggest that it did agree to keep the internet hub inside the Hutchinson Center, there was nothing in the materials submitted to Mr. Low, or submitted as evidence to the Court, reflecting that agreement. First, the press release that the Church asked about at the hearing noting that the Church agreed to lease "a carve-out of space" in perpetuity was not specific to inside the Hutchinson Center, but instead reflected the reality that all respondents were required to agree to enter into a lease with the System to ensure the System could access the internet hub in perpetuity, which everyone understood would occur outside of the building. App, 483. Second, the email exchange between Mr. Stutheit and Ms. Cyr shows that the Church was negotiating the placement of the internet hub outside of the Hutchinson Center, including things like shrubs to improve the appearance of the purpose-built utility building that was going to be constructed on the property. App. 485. Third, the award deck does not show that the Church agreed to keep the internet hub inside the Hutchinson Center, whereas it does show that FHC-WA agreed to do so. App. 400, 405, 407. The Church made much of the fact that the Award Deck noted FHC-WA's agreement to negotiate Phase 1 shared space to effectively meet the needs of both parties was listed under key considerations, but really, what the Award Deck shows is that FHC-WA was the only respondent that offered to keep the internet hub in Room 100Y yet it was not awarded any points for the cost avoidance associated with that offer.

price of goods or services requested." App. 238. Additionally, after FHC-WA raised the cost avoidance measure, it would have been unfair for the System to adopt its recommendation but fail to evaluate its proposal with the cost avoidance measure factored into the scoring.

Ultimately, even if the System could have kept the internet hub inside Room 100Y indefinitely, no one participating in the RFP process understood that to be the case. Accordingly, Mr. Low granted FHC-WA's Award Protest and the System issued the Second RFP that clearly and expressly provided for the internet hub to remain in Room 100Y for the life of the lease. As this District Court explained in its Order denying the Church's motion for a temporary restraining order, "[r]ather than indicating the Networkmaine hub issue was used as a pretext for religious discrimination as the Church posits, the System's decision to issue the second RFP, RFP #2025-031, instead demonstrates that leaving the hub in place indefinitely to save $500,000 was the actual and not the pretextual reason for the System to overturn its original decision granting the Church the winning bid." Add. 047. Indeed, "[b]y incorporating FHC-WA's idea on the hub location (and not simply awarding the bid to FHC-WA then or later) the System's use of a second RFP gave respondents a chance to make a new proposal that included leaving the hub in its position inside the Hutchinson Center." Add. 047. As Ms. Piper testified, the System's appeals process worked "exactly how its [sic] set up to work." App. 722.

As the District Court explained, "[t]he fact that some language in the draft lease could at a later date be read to allow for the hub to remain in the Hutchinson Center does not mean that was the understanding of the parties—and in particular Vice Chancellor Low—when the System rescinded the initial RFP award." Add. 023. Further, "[e]ven if the Court were to conclude now that, pursuant to the terms in the draft lease, the System could have unilaterally decided to leave the hub inside the Hutchinson Center, such a finding does not equate to a conclusion that the System's rescission of the initial RFP was a 'substantive departure' where 'the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.'" Add. 023-024 (quoting *Vill. of Arlington Heights*, 429 U.S. at 267). Instead, the District Court found that "[t]he record demonstrates Vice Chancellor Low made the decision to rescind the award and issue a new RFP based on one of the same factors the second-appeal-level administrator would usually consider—cost savings. The Church did not produce evidence indicating such a decision-maker would not have considered that important factor." Add. 024. Therefore, "[t]he Court does not conclude the isolated use of the term 'option' in a draft lease that was never executed is probative of pretext of discriminatory animus." Add. 024. This conclusion is supported by the overwhelming evidence and does not constitute clear error.

**ii.    The System's Decision was Not Affected by Impermissible Animus**

The evidence at the hearing clearly established that neither the System nor Mr. Low made any negative comments about the Church and that both the System and Mr. Low rejected all such comments from the public and Respondents. As set forth in the applicable case law and the District Court's decision, "impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share those views." Add. 017. "However, these cases also establish the requirement of a showing connecting the animus in the community to the government action for that action to constitute a violation of law." Add. 017 (citing *A.F.A. P.S.*, 740 F. Supp. at 105; *Town of Clarkton*, 682 F.2d at 1066; *Jesus Christ is the Answer Ministries, Inc.*, 915 F. 3d at 263-65; and *Valentin*, 633 F. Supp. 3d at 375).

The Church did not introduce evidence at the hearing connecting the animus in the community to Mr. Low's decision. Though the Church's counsel reviewed with Ms. Cyr several emails from citizens, former employees, legislators, and donors, none of the emails were sent to Mr. Low or included in the materials he reviewed in making his decision. App. 466, 470, 474, 481, 605-606. As Mr. Low testified, the materials he reviewed in making his decision on the appeals included the RFP, the Addenda including Addendum 4, the submissions, the appeals, and Ms. Piper's decision on the appeals. App. 605. As soon as Mr. Low learned that he

was going to serve as the final decisionmaker for the RFP he removed himself from all conversations about the Hutchinson Center and did not read news articles about the Hutchinson Center. App. 598. The only impermissible comments that Mr. Low reviewed were in WCAP's and FHC-WA's appeals, which he expressly rejected and determined had no merit. App. 434 ("I find no merits in the arguments presented and must deny the requested appeal."); App. 436 ("Though I found your other assertions to be *entirely unsubstantiated*, I am obligated to rescind the original award [because of the cost savings analysis].") (Emphasis added)). Further, the System expressly rejected impermissible comments from the Community. In its August 22, 2024, press release, the System wrote "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." App. 483. Pastor Huston testified that he never heard anyone from the System who was responsible for the RFP process say anything negative about the Church. App. 548. Instead, he testified that he assumed that the decision to grant the appeal was because of religious discrimination. App. 548.

These facts are readily distinguishable from the facts in cases where courts concluded there was evidence to support an inference of discriminatory animus. *See* Add. 017-018 (discussing *A.F.A.P.S.*, 740 F. Supp. at 105; *Town of Clarkton*, 682 F.2d at 1066; *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 263-65;

and *Valentin*, 633 F. Supp. 3d at 375). As the District Court explained in its Order denying the Church's motion for a temporary restraining order, "[n]one of the Church's cited authorities stand for the proposition that the Court can conclude solely from public opposition that the System violated the Equal Protection Clause for following its own stated procedures to rescind the award to the Church." Add. 048. Thus, having found "the Church has produced no evidence of impermissible religious animus from within the System", Add. 026, and that "the alleged substantive and procedural departures are not probative of any intent by the System to discriminate on the basis of religion or adopt the community's religious animus", Add. 026, the District Court did not abuse its discretion in concluding that the Church is not likely to succeed on the merits of its Equal Protection Clause claim.

### III. The Church Failed to Establish A Likelihood of Success on the Merits of its Free Exercise Clause Claim.

The District Court explained that "[u]nder the Free Exercise Clause, governmental bodies must act neutrally towards religious beliefs and 'cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.'" Add. 026. (quoting *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018)). As set forth in detail above, the Church failed to adduce evidence that the System's decision to grant FHC-WA's

appeal was because of religious animosity and, therefore, it is not likely to succeed on this claim. Add. 024-026.[10]

## IV. The Remaining Factors Weigh Against a Preliminary Injunction

In its Order denying the Church's motion for a temporary restraining order, the District Court properly concluded that the Church failed to demonstrate irreparable injury. Add. 050-051. Because the Church failed to demonstrate a likelihood of success on the merits at the preliminary injunction stage—the sine quo non of the preliminary injunction analysis—the District Court did not revisit the remaining preliminary injunction factors. Add. 027. Even if the District Court had revisited the remaining factors, they all weigh against a preliminary injunction.

With respect to irreparable harm, the Church claims that because the Church is not in the Hutchinson Center, it has space constraints that prevent the Church from spreading its religious mission as much as it would like. Pastor Huston, however, testified some people are "not excited about being crammed in a room, so they'll watch online instead." App. 538. Pastor Huston also confirmed that "[w]e supply our out-of-state attendees with live-stream and radio option for our gatherings on Sundays and Thursdays. These options are also heavily utilized with

---

[10] The Church's argument regarding strict scrutiny is a non sequitur. Levels of scrutiny apply in cases where the challenged decision was based on protected status. Here, the System has never claimed that it was entitled to take the Church's religious views into consideration in awarding the RFP.

the local community who are unable to make it in to the service." App 537-538.

Thus, the Church's own testimony undercuts any argument that it is unable to spread its religious mission due to space constraints.

Furthermore, the relief requested by the Church, an injunction preventing the System from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds," App. 073, would not remedy the Church's alleged injury. "To show irreparable harm, a plaintiff must 'demonstrate that irreparably injury is *likely* in the absence of an injunction', not merely that it is a possibility." *Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 125 (D. Me. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis in original). Instead, all it would do is further harm the System and the public interest by preventing the System from negotiating with the rightful winner of the RFP for the Hutchinson Center to close on the sale of the property in exchange for the $3 million offer—money that the System, a public institution in the State of Maine—is entitled to and desperately needs. In a case such as this, where the requested injury is not likely to remedy the alleged irreparable harm, an injunction is inappropriate and should not be granted.

## <u>CONCLUSION</u>

The District Court did not abuse its discretion when it denied the Church's motion for a preliminary injunction because it properly concluded that the Church

did not demonstrate a likelihood of success on the merits on its claims. Therefore, the System respectfully requests that this Court affirm the District Court's Order denying the preliminary injunction in favor of the System.

Dated: August 19, 2025

/s/ Melissa A. Hewey
Melissa A. Hewey, Bar No. 40774
Jeana M. McCormick, Bar No. 1168137
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com
jmccormick@dwmlaw.com
*Counsel for Appellees University of Maine System, Board of Trustees, Ryan Low, Rachel Piper, Robin Cyr, and Derek Houtman*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10, 648 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using serifs in Times New Roman 14 point font.

Dated: August 19, 2025        */s/ Melissa A. Hewey*
                                      Melissa A. Hewey
                                      First Circuit Bar No. 40774

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2025, I electronically filed the Brief of Appellees with the U.S. Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered as CM/ECF users and that service will be accomplished by Notice of Electronic filing by CM/ECF system.

Dated: August 19, 2025          /s/ Melissa A. Hewey
                                Melissa A. Hewey
                                First Circuit Bar No. 40774

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME  04101-2480
Tel: (207) 772-1941
mhewey@dwmlaw.com