No. 25-1452

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CALVARY CHAPEL BELFAST,
*Plaintiff-Appellant,*

v.

UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES FOR THE UNIVERSITY OF MAINE SYSTEM; RYAN LOW, individually and in their official capacity as Vice Chancellor for Finance and Administration, University of Maine; RACHEL PIPER, in their official capacity as Executive Director of Strategic Procurement and Services, University of Maine System; ROBIN CYR, in their official capacity as Senior Director of Strategic Procurement, University of Maine System; DEREK HOUTMAN, in their official capacity as Associate Strategic Sourcing Director, University of Maine System,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maine, Bangor Division
Case No. 1:24-cv-00392-SDN (Hon. Stacey D. Neumann)

## REPLY BRIEF OF PLAINTIFF-APPELLANT

Stephen C. Whiting
WHITING LAW FIRM
75 Pearl St., Ste. 207
Portland, ME 04101
(207) 780-0681
steve@whitinglawfirm.com

Mathew D. Staver,
  *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT ........................................................................................ 3

A. A government decisionmaker need not harbor "animus" to intentionally discriminate against a particular race or religion. ...... 3

B. The district court committed an error of law by fashioning an insurmountable evidentiary barrier rather than analyzing the System's discriminatory intent based on the totality of the circumstances. ................................................................................. 7

C. The district court ignored probative evidence that the System rescinded the Church's award at least in part to effectuate the discriminatory demands of its donors, alumni, faculty, and the disappointed bidders. ................................................................... 12

    1. The historical background and series of events leading up to the revocation shows that the System was under unprecedented pressure to revoke the Church's award. ..................................... 13

    2. Vice Chancellor Low revoked the Church's award after overruling the findings of the System's strategic-procurement experts. .... 19

    3. The System's revocation of the Church's award substantively departed from standard procurement practices and was procedurally irregular. ............................................................... 23

    4. The System could have negotiated the location of the network hub rather than arbitrarily revoking the Church's winning bid. ...................................................................................... 27

CONCLUSION ................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. William Paterson Coll. of N.J.*,
260 F.3d 265 (3d Cir. 2001) ...................................................................17

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ..................................................................................13

*Anderson ex rel. Dowd v. City of Bos.*,
375 F.3d 71 (1st Cir. 2004) ....................................................................31

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015)...................................................................10

*Ave. 6E Invs., LLC v. City of Yuma*,
818 F.3d 493 (9th Cir. 2016)....................................................................2

*Bangerter v. Orem City Corp.*,
46 F.3d 1491 (10th Cir. 1995)...................................................................4

*Banknote Corp. of Am., Inc. v. United States*,
56 Fed. Cl. 377 (2003) ......................................................................22, 28

*Berry v. Sch. Dist. of City of Benton Harbor*,
494 F. Supp. 118 (W.D. Mich. 1980).........................................................5

*Cal. Marine Cleaning, Inc. v. United States*,
42 Fed. Cl. 281 (1998) ...........................................................................26

*Cardinal Maint. Serv., Inc. v. United States*, 6
3 Fed. Cl. 98 (2004) ...............................................................................31

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist.
Comm'n*,
768 F.3d 183 (2d Cir. 2014) .....................................................................8

*CMDS Residential, LLC v. Mayor & City Council of Baltimore*,
714 F. Supp. 3d 583 (D. Md. 2024)..........................................................14

*Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,
421 F.3d 170 (3d Cir. 2005) .....................................................................4

*Colorado Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008)..................................................................4

*Conway v. Electro Switch Corp.*,
825 F.2d 593 (1st Cir. 1987) ............................................................... 15

*Cooper v. Harris*,
581 U.S. 285 (2017) ............................................................................ 8

*CRAssociates, Inc. v. United States*,
102 Fed. Cl. 698 (2011) ................................................................ 26, 30

*Dailey v. City of Lawton*,
425 F.2d 1037 (10th Cir. 1970) ........................................................... 2

*Def. Tech., Inc. v. United States*,
99 Fed. Cl. 103 (2011) ...................................................................... 22

*DOR Biodefense, Inc.*,
2006 WL 279311 (Comp. Gen. Jan. 31, 2006) .................................... 29

*E.E.O.C. v. Steamship Clerks Union, Loc. 1066*,
48 F.3d 594 (1st Cir. 1995) ................................................................. 4

*E.W. Bliss Co. v. United States*,
77 F.3d 445 (Fed. Cir. 1996) ............................................................. 20

*Ferrill v. Parker Grp., Inc.*,
168 F.3d 468 (11th Cir. 1999) ............................................................. 4

*Galen Med. Assocs., Inc. v. United States*,
369 F.3d 1324 (Fed. Cir. 2004) ......................................................... 23

*Hunt Bldg. Co. v. United States*,
61 Fed. Cl. 243 (2004) ...................................................................... 25

*Hunter v. Underwood*,
471 U.S. 222 (1985) ............................................................................ 9

*Innovative Health Sys., Inc. v. City of White Plains*,
117 F.3d 37 (2d Cir. 1997) .................................................................. 2

*Innovative Health Sys., Inc. v. City of White Plains*,
931 F. Supp. 222 (S.D.N.Y. 1996) ................................................ 11, 17

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*,
915 F.3d 256 (4th Cir. 2019) ............................................................... 2

*Judge v. City of Lowell*, 160 F.3d 67 (1st Cir. 1998) ............................... 9

iv

*M. Steinthal & Co. v. Seamans*,
  455 F.2d 1289 (D.C. Cir. 1971) ............................................................. 22

*Massman Const. Co. v. United States*,
  60 F. Supp. 635 (Ct. Cl. 1945) ............................................................... 26

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) .................................................................... 2

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ................................................... 10, 11, 19

*MORI Assocs., Inc. v. United States*,
  102 Fed. Cl. 503 (2011) .......................................................................... 24

*Northrop Grumman Corp. v. United States*,
  50 Fed. Cl. 443 (2001) ............................................................................ 28

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ......................... 7

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ................................................................................ 18

*Quigg v. Thomas Cnty. Sch. Dist.*,
  814 F.3d 1227 (11th Cir. 2016) .............................................................. 18

*Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471 (1997) .................................... 5

*Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs.*,
  123 F.4th 565 (1st Cir. 2024) ................................................................... 9

*Safeguard Base Operations, LLC v. United States*,
  144 Fed. Cl. 304 (2019) .......................................................................... 30

*Saint-Jean v. Emigrant Mortg. Co.*,
  129 F.4th 124 (2d Cir. 2025) .................................................................... 4

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ........................................................... 2, 10

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011) .......................................................................... 18, 19

*Tolliver Grp., Inc. v. United States*,
  151 Fed. Cl. 70 (2020) ............................................................................ 27

*United States v. City of Black Jack*,
  508 F.2d 1179 (8th Cir.1974) ................................................................... 2

*United States v. Yonkers Bd. of Educ.*,
   837 F.2d 1181 (2d Cir. 1987) ..............................................................17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................ passim

*Washington v. Davis*,
   426 U.S. 229 (1976) ...............................................................................8

*Wyle Lab'ys, Inc.*,
   69 Comp. Gen. 648 (Aug. 6, 1990) .......................................................25

**Statutes**

42 U.S.C. § 1983....................................................................................5

Me. Rev. Stat. Ann. tit. 5, § 12021 .........................................................20

Me. Rev. Stat. Ann. tit. 5, § 12022 .........................................................20

**Other Authorities**

Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental
   Motive in First Amendment Doctrine*,
   63 U. Chi. L. Rev. 413 (1996) ...........................................................4, 5

Linda Hamilton Krieger & Susan T. Fiske, *Behavioral Realism in
   Employment Discrimination Law: Implicit Bias and Disparate
   Treatment*,
   94 Cal. L. Rev. 997 (2006) ...................................................................16

Michael Selmi, *Proving Intentional Discrimination: The Reality of
   Supreme Court Rhetoric*,
   86 Geo. L.J. 279 (1997) ..........................................................................6

**Treatises**

11 Williston on Contracts § 32:2 (4th ed.) .............................................30

64 Am. Jur. 2d Public Works and Contracts § 49 ...................................29

James A. Kushner, Gov. Discrim. § 3 (2024 update) ...............................9

Restatement (Second) of Torts § 8A (1965) .............................................5

Stephen W. Feldman, 1 Gov't Contract Awards ..............................20, 24

## SUMMARY OF ARGUMENT

The parties are here today because a Christian church was the winning bidder to buy a University of Maine-owned property. "Shocked" and "horrified" by that result, donors closed their checkbooks and cut the University out of their wills. Professors and alumni likewise were "appalled," decrying the decision as a "disgrace." And the disappointed bidders implored the University of Maine System to "ameliorate this situation" by rescinding Calvary Chapel's award to "put the community and the University back on the same path together." The System obliged. Regardless of its purported "cost savings" rationale, the causal chain is straightforward—animus in, award out.

The System offers no sound defense of the district court's erroneous decision.[1] The System cannot explain why it should fare better than the City of White Plains, the County of Nassau, the Town of Clarkton, Baltimore County, the City of Black Jack, the City of Yuma, and the City of Lawton—each found to have discriminated, at least in part, to appease

---

[1] The Church limits this reply to the System's substantive legal and factual arguments related to the merits of its equal protection claim. It preserves all other arguments and respectfully incorporates by reference the discussion of the remaining preliminary-injunction factors in its opening brief.

1

the religiously or racially motivated opposition.[2] Each of those government defendants also offered a "legitimate" excuse. Yet in each case, as here, the neutral rationale was beside the point; the decision happened only because the bigoted opposition demanded it.

Nor does the System cite a single case supporting its assertion that a government actor can escape equal protection scrutiny so long as he harbors no "animus." Indeed, the System repeats the district court's error by confusing "animus" with "intent." But courts do not just ask whether the decisionmaker was a bigot; they also ask whether he knowingly acted on the objections of those who were. Vice Chancellor Low did exactly that: his sworn testimony shows he knew about the vociferous backlash against the Church's award; he granted the disappointed bidder's discriminatory appeal; and he knew the effect that decision would have—yet he acted anyway.

---

[2] *See, e.g., Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982); *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256 (4th Cir. 2019); *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016); *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970).

As of this writing, every circuit considering the question presented in this appeal has held that a plaintiff raised an inference of intentional discrimination by showing, through the totality of direct and circumstantial evidence, that the government action was responsive to religiously or racially hostile opposition. This Court should follow its sister circuits, reverse the decision below, and remand for entry of a preliminary injunction.

## ARGUMENT

### A. A government decisionmaker need not harbor "animus" to intentionally discriminate against a particular race or religion.

The System echoes the district court's erroneous assumption that an equal protection plaintiff bringing an intentional-discrimination claim must establish that the government decisionmaker acted with "animus." Brief of Appellees ("UMS Br.") 1–3, 13, 15–16, 18, 20–22, 29–30, 34, 42. Both the System and the district court misunderstand the correct legal principle: A government actor need not be driven by animus to intentionally discriminate against a particular race or religion. "It has long been understood that discrimination, whether measured quantitatively or qualitatively, is not always a function of a pernicious motive or malign intent." *E.E.O.C. v. Steamship Clerks Union, Loc. 1066*,

3

48 F.3d 594, 600–01 (1st Cir. 1995).[3] Indeed, "discriminatory purpose need not be malicious or invidious, nor need it figure in *solely*, *primarily*, or *even predominantly* into the motivation behind the challenged action." *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) (citation modified) (emphasis added). The System's assertion that the controlling issue is whether the System "acted with discriminatory animus" is therefore wrong. UMS Br. 3.

So what is discriminatory intent? As Judge McConnell explained, "[t]he 'intent to discriminate' forbidden under the Equal Protection Clause is merely the intent to treat differently." *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) (McConnell, J.). That being so, the inquiry is not about "the essential intent of any individual, much less of the decision-making body." Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 439 (1996). Instead, "[t]he 'thing' that a

---

[3] Courts of appeals repeatedly hold that proving animus is not required to prevail on an intentional-discrimination claim. *See, e.g.*, *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 153–54 (2d Cir. 2025); *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472–73 & n.7 (11th Cir. 1999).

court is attempting to find is only the intrusion of a particular factor in a way that affects the decision-making process." *Id.*

Courts also infer a decisionmaker's intent by applying the common law standard of intentional tort liability: an actor is "responsible for the natural and probable consequences of acts knowingly done or knowingly omitted." *Berry v. Sch. Dist. of City of Benton Harbor*, 494 F. Supp. 118, 121 (W.D. Mich. 1980); *cf. id.* (applying this rule to 42 U.S.C. § 1983 Equal Protection claim). In this context, "intent" refers "to the *consequences* of an act rather than the act itself." Restatement (Second) of Torts § 8A cmt. a (1965) (emphasis added).

Critically, intent is not limited to *desired* consequences. "If the actor *knows* that the consequences are certain, or substantially certain, to result from his act, *and still goes ahead*, he is treated by the law *as if he had in fact desired* to produce the result." Restatement (Second) of Torts § 8A cmt. b (emphases added); *accord Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Applied here, the Church was not required to extract a confession from Low or the Board of Trustees. "[I]ntent is generally proved through a *causal inference*." Michael Selmi, *Proving Intentional Discrimination: The Reality of Supreme Court Rhetoric*, 86 Geo. L.J. 279, 291 (1997) (emphasis added). As such, the Church only needed to show—through direct and circumstantial evidence—that its religious status and beliefs were at least *in part* a motivating factor for the System's decision to rescind its award. *See Arlington Heights*, 429 U.S. at 266. It did.

Indeed, the record shows that Low acted in the wake of extraordinary religiously motivated opposition from UMaine donors, faculty, alumni, and the disappointed bidders. App.466–482. He granted FHC-WA's appeal, which was infected with religious animus; overruled the System's procurement experts; disregarded the competitive negotiated procurement process; and, as the System conceded, ultimately "ma[d]e a decision that result[ed] in the community's desired outcome." UMS Br. 22.

As the Supreme Court has noted, "[t]he inquiry is practical. What [the University] was 'up to' may be plain from *the results the actions achieve, or the results they avoid*. Often it is made clear from what has

been called, in a different context, 'the give and take of the situation.'"

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.24 (1979)

(emphasis added) (citation modified).

The natural, inevitable outcome of Low's choice was clearly

foreseeable: the professors stopped howling, the alumni stopped railing,

and the donors eased their threats. His decision delivered exactly what

their animus demanded.[4] In other words, what Low was "up to" is

demonstrated by the results he simultaneously achieved and avoided.

**B.    The district court committed an error of law by fashioning an insurmountable evidentiary barrier rather than analyzing the System's discriminatory intent based on the totality of the circumstances.**

In its opening brief, the Church argued that the district court erred

as a matter of law by mandating a "*requirement* of a showing *connecting*

the animus in the community to the government action for that action to

constitute a violation of law." Brief of Appellant 37 ("CCB Br.") (citing

Add.017) (emphases added). Although that novel rule conflicts with the

---

[4] For example, after the System rescinded the Church's award, a professor emailed the Board of Trustees to "thank" them "for allowing the FHC to be open to bidders again." The professor then accused the Church—falsely—of "spreading fear and lies," having "anti LGBTQ views," and spewing "Qanon aligned disinformation." App.470.

decisions of both the Supreme Court and several courts of appeals, *see* CCB Br. at 35–45 (discussing cases), the System accuses the Church of trying to "manufacture a legal issue." UMS Br. 1. But then it contradicts itself by doubling-down on the district court's legal error, asserting that "there must be a connection between community animus and the System's decision." UMS Br. 22. The System is wrong on both counts.

The Supreme Court has never required plaintiffs to link two *Arlington Heights* factors to prove discriminatory intent. *See Cooper v. Harris*, 581 U.S. 285, 319 (2017) ("[I]n no area of our equal protection law have we forced plaintiffs to submit one particular form of proof to prevail." (citing *Arlington Heights*, 429 U.S. at 266–68)). Instead, intent is *inferred* from the "the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see generally Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014) (discussing *Arlington Heights* factors). And once a plaintiff raises the plausible inference that race or religion was a "motivating factor" behind the adverse action, the burden shifts to the government to demonstrate that the decision would have been made

anyway. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The district court's error was to require *direct* proof of a causal link between a specific *Arlington Heights* factor and the adverse government decision. But "there is no smoking gun." *Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs.*, 123 F.4th 565, 579 (1st Cir. 2024). "No one piece of evidence, taken in isolation, suffices to prove disparate treatment." *Ibid.* The task is to weigh *the full body of circumstantial evidence*, draw reasonable inferences, and decide whether the government decision was motivated at least in part by a discriminatory purpose. *See generally* James A. Kushner, Gov. Discrim. §§ 3:6–3:17 (2024 update). "[I]t will be the rare case in which a plaintiff can point to specific [discriminatory] statements made by government officials," which is why "[i]ntent to discriminate may be demonstrated by circumstantial evidence," sufficient to provide the plausible inference of discrimination. *Judge v. City of Lowell*, 160 F.3d 67, 77 (1st Cir. 1998).

The System's accusation that the Church is trying to "manufacture a legal issue" over the district court's "connection" rule is not only meritless; it is foreclosed by the Ninth Circuit's decision in *Mi Familia*

9

*Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025). There, the Ninth Circuit held that the district court erred when it "applied a heightened version of the *Arlington Heights* analysis … insisting that Plaintiff-Appellees *directly link* the motive of the Legislature to every piece of evidence offered under each prong of the *Arlington Heights* framework." 129 F.4th at 725 (emphasis added). Such a requirement was "not likely ever to happen," the court of appeals explained, because legislators "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate." *Id.* (quoting *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015), in turn quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982)). The court of appeals thus ruled that the district court erred because it "imposed a higher evidentiary standard than that required by the *Arlington Heights* test analyzing the 'totality of circumstances.'" *Id.*

Like the lower court in *Mi Familia Vota*, which required the plaintiffs to show a "nexus" between *Arlington Height*'s historical-background factor and the state action, 129 F.4th at 725, the district court here erected the same artificial hurdle, requiring the Church to produce a "connection" between the community animus and the System's

10

decision. Add.017. By collapsing the inquiry into a search for a smoking gun, or at least for a direct causal link, "the district court misapplied the *Arlington Heights* framework." *Mi Familia Vota*, 129 F.4th at 725.

Having no supporting authority, the System resorts to plucking selective quotations from the cases the Church discussed in its opening brief. *Contrast* UMS Br. 23–29, *with* CCB Br. 36–45. But each of those decisions ultimately affirms that the court must judge discriminatory intent by the totality of the circumstances. For example, the System cherry-picks from *Innovative Health Systems, Inc. v. City of White Plains* for the proposition that "plaintiffs must show more than that public opposition … was discriminatory." UMS Br. 26. But that court proceeded to caution that "if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." 931 F. Supp. 222, 243 (S.D.N.Y. 1996), *aff'd in part*, 117 F.3d 37 (2d Cir. 1997) (citation modified). The court then found that the evidence supported the plaintiffs' claim that the government defendants "bowed to the political pressure exerted by certain members of the community," based in part on its finding "that

*defendants were operating in the context of intense political pressure* from important components of the community" and that "defendants inexplicably failed to defer to the Commissioner of Building." *Id.* (emphasis added). The court reached the correct result in that case; the district court here should have done the same.

Because no court of appeals has adopted the "connection" theory, the System is left to rely on snippets torn from context. The lack of authority only confirms why the district court's rule cannot stand and why reversal and remand are required.

**C.    The district court ignored probative evidence that the System rescinded the Church's award at least in part to effectuate the discriminatory demands of its donors, alumni, faculty, and the disappointed bidders.**

The System does not address the extraordinary institutional animus from its donors, alumni, and professors—which at least four sister circuits would treat as probative of discriminatory intent. *See* CCB Br. 41–44 (discussing cases). Nor does the System deny that Low overruled the findings of the System's procurement experts when he rescinded the Church's award. *See* CCB Br. 51–54. And it does not dispute that a constitutional violation was the natural and foreseeable consequence of revoking the Church's award. *See* CCB Br. 61–63.

12

Confronted with these incontrovertible facts and the persuasive weight of authority favoring the Church's arguments, the System tries to shoehorn this entire appeal into a clear-error review. UMS Br. 17, 29. But "there is a special danger that a misunderstanding of what the law requires may infect what is labeled a finding of fact." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18–19 (2024). "If a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Id.* (citation modified). Here, the *Arlington Heights* analysis "has a very substantial legal component," so this Court must review the district court's findings with "special care." *Alexander*, 602 U.S. at 19. Because the district court's factual findings rest on legal error, they are entitled to no deference.

1. **The historical background and series of events leading up to the revocation shows that the System was under unprecedented pressure to revoke the Church's award.**

As argued in the Church's opening brief (at 46–50), the district court erred in overlooking the historical background and specific sequence of events showing that the System revoked the Church's winning amid extraordinary institutional and community opposition. In

13

response, the System simply contends that it "rejected all such comments." UMS Br. 40.[5] That is not enough. The historical-background factor calls for "*a broad and general inquiry* into the *social climate* surrounding the decision as well as any related government actions, distinct from the other factors which focus more specifically on the decision at issue." *CMDS Residential, LLC v. Mayor & City Council of Baltimore*, 714 F. Supp. 3d 583, 613 (D. Md. 2024) (emphases added). As such, the System cannot hide behind its own self-serving denials of discriminatory intent when the evidence shows that it was under unprecedented political and financial pressure to revoke the Church's award. And unprecedented backlash it was. As Ms. Cyr testified, the System had never received anything like the "significant opposition" it

---

[5] In support of its claim that it "expressly rejected impermissible comments from the community," the System points to an August 22, 2024 press release issued in response to the flood of religiously hostile backlash against the Church. UMS Br. 41. That is misleading. Notwithstanding that it only confirms the System was inundated with discriminatory complaints, the press release predates the events that matter: it came nearly two weeks before FHC-WA appealed to Low and three weeks before Low revoked the Church's award on September 12. A boilerplate statement from the System's public relations department issued weeks before does not cleanse the discriminatory intent that infected Low's final decision.

received over the Church's winning bid and that it even had to create a system for dealing with the significant backlash. App.641–642.

It is telling what the System says about the bigoted backlash from its donors, alumni, and faculty—*nothing*. Its only response to the remarkable record of institutional animus is that the complaints were not "sent to Mr. Low" or included in his review materials. UMS Br. 40. That is thin gruel. Low admitted that he was fully aware of the uproar over the Church's award at the time he made his decision. App.592. In any event, circumstantial evidence of "a *discriminatory atmosphere*" at an institution is a relevant consideration because it "add[s] color" to the "decisionmaking processes and to *the influences behind* the actions taken." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987) (citation modified).

The notion that the complaints from the donors, alumni, and faculty had no influence because they were not slipped into Low's folder blinks reality. After all, intentional discrimination "can just as easily result from … *subtle ingroup preferences* as from the operation of conscious discriminatory designs." Linda Hamilton Krieger & Susan T. Fiske, *Behavioral Realism in Employment Discrimination Law: Implicit Bias*

*and Disparate Treatment*, 94 Cal. L. Rev. 997, 1004 (2006) (emphasis added). The System cannot launder evidence of animus by hiding it in plain sight.

Even if the bigoted vitriol from UMaine's donors, professors, and alumni were not probative of discriminatory intent—a proposition that would be at odds with the decisions of at least six sister circuits, *see* CCB Br. 34–37 (discussing cases)—the analysis does not stop there. The disappointed bidders ferried that same animus straight into the protest process. FHC-WA warned Low that, "[a]s you are no doubt aware, tempers and frustrations with the award decision are running high in the community and presumably within the University of Maine as well." App.103. FHC-WA then urged Low to "ameliorate this situation," by revoking the Church's award, which would "put the community and the University back on the same path together." App.103. The story arc is clear: bigots set the stage, FHC-WA supplied the script, and Low delivered the performance.

The System concedes that the disappointed bidders were driven by animus but nevertheless contends that Low "expressly rejected" their "impermissible comments." UMS Br. 41. Again, the System ignores, or at

16

least misunderstands, the principles of intent and causation in the discrimination context. Low "did not make his decision in a vacuum." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 285 (3d Cir. 2001). Even if Low "may not have had strong views" about the Church, the disappointed bidders "expressed fervent and illegal resistance" in their protest appeals. *Innovative Health*, *supra*, 931 F. Supp. at 243. It is enough to sustain an Equal Protection claim if religious animus "was a significant factor in the position taken by the persons to whose position the official decision-maker is *knowingly responsive.*" *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1226 (2d Cir. 1987) (emphasis added). Everyone agrees that Low was "knowingly responsive" to FHC-WA's appeal, which was rife with religious animus. And like a baker who receives batter laced with poison, a government decisionmaker cannot salvage the mixture by scooping out what he thinks are the contaminated parts and insisting the cake is safe. No reasonable customer would eat it—and no reasonable factfinder would accept the baker's explanation.

Even if Low somehow could remove the discriminatory taint, FHC-WA's animus is still attributable to the System because its appeal *caused* Low to revoke the Church's award. A plaintiff may raise the inference of

17

discriminatory intent if the "discriminatory input" of others influenced or factored into the "decisional process." *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring)). Indeed, "[a]nimus and responsibility for the adverse action can both be attributed to" FHC-WA because "the adverse action is the *intended* consequence of [its] discriminatory conduct." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (emphasis added). Low's "exercise of judgment" does not erase the fact that FHC-WA's appeal was the proximate cause of Low's discriminatory decision. *Id.* at 419. And proximate cause requires only "some direct relation" between the injury and the conduct. *Id.* (citation modified).

Here, FHC-WA's appeal—regardless of whether it contained both bigoted and non-bigoted arguments—was motivated at least in part by discriminatory animus, and it was the cause of Low's decision, as the System concedes. *See* UMS Br. 38 (noting that the System "adopt[ed] [FHC-WA's] recommendation"). The System would have the Court ignore the tainted statements and focus solely on the non-tainted ones. That is not how it works. To be sure, Low's decision likewise is a proximate cause

18

of the Church's constitutional injury, but "it is common for injuries to have multiple proximate causes." *Staub*, 562 U.S. at 419–20.

In short, the causal chain is plain: FHC-WA's biased appeal triggered Low's decision, and the System acted in response to that discriminatory pressure. *Cf. Mi Familia Vota, supra,* 129 F.4th at 727 (finding that advocacy organization, as "architect and advocate" of challenged voting laws that sent racially coded lobbying materials to legislators, "was motivated by a discriminatory purpose in drafting and advocating for the [laws], which, in turn, supports a conclusion that the [laws] were the product of intentional discrimination").

**2.  Vice Chancellor Low revoked the Church's award after overruling the findings of the System's strategic-procurement experts.**

The System does not dispute that Low overruled the findings of its strategic-sourcing experts. Nor does the System distinguish itself from the offending government agencies cited in the Church's opening brief, in which the courts found that the decisionmakers' overruling of its experts was probative of discriminatory intent. *See* CCB Br. 51–54. Instead, its lone justification is that Low "believed it was necessary to save the System $500,000." UMS Br. 30. That argument only confirms that Low's

19

overruling of the System's sourcing experts was an unusual and substantive departure from standard procurement practice.

Maine law requires quasi-independent state agencies to adopt policies that secure "the best value" in its competitive procurements. Me. Rev. Stat. Ann. tit. 5, § 12022(1), such as RFP 2024-048. Me. Rev. Stat. Ann. tit. 5, §12021. To that end, the System's sourcing officers exercise "substantial discretion" to determine which proposal offers "the best value." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

In a negotiated "competitive procurement" like RFP 2024-048, sourcing officers weigh "both price or cost *and* the relative merits of the offerors' technical proposals under the solicitation's announced evaluation factors." Stephen W. Feldman, 1 Gov't Contract Awards § 2:6 (emphasis added).[6] Critically, "[t]he agency may—and indeed must—only evaluate those prices or costs fairly encompassed by the RFP's evaluation

---

[6] *Accord* App.217 (UMS Admin. Prac. Ltr. VII-A(A), stating that UMS's "practice" is "to obtain all goods and services at the lowest cost to the University *consistent* with those standards of quality, performance, service, and availability which will *best meet* the needs of the University," and defining "competitive procurement process" as "all methods of obtaining prices from multiple vendors including selections based on bid price alone, qualifications alone or [as here] best value" (emphasis added)).

criteria; the contracting officer has no authority to consider prices or costs that the RFP may have excluded." *Id.* § 11:2; App.216 (UMS Admin. Prac. Ltr. VII-A(F), defining "RFP" as the document used to solicit proposals when "the evaluation generally is based on a variety of criteria such as a proposal's ability to meet the identified need, the qualifications of the provider, the proposal's conformity with the available specifications, and other factors as determined useful").[7] Rachel Piper, the System's chief procurement officer, followed those rules. After "a thorough review of the solicitation process," App.210, Piper concluded that FHC-WA's protest fell outside the RFP's evaluation criteria and did not warrant canceling the Church's award.

Low disregarded that expert assessment. Rather than adhering to the RFP's evaluation criteria, he introduced a new metric—speculative relocation costs for the network hub—that the RFP did not authorize. "It

---

[7] Although the System's procurement policies provide that "in the competitive procurement process, the award will be made to the vendor with the lowest cost responsible and responsive … proposal," the "authorized purchasing agent" ultimately has substantial discretion to determine, in their "judgment," whether such an award would serve the System's "best interests." App.219. In any event, that the RFP included an "Alternative Creative Real Property Offer" option for bidders with limited financial resources shows that the System contemplated a "best value" proposal, not a bottom-line-cost bid.

21

is hornbook law that agencies *must* evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003) (emphasis added). And courts have long been "properly concerned" that government procurement activities "be carried out in accordance with the applicable statutes and agency regulations and that these governmental functions not be permitted to deteriorate into actions reflecting personal predelictions [sic] of administrative officials, whether *ascribable to whim*, misplaced zeal, or *impermissible influence*." *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305–06 (D.C. Cir. 1971) (emphases added).

Despite these longstanding principles, Low sidelined Piper's expert judgment and substituted his own *post hoc* view of what should matter in the competition. App.434. That maneuver is strong probative evidence of discriminatory intent. *Cf. Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 122 (2011) (stating that "[a]n agency's explanation for canceling a solicitation cannot be a pretext for an improper motive or reason").

22

**3.    The System's revocation of the Church's award substantively departed from standard procurement practices and was procedurally irregular.**

Predictably, the System denies any procedural irregularities in its decision to revoke the Church's award, contending that it "followed its RFP process." UMS Br. 30. It also parrots the district court's view that "cost savings" is something a "second-appeal-level-administrator would usually consider." UMS Br. 39 (quoting Add.024). The System is wrong on both counts. Low's decision was procedurally irregular and a "clear and prejudicial violation" of standard procurement practices for three independent reasons. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330–31 (Fed. Cir. 2004).

*First*, the System cannot justify revoking the Church's award with Low's speculative $500,000 "cost savings." UMS Br. 39. The System's own brief admits that *cost was not controlling* in this RFP. The solicitation expressly invited "Alternative Creative Real Property Offer[s]" for bidders "who would not have the financial ability to provide conventional offers." UMS Br. 5 n.1 (citing App.691). That remarkable admission shows that the System expected and *encouraged* proposals from bidders with limited financial resources. In other words, the System's sourcing

23

officers never drafted the RFP as a bare-knuckled auction for maximum cash return.

So what changed? The sole new variable between selection and rescission was the backlash against the Church. In any event, "[t]he mere fact that calculations were performed does not make their results a rational basis for decision making—if that were the case, then cost savings would be whatever an agency says they are, insulating decisions based on them from court review." *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 550 (2011).

Despite RFP 2024-048's design as a negotiated competitive procurement, Low interjected his own subjective judgment and recast the solicitation as if it were a sealed bid governed by bottom-line cost.[8] That approach contravenes competitive-procurement standards, which require costs to be weighed against the technical and qualitative factors specified in the solicitation. *See Wyle Lab'ys, Inc.*, 69 Comp. Gen. 648,

---

[8] In sealed bidding, "any award must be made strictly on the announced price and price-related factors to the low, responsive, and responsible bidder." Steven W. Feldman, 1 Gov't Contract Awards § 2:6. By contrast, a solicitation that receives proposals followed by the possibility of discussions, such as RFP 2024-048, is "a negotiated procurement." *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 90 (2020).

24

654–55 (Aug. 6, 1990); *accord* App.221 (UMS Admin. Prac. Ltr. VII-A, stating that System "is not necessarily bound to accept the lowest cost response if that response is contrary to the best interests of the University"). In short, Low's abrupt departure from the System's "best value" procurement policy, which is consistent with Me. Rev. Stat. Ann. tit. 5, § 12021, supports the inference that impermissible considerations influenced his decision.

*Second*, the government's duty in a competitive procurement is to evaluate proposals on the stated criteria, not to adopt a bidder's recommendation. *Cf. Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 274 (2004) ("[I]t is a fundamental rule of competitive procurement that all offerors compete on an equal basis by proposing to the same terms, conditions and specifications."). Yet the System admits it "adopt[ed] [FHC-WA's] recommendation." UMS Br. 38. That divulgence is striking. Elevating one bidder's *post hoc* "recommendation" conferred an unwarranted advantage and prejudiced the other two, including the Church. That action finds no support in procurement law, *see Hunt*, 61 Fed. Cl. at 274, and unsurprisingly the System cites no supporting authority. There is none.

25

*Third*, canceling a solicitation after bid opening is widely disfavored. *See Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 293 (1998). Once bids are exposed, they become "sitting ducks" for competitors in the next round of bidding. *Id.* at 292. Such a scenario "undermine[s] the integrity of the bidding process." *Id.* That is what happened here. After the award, the disappointed bidders learned the Church's terms, giving them an unfair advantage in the second solicitation. WCAP predictably upped its proposal and won—the very auction-style sequence that courts disfavor. *Cf. Massman Constr. Co. v. United States*, 60 F. Supp. 635, 643 (Ct. Cl. 1945) ("To have a set of bids discarded after they are opened and each bidder has learned his competitor's price is a serious matter, and it *should not be permitted* except for cogent reasons." (emphasis added)). These departures prejudiced the Church because "there was a substantial chance it would have received the contract award but for that error." *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 710–11 (2011) (citation modified).

Finally, even if the System's treatment of the bid protest (as "award" rather than "specification" protests) is not probative of discriminatory intent as it alleges, its contention that Low "believed" they

26

were award protests misstates the record. UMS Br. 33. In both his deposition and at the hearing, Low conceded that he did not in fact believe the appeals qualified as award protests. App.585–587. In any event, FHC-WA's *own appeal* expressly stated that the "elements" of its protest included the "[l]ack of defined selection criteria" and "[i]neffective methodology for reviewing offers and selecting a preferred offer." App.103. FHC-WA's improper complaint about "criteria" and "methodology" is a classic specification protest that was too late to raise and too late for the System to consider—another glaring procedural irregularity. CCB Br. 57–60.

4. **The System could have negotiated the location of the network hub rather than arbitrarily revoking the Church's winning bid.**

The System repeats the district court's mistaken view that denying the disappointed bidders' bigoted appeals would have "locked" it into a decision causing "substantial net financial loss." UMS Br. 22. That is wrong. "A solicitation that contemplates the submission of proposals and the possibility of discussions is a *negotiated procurement." Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 90 (2020) (emphasis added). The RFP expressly contemplated that the System would "negotiate with the

27

successful Respondent to finalize a contract." App.087. And Rachel Piper, the System's procurement expert, confirmed that "discussion and negotiation" would occur with the awardee, during which "there would have been changes to this lease and additions to this lease to identify any areas of disagreement or misunderstanding." App.712. The notion that the System had no choice but to revoke the Church's award is simply wrong. *Cf. Banknote*, 365 F.3d at 1355 ("[T]he Government's position is merely a legal theory developed during litigation, not a contemporaneous interpretation of the solicitation.").

Backed into a corner, the System argues that negotiating the hub's location would have violated the RFP's prohibition against post-award negotiations that "significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." UMS Br. 37–38. That clause is inapplicable. Post-award variances or modifications are material only when they result in changes *outside the scope* of the original solicitation. *See Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 465 (2001). Keeping the hub in the Hutchinson Center would not have altered the RFP's scope in any meaningful way. The draft lease

28

already carved out that space for up to sixty years. App.127. That means all bidders competed under the same baseline assumption: that the System retained the right to keep the hub in place unless it exercised its "option" to "relocate the hub." App.362.[9]

Clarifying when, or if ever, the System would exercise that option would not have changed the RFP's "content, nature, or requirements"; it would have simply effectuated a term *already* in the lease. *Cf.* 64 Am. Jur. 2d Public Works and Contracts § 49 ("A slight or immaterial variance from the specifications and advertisements for bids for a public contract does not destroy the competitive character of the bid so as to require its rejection.").[10]

Undaunted, the System insists that even if the lease provided that the hub could remain inside the building, "no one … understood that to be the case." UMS Br. 38. That is untrue. FHC-WA's proposed redline edits to the draft lease agreement are telling. App.361. For example, by

---

[9] Prior to the Church's award, both FHC-WA and WCAP believed that the hub's location was negotiable. App.337 (FHC-WA); App.395 (WCAP).

[10] Moreover, "even substantial increases in cost do not inexorably compel a conclusion that a contract has been modified outside its original scope." *DOR Biodefense, Inc.*, 2006 WL 279311, at *7 (Comp. Gen. Jan. 31, 2006).

changing the draft lease from "currently proposed to continue" to "Lessee *will continue* the operation of the hub within the Hutchinson Center," FHC-WA confirmed that everyone knew System's intent was to keep the hub in place indefinitely until it exercised its Phase 2 relocation "option." App.361 (emphasis added).

In any event, "[t]he parties' intentions are, first and foremost, determined by the language used in their agreement." 11 Williston on Contracts § 32:2 (4th ed. 2025 update).[11] A court interprets and construes a written contract by ascertaining "the meaning and intent of the parties … by the words they used, irrespective of their supposed actual, subjective intent." *Id.* § 31:4. The initial draft lease speaks with crystalline clarity: the System reserved a carve-out "option" in Room 100Y for the hub for up to sixty years. App.127. That language means

---

[11] Further, courts hold that "the principles governing the interpretation of government contracts apply with equal force to the interpretations of RFPs." *CRAssociates*, 102 Fed. Cl. at 713. "That means that the court's analysis of the RFP begins with the plain meaning of the document." *Id.* (citation modified). "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." *Safeguard Base Operations, LLC v. United States*, 144 Fed. Cl. 304, 334 (2019) (citation modified).

what it says. Speculation about what the parties "understood" cannot overcome the unambiguous text in the lease.

Ultimately, the relevant question is whether the final contract between the parties would have still called for "essentially the same performance." *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 106 (2004) (citation modified). The Church's proposal—and the System's acceptance of it—always contemplated a sale of the building with the hub in place. Whether the hub remained inside for the full lease term or was relocated later, the essential performance was the same: transfer of ownership under the agreed terms. By treating relocation as "non-negotiable" and canceling the award rather than negotiating, the System jettisoned the competitive-procurement process and imposed a *post hoc* penalty on the Church that cannot withstand strict scrutiny.[12]

---

[12] The System's contention (at 43, n.10) that strict scrutiny is inapplicable is meritless. Strict scrutiny review is not limited to where government expressly relies on a protected trait: "plaintiffs may also invoke strict scrutiny review by showing that the facially neutral policy is applied in a discriminatory manner." *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 82 (1st Cir. 2004).

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Church's opening brief, the Court should reverse and remand for the district court to issue a preliminary injunction.

Dated: September 9, 2025

/s/ Daniel J. Schmid

Stephen C. Whiting
WHITING LAW FIRM
75 Pearl St., Ste. 207
Portland, ME 04101
207-780-0681
steve@whitinglawfirm.com

Mathew D. Staver,
  *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,494 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

 Dated: September 9, 2025

/s/ Daniel J. Schmid

Daniel J. Schmid

*Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 Dated: September 9, 2025

/s/ Daniel J. Schmid

Daniel J. Schmid

*Attorney for Appellant*